In connection with the MNAT retention application, partner Robert Dehney ("Dehney") submitted an affidavit listing parties in interest in the case that the firm had represented within the previous three years or was representing at the time. (None of the other representations were on matters related to the Debtors.) The Dehney Affidavit failed to disclose that, at that time, MNAT was representing General Electric Capital Corporation ("GECC") and two affiliates of Goldman ("the Goldman Affiliates") in the bankruptcy case filed by Finova Capital Corporation ("Finova") on the same day that the Debtors filed their case. No objections were filed to the MNAT application and, as a result, the Court approved MNAT's retention on April 25, 2001.

On March 16, 2001, the UST appointed the Official Committee of Unsecured Creditors ("the Committee"). The Committee retained TBF as its counsel, which was approved by the Court on April 25, 2001. On May 21, 2001, the Debtors hired Gold to coordinate their liquidation. On July 23, 2001, after the Debtors had obtained D&O insurance, Gold was named President and CEO. At no time did Gold or TBF disclose that Gold and TBF's senior partner, Paul Traub, were partners in an entity known as Asset Disposition Advisors, LLC ("ADA") or that, TBF paid Gold $30,000 a month from February to May 2001 for his services to ADA.

3

On November 1, 2002, the Court confirmed the Debtors' First
Amended Consolidated Liquidating Plan of Reorganization ("the
Plan"), which went effective on November 5, 2002.  Pursuant to
the Plan, the Debtors' remaining assets were vested in EBCI, Inc.
(the "Reorganized Debtor"), which was to be managed by a Plan
Administrator.  Gold was appointed as the Plan Administrator and
retained MNAT as counsel for the Reorganized Debtor.  The
Committee was dissolved and succeeded by the Post Effective Date
Committee (the "PEDC").  The liquidation of the Reorganized
Debtors' assets is close to conclusion.  The secured and priority
creditors have largely been paid in full and unsecured creditors
are expected to receive a distribution of approximately 16%.
Shareholders will receive no distribution.

On November 24, 2004, the PEDC filed a Motion for approval
of a settlement it had reached with Goldman for the return of
$200,000 of a success fee which had been paid pre-petition by the
Debtors.  Alber and CLI filed objections to that Motion asserting
that the attorneys and members of the PEDC had conflicts of
interest.

On December 20, 2004, Alber filed an emergency Motion for
sanctions and related relief against Gold, TBF and certain of its
partners.  On December 22, 2004, CLI filed a similar Motion.  On
January 25, 2005, Alber filed a Motion against MNAT purportedly

4

on behalf of himself and other shareholders which also seeks disqualification and disgorgement of fees.  Objections were filed by the Respondents.

On February 15, 2005, the UST filed its own Motion which sought disgorgement of fees from TBF (the "Disgorgement Motion"). The Disgorgement Motion was subsequently settled and a Motion to approve the settlement was filed on February 24, 2005 (the "Settlement Motion").  Alber and CLI filed pleadings in support of the Disgorgement Motion and in opposition to the Settlement Motion.

A hearing on all the Motions was held on March 1, 2005, at which evidence and testimony were presented in support of the parties' positions.  At the conclusion, the Court permitted additional briefing by the parties to explain their positions based on the facts that had been presented.[2]  That briefing is complete and the issues are now ripe for decision.

## II.  JURISDICTION

This Court has jurisdiction pursuant to 28 U.S.C. §§ 1334 &

---

[2]  The Court directed the parties to complete briefing by March 15, 2005.  Despite that direction, Alber and Mr. Haas, purportedly on behalf of CLI, have continued to file pleadings related to the issues at bar.  The Court has stricken those pleadings.  Further, the pleadings filed by Mr. Haas on behalf of CLI have been stricken because a corporation must have counsel represent it in federal court.  See Discussion infra at Part A1.

157(b)(2)(A), (B) & (O).


III. DISCUSSION

Alber alleges that the Respondents violated Bankruptcy Rule 2014 and section 327(a) of the Bankruptcy Code by not disclosing connections to other parties in the case, some of which he asserts are actual conflicts of interest. Alber contends that the delayed disclosure was intentional and that even the subsequent disclosure of the relationships failed to comply with the requirements of the Rule. Finally, Alber suggests that the Respondents violated Bankruptcy Rule 2016, Rule 11 and various provisions of title 18. Alber asks the Court to: (1) compel the Respondents to disgorge all payments that they have received to date in the case; (2) dismiss MNAT and TBF as counsel to the Reorganized Debtor and the PEDC, respectively; (3) permit Alber to conduct far-ranging discovery of the Reorganized Debtor and counsels' records; (4) appoint a trustee; and (5) refer the entire matter for additional criminal and disciplinary investigations into the conduct of the case.

A.    Preliminary Arguments

The Respondents raise preliminary arguments that the Court is precluded from even addressing the merits of the Motions.

1.    CLI Motion

6

At the hearing it was asserted that the Motion filed by CLI was procedurally improper because it was filed by a corporation without benefit of an attorney. The Court agreed and ruled that CLI, as a corporation, may not file pleadings or appear except through counsel. Rowland v. California Men's Colony, 506 U.S. 194, 202 (1993) ("It has been the law for the better part of two centuries . . . that a corporation may appear in the federal courts only through licensed counsel."). Therefore, the pleadings filed by CLI have not been considered.[3]

          2.   Jurisdiction over the PEDC and Reorganized Debtors

The Respondents also assert that the Court lacks jurisdiction over the PEDC, the Reorganized Debtor, and the Plan Administrator. Section 5.3(c)(v) of the Plan empowers the Plan Administrator to select, retain and compensate professionals without approval of the Court. Therefore, the Respondents assert that the Court does not have the power to remove TBF and MNAT from their post-confirmation employment as requested by Alber.

The Plan does, however, expressly provide that the Court retains jurisdiction to remove the Plan Administrator for cause. (See Plan at § 5.2.) See also Griffin Resorts, Inc. v. Price Waterhouse & Co. (In re Resorts Int'l, Inc.), 372 F.3d 154, 161

---

[3] This has not, however, diminished the issues addressed by the Court because Alber's pleadings are substantially identical to CLI's pleadings.

(3d Cir. 2004) (holding that "Retention of jurisdiction provisions will be given effect, assuming there is bankruptcy court jurisdiction.")

Notwithstanding that retention language, however, the post-confirmation jurisdiction of the Bankruptcy Court is extremely limited. See, e.g., Resorts Int'l, 372 F.3d at 161 (concluding that, notwithstanding retention of jurisdiction provisions in a plan, "neither the bankruptcy court nor the parties can write their own jurisdictional ticket. Subject matter jurisdiction 'cannot be conferred by consent' of the parties. . . . Where a court lacks subject matter jurisdiction over a dispute, the parties cannot create it by agreement even in a plan of reorganization.") (citations omitted); Walnut Assocs. v. Saidel, 164 B.R. 487, 491-92 (E.D. Pa. 1994) ("Although the jurisdiction of the bankruptcy court continues until the Chapter 11 case is closed, once a plan has been confirmed, the court's jurisdiction begins to weaken.") (citations omitted).

The Bankruptcy Court, however, does retain jurisdiction post-confirmation to enforce the Plan. 11 U.S.C. § 1142(b) ("[t]he court may direct the debtor and any other necessary party . . . to perform any . . . act . . . that is necessary for the consummation of the plan."). See, e.g., In re Terracor, 86 B.R. 671, 676 (Bankr. D. Utah 1988) ("The clear intent of section

8

1142(b) is for the court to retain its jurisdiction to assure
that the terms and provisions of the confirmed Chapter 11 plan
are carried out until the plan is completed and a final decree is
entered closing the case.").

The Court concludes, nonetheless, that the issue of
replacement of professionals for the PEDC and the Reorganized
Debtors or the Plan Administrator does not fall within that
limited jurisdiction. The identity of the Plan Administrator or
its professionals does not have such a significant impact on the
estate for the Court to conclude that it is related to the
bankruptcy case. This case is factually indistinguishable from
the Resorts Int'l case where the Third Circuit held that the
bankruptcy court did not have jurisdiction over a suit by the
post-confirmation trust against a trust professional for post-
confirmation activities, notwithstanding the retention of
jurisdiction language in the plan and confirmation order. 372
F.3d at 161. Therefore, the Court will deny Alber's request to
replace Gold, MNAT and TBF in their post-confirmation roles. The
Court does, however, have jurisdiction to deal with the issues
raised by the parties' pre-confirmation actions.

### 3.    Appointment of Trustee or Examiner

The Respondents further argue that Alber's request for the
appointment of a trustee or examiner must be denied. Section

9

1104 of the Bankruptcy Code, which provides the authority for
such an appointment, states:

> (a)  At any time after commencement of the case but
> before confirmation of a plan, on request of a party in
> interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of
> a trustee –
>> (1) for cause . . .; or
>> (2) if such appointment is in the interests
>> of creditors, any equity security holders,
>> and other interests of the estate. . . .
>
> (c) If the court does not order the appointment of a
> trustee under this section, then at any time before the
> confirmation of a plan, on request of a party in
> interest or the United States trustee, and after notice
> and a hearing, the court shall order the appointment of
> an examiner. . . if –
>> (1) such appointment is in the interests of
>> creditors, any equity security holders, and
>> other interests of the estate; or
>> (2) the debtor's fixed, liquidated, unsecured
>> debts, other than debts for goods, services,
>> or taxes, or owing to an insider, exceed
>> $5,000,000.

11 U.S.C. § 1104 (emphasis added).  Because the Debtors' Plan has
been confirmed, the Respondents assert that Alber's request for
appointment of a trustee or examiner must be denied.  The Court
agrees that such a remedy is unavailable based on the express
language of the Code.

        4.    Appointment of Equity Committee and Counsel

Alber also seeks the appointment of an equity committee and
counsel to permit him to continue to investigate this case.  The
Court concludes that such a request is not warranted.  Though

section 1102(a)(2) authorizes the Court to order the appointment
of additional committees of creditors or equity security holders,
it may do so only "if necessary to assure adequate
representation" of those parties.  In this case there is no
necessity to appoint a committee for equity security holders
because their interests have been extinguished by the Debtors'
Plan and they will receive nothing from the estate.  (See Plan at
§§ 4.10.2 & 7.1(b).)  See, e.g., In re Kalvar Microfilm, Inc.,
195 B.R. 599, 601 (Bankr. D. Del. 1996) (denying appointment of
equity committee where request was made after plan and disclosure
statement were filed).  Therefore, the Court will deny the
request for appointment of an equity committee and counsel
because it will provide no benefit to the estate and is simply
too late.

     5.   Bad Faith

The Respondents assert that the Motions were filed in bad
faith.  Specifically, Gold asserts that the CLI Motion was filed
in response to the Plan Administrator's objection to CLI's claim.
Gold argues that CLI's Motion was filed to gain leverage in that
contested matter.

MNAT argues that Alber's request for relief is "a strategic
ploy" to improve his position under the established liquidation
scheme.  MNAT states that Alber has made it clear that he would

like the Debtors' shareholders to gain control of the Reorganized Debtor.  MNAT notes further that Alber faxed the Motion to the firm within hours after he was served with the Reorganized Debtor's objection to Alber's Motions to disqualify TBF and Gold.

Even if the Motions were filed in bad faith, however, they raise serious questions about the disclosure of conflicts and connections made by both counsel for the Debtors and for the Committee in this chapter 11 case.  Disclosure "goes to the heart of the integrity of the bankruptcy system."  In re B.E.S. Concrete Prods., Inc., 93 B.R. 228, 236 (Bankr. E.D. Ca. 1988). Therefore, the Court is compelled to address the merits of the Motions.

6.    Exculpations

The Respondents assert that the allegations regarding their activities prior to confirmation of the Debtors' Plan are barred by the exculpations they received under the Plan.  The Plan provided releases to Gold, MNAT and TBF for "any act taken or omission occurring on or after the Petition Date in connection with or related to the Debtors, the Plan Administrator or the Chapter 11 Cases . . . except for acts constituting willful misconduct or gross negligence."  (See Plan at § 7.2(e).)  This provision is consistent with Third Circuit authority.  See, e.g., In re United Artists Theatre Co., 315 F.3d 217, 230 (3d Cir.

2003) (holding that indemnification provision in retention application of professional which excludes gross negligence and willful misconduct is consistent with professional's fiduciary duty to the estate under the Bankruptcy Code and Delaware law); In re PWS Holding Corp., 228 F.3d 224, 246 (3d Cir. 2000) (holding that release in plan of committee's professionals from liability for acts other than gross negligence or willful misconduct is consistent with the Bankruptcy Code).

The allegations in Alber's Motions are, however, that the parties had actual conflicts of interest which they knowingly failed to disclose at the time of their retention and throughout the case. If this is true, the Court concludes that the exculpation clause would not protect the Respondents because it constitutes willful misconduct. Therefore, the Court concludes that the releases do not preclude Alber from pressing his Motions.

### 7.   Timeliness of Motions

MNAT asserts that, even absent a finding that Alber has brought the Motions in bad faith, Alber's right to obtain relief is time-barred under Rule 60(b). Rule 60(b) allows the Court to revoke or modify earlier orders and provides, in relevant part:

> On motion and upon such terms as are just, the court may relieve a party . . . from a final judgement . . . [or] order. . . for the following reasons: (1) mistake,

13

inadvertence, surprise or excusable neglect; (2) newly
discovered evidence which by due diligence could not
have been discovered in time to move for a new trial
under Rule 59(b); (3) fraud . . . misrepresentation, or
other misconduct of an adverse party . . . or (6) any
other reason justifying relief from the operation of
the judgment.  The motion shall be made within a
reasonable time, and for reasons (1), (2), and (3) not
more than one year after the judgment . . . [or] order
. . . was entered or taken.

Fed. R. Civ. P. 60(b).

 MNAT claims that sections (1), (2) or (3) are the only
conceivable bases under which Alber could seek relief, which
limits the time for bringing the motion to one year.  MNAT notes
that the Orders from which the Motions seek relief were all
entered more than one year ago.  Therefore, MNAT asserts that
relief is simply not available to Alber under Rule 60(b).

 While MNAT is correct that Alber could have been entitled to
relief from the Orders under sections (1), (2) and (3) of Rule
60(b), Rule 60(b)(6) allows a court to reconsider an order for
"any other reason justifying relief from the operation of the
[order]."  Fed. R. Civ. P. 60(b)(6).  "To justify relief under
subsection (6), a party must either show some 'other reason'
justifying relief outside of the earlier clauses of the Rule, or,
if the reasons for seeking relief could have been considered in
an earlier motion under another subsection of the rule, [he] must
show 'extraordinary circumstances' suggesting the party is

faultless in the delay." In re Benjamin's-Arnolds, Inc., No. 4-
90-6127, 1997 WL 86463, at *10 (Bankr. D. Minn. Feb 28, 1997).

Such "extraordinary circumstances" are present in this case.
If the professionals did not disclose their conflicts or other
connections with others in the case to the Court, or did so in
ways that clearly contravened the statutory requirements, then
parties did not have sufficient notice to seek relief under Rule
60(b)(1), (2) or (3) within the prescribed one-year time limit.
In fact, many of the relationships were revealed only in response
to Alber's Motion.

Furthermore, the disclosure obligation mandated by the
Bankruptcy Code and Rules "implicates a public policy interest
justifying relief . . . under Rule 60(b)(6)." In re Southmark
Corp., 181 B.R. 291, 295 (Bankr. N.D. Tex. 1995) (granting relief
under Rule 60(b)(6) from final fee order which had been entered
nearly three years earlier). See also Hazel-Atlas Glass Co. v.
Hartford Empire Co., 322 U.S. 238, 244-45 (1944) (holding that
fraud upon the court equitably tolls the time for seeking to set
aside a judgment or order); Pearson v. First NH Mort. Corp., 200
F.3d 30, 35-41 (1st Cir. 1999) (holding that attorney's false
disclosure which denied any connection with creditors could
support a finding that attorney had committed a fraud on the
court); Benjamin's-Arnold, 1997 WL 86463, at *10 (holding that

15

"the failure of an attorney employed by the estate to disclose a
disqualifying conflict of interest, whether intentional or not,
constitutes sufficient 'extraordinary circumstances' to justify
relief under Rule 60(b)(6).  To hold otherwise would only serve
to penalize the [Plaintiff] for delay that was beyond his control
and to reward conflicted attorneys for failing to disclose their
conflicts beyond the one-year period.").

In this case it is alleged that the professionals did not
disclose conflicts of interest that would have barred their
retention.  If this is true, it would constitute a fraud on the
Court warranting relief even though more than a year has passed
since the professionals were retained and their fees approved.
Therefore, the Court concludes that Rule 60(b)(6) allows the
Court to consider Alber's Motions.

B.    MNAT and its Partners

Alber seeks an order disqualifying MNAT from serving as
counsel to the Debtors and disgorgement of all fees earned by
MNAT and its partners who worked on the case.  The basis of his
Motion is that MNAT failed to disclose in its retention
application that it had a conflict of interest because it was
concurrently representing the Goldman Affiliates and GECC in the
Finova case.  GECC was a creditor in this case and the Debtors
had claims against Goldman (including litigation that is

16

currently being prosecuted by the PEDC).

MNAT opposes the Motion arguing that: (1) it made "timely, adequate and candid" disclosures of its connections to the Goldman Affiliates in full compliance with the requirements of Bankruptcy Rule 2014; (2) the late supplemental disclosure of its connection to GECC was the result of "an inadvertent oversight"; and (3) its representation of the Debtors in the case was consistent with section 327(a) of the Code.

### 1.    Disinterestedness and Adverse Interests

Section 327(a) of the Bankruptcy Code governs a debtor's employment of attorneys in a bankruptcy case.  It provides, in relevant part:

> The [debtor], with the court's approval, may employ one
> or more attorneys . . . that do not hold or represent
> an interest adverse to the estate, and that are
> disinterested persons, to represent or assist the
> [debtor] in carrying out [its] duties under this title.

11 U.S.C. § 327(a).

Thus, counsel for a debtor must not hold or represent an interest adverse to the estate.  An adverse interest is generally defined to mean "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which the estate is a rival claimant."  TWI Int'l v. Vanguard Oil Serv. Co., 162 B.R. 672, 675 (S.D.N.Y. 1987).  See also, In re National Liquidators, Inc.,

17

182 B.R. 186, 192 (S.D. Ohio 1995).

Further, under section 327 of the Code, counsel for the debtor must also be "disinterested." Disinterestedness is defined to mean that counsel "does not have an interest materially adverse to the interest of the estate or of any class of creditors or equity security holders, by reason of any direct or indirect relationship to, connection with, or interest in, the debtor . . . or for any other reason." 11 U.S.C. § 101(14)(E). See also, TWI Int'l, 162 B.R. at 675.

### 2.    Disclosure Requirements

Bankruptcy Rule 2014 provides the mechanism for enforcing the provisions of section 327(a) by requiring disclosure of the attorney's relationships with parties in interest in the case. Rule 2014 requires that an application to retain counsel for the debtor:

> be accompanied by a verified statement of the person to
> be employed setting forth the person's connections with
> the debtor, creditors, or any other parties in
> interest, [and] their respective attorneys and
> accountants.

Fed. R. Bankr. P. 2014(a).

Disclosure "goes to the heart of the integrity of the bankruptcy system." B.E.S. Concrete, 93 B.R. at 236. Therefore, the duty to disclose under Bankruptcy Rule 2014 is considered sacrosanct because the complete and candid disclosure by an

18

attorney seeking employment is indispensable to the court's discharge of its duty to assure the attorney's eligibility for employment under section 327(a) and to make an informed decision on whether the engagement is in the best interest of the estate. See, e.g., In re Leslie Fay Cos., 175 B.R. 525, 533 (Bankr. S.D.N.Y. 1994). See generally 9 Collier on Bankruptcy ¶ 2014.03 (15th ed. 2004). The bankruptcy court must be given timely and complete disclosure by the debtor's attorney of all connections with parties in interest in the case to "exercise its own ongoing affirmative responsibility 'to root out impermissible conflicts of interest' under Bankruptcy Code §§ 327(a) and 328(c)." Rome v. Braunstein, 19 F.3d 54, 58 (1st Cir. 1994). See also, In re BH & P, Inc., 949 F.2d 1300, 1315 (3d Cir. 1991).

Consequently, Bankruptcy Rule 2014 requires that the attorney seeking employment disclose to the Court all connections with parties in interest in the case, rather than furnishing only those which appear to implicate "disinterestedness" or "adverse interest" concerns under section 327(a). See, e.g., In re Filene's Basement, Inc., 239 B.R. 850, 856 (Bankr. D. Mass. 1999) (holding that the requirements of Bankruptcy Rule 2014 "transcend those of § 327(a), as they mandate disclosure of all connections with the [applicant] rather than being limited to those which deal with disinterestedness.").

Furthermore, the duty to disclose is ongoing.  Local Rule 2014-1 provides: "Promptly after learning any additional material information relating to [its] employment (such as potential or actual conflicts of interest), the professional employed or to be employed shall file and serve a supplemental affidavit setting forth the additional information."  Del. R. Bankr. P. 2014-1. See also, Rome, 19 F.3d at 57-58 ("[A]s the bankruptcy court is invested with ample power to deter inappropriate influences upon the undivided loyalty of court-appointed professionals throughout their tenure, the need for professional self-scrutiny and avoidance of conflicts of interest does not end upon appointment.") (emphasis in original); In re Tinley Plaza Assocs., L.P., 142 B.R. 272, 278 (Bankr. N.D. Ill. 1992) ("[T]he duty to disclose continues beyond the initial stage of application to employ counsel. . . .  If a conflict arises after attorneys are employed by the debtor-in-possession, such conflict must be disclosed to the court and the court must immediately disqualify the attorney.") (citations omitted).

"So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees."  Leslie Fay, 175 B.R. at 533.  See also, Rome, 19 F.3d at 59 ("Absent the spontaneous, timely and complete disclosure required by section 327(a) and Fed. R. Bankr. P.

20

2014(a), court-appointed counsel proceed <u>at</u> <u>their</u> <u>own</u> <u>risk</u>.")
(emphasis in original).

    a.   Goldman and its Affiliates

MNAT argues that it was not aware of Goldman's involvement
in this case at the time it filed its retention application
because Goldman was not a creditor. In addition, because MNAT
had not represented the Debtors before the case was filed (and
was originally only to serve as local counsel), it was not aware
of the Debtors' pre-petition transactions with Goldman which led
to the conflict.

Prior to the bankruptcy filings, the Debtors had engaged
Goldman to obtain a sale, merger or capital infusion for their
ailing businesses. Pursuant to an engagement letter, the Debtors
advanced Goldman $150,000 for out-of-pocket expenses and a $3
million success fee. That letter provided, however, that $2.5
million of the success fee was refundable if Goldman did not
facilitate the sale of the Debtors' assets for at least $20
million or fifty percent of their outstanding stock. As of the
Petition Date, the only transaction which had been consummated
under the Goldman retention letter was the sale of BabyCenter LLC
for approximately $12 million.

After the bankruptcy cases were filed, MNAT became aware of
the dispute between the Debtors and Goldman. On May 25, 2001,

21

MNAT wrote to Goldman on behalf of the Debtors requesting at
least $2.5 million of the success fee be returned.  The matter
was resolved by a Termination Agreement in August, 2001, pursuant
to which Goldman returned approximately $2.55 million to the
Debtors.  MNAT admits, however, that by early June, 2001, it was
aware that the Debtors had substantial other claims against
Goldman.  Rather than file a supplemental disclosure of its
conflict, MNAT states that it "solved" the problem by involving
the Committee in discussions with Goldman and ultimately
arranging for the Committee to take over the representation of
the estate in matters involving Goldman.

On September 26, 2001, the Debtors filed a motion to
authorize the Committee to investigate and prosecute any further
actions the estate may have against Goldman ("the Committee
Authorization Motion").  In that Motion, MNAT disclosed that it
represented Goldman in an unrelated matter.  When no objections
were filed, the Court granted the Committee Authorization Motion
by order dated October 12, 2001.

Thereafter, the Committee asserted preference and fraudulent
conveyance claims against Goldman with respect to the remaining
$500,000 of the success fee.  The parties have reached a
settlement of that motion which would require Goldman to pay an
additional $200,000 to the estate.  Alber objected to that

22

settlement asserting that it is tainted by conflicts of interest.
The Court took the Goldman settlement motion under advisement
with these matters.[4]

Alber argues that MNAT's representation of the Goldman
Affiliates during the pendency of the Debtors' case, while at the
same time it represented Goldman in the Finova case, created a
conflict of interest which is impermissible under section 327(a)
of the Bankruptcy Code.  He argues that MNAT intentionally failed
to disclose its representation of the Goldman Affiliates at the
outset of the case and that the subsequent disclosure was
inadequate.

### i.   Disclosure

MNAT argues that the disclosure requirements do not go so
far as to require the disclosure of all connections it has with
all parties in interest in the case.  Such a rule would be so
onerous as to create an impossible task, particularly in large
corporate cases.  See, e.g., In re Enron Corp., No. 01-16034,
2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), aff'd,
2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument
that counsel should be disqualified for "a failure to disclose -

---

[4]  As noted hereafter, the Committee (and now the PEDC) is also
pursuing a suit in District Court in New York against Goldman
related to the Debtors' initial public offering.  That action is
not affected by the settlement before this Court.

not connections as required under 2014 – but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough.").

While the disclosure requirements "may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict." In re BH & P, Inc., 119 B.R. 35, 44 (D.N.J. 1990), aff'd 949 F.2d 1300 (3d Cir. 1991). In this case, there was an actual conflict beginning in May 2001, when MNAT learned that the Debtors had a claim against Goldman. Disclosure at that time was mandated.

## ii.    Conflict of interest

MNAT argues nonetheless that its representation of the Debtors was at all times consistent with the requirements of section 327(a) of the Bankruptcy Code because it did not hold any "adverse interest" with respect to the Debtors and remained "disinterested" during the engagement. This is incorrect. While MNAT did not hold an interest adverse to the estate, it represented one.

24

MNAT suggests, however, that Goldman did not really have an interest adverse to the Debtors because it was clear that the success fee had to be returned by Goldman. That is belied by the fact that Goldman did not immediately return the funds and it took several months to obtain even the $2.5 million. The final settlement of this dispute was filed in December 2004, more than three years later. The suggestion that there was no real adverse interest between the Debtors and Goldman is quite simply wrong. Therefore, instead of representing the Debtors in any matter involving Goldman, MNAT should have promptly filed a supplemental affidavit with the Court disclosing its connection with Goldman and let another, disinterested professional handle the matter.

MNAT contends that its representation of Goldman in the Finova case was not a conflict because it was unrelated to this case, was limited to acting as Delaware counsel, and only accounted for 0.24% of the firm's total billings from 2000 to 2004. In support of its argument, MNAT cites In re Muma Servs., Inc., 286 B.R. 583, 591 (Bankr. D. Del. 2002). In the Muma case, the Court held that the limited representation of a client in another bankruptcy case did not disqualify the firm from representing the committee in a suit against the former client.

The Muma case is distinguishable from the instant case. First, the Muma case dealt with committee counsel, not debtor's

counsel.[5]  Second, in Muma, committee counsel did not continue to
represent the other client (in fact the responsible attorney left
the firm saying he was taking the client).  Third, the Court
found that the client had waived any conflict by not objecting to
the firm's retention by the committee for more than a year.

In this case, MNAT continued to represent Goldman in the
Finova case.  Further, Goldman did not waive any conflict as is
evidenced by the fact that MNAT admitted in the Committee
Authorization Motion that there was a conflict and that it was
not able to represent the Debtors in any action against Goldman.

Because MNAT had an actual conflict of interest it was not
qualified to represent the Debtors in asserting their claims
against Goldman.  See, e.g., In re Fleming Cos., 305 B.R. 389,
393 (Bankr. D. Del. 2004) ("[S]ection 327(a) imposes a per se
disqualification on any professional who has an actual conflict
of interest.") citing In re Pillowtex, Inc., 304 F.3d 246, 251
(3d Cir. 2002).

---

[5]  Committee counsel, retained under section 1103, need only show
it does not represent an interest adverse to the estate; in fact,
committee counsel is specifically authorized to represent a
creditor in the case so long as its interests are not adverse to
the committee's.  11 U.S.C. § 1103(b).  In contrast, debtor's
counsel, retained under section 327, must establish that it is
disinterested, which is a higher standard.  11 U.S.C. §
101(14)(E).

### iii. Timing of Disclosure

MNAT asserts that it could not have disclosed its representation of the Goldman affiliates in the Finova case when the retention application was filed because it did not know at that time of Goldman's involvement in this case.

Assuming arguendo that MNAT did not know at the outset of this case that Goldman was involved, it nonetheless became aware of Goldman's involvement in May 2001, when MNAT learned that the Debtors had the right to recover the success fee from Goldman. At that time, MNAT was obligated to file a supplemental affidavit of disinterestedness, disclosing its connection with Goldman. See, e.g., Rome, 19 F.3d at 59 ("as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict . . . a bankruptcy court ruling should be obtained."). It failed to do so.

MNAT asserts, however, that it did disclose the connection with Goldman by filing the Committee Authorization Motion when the firm learned of circumstances that necessitated the additional disclosure. The Court finds that is not sufficient. The Committee Authorization Motion was filed four months after MNAT knew there was a conflict, during which time MNAT continued to represent the Debtors on the matter. Further, the disclosures should have been made in a supplemental declaration filed under

27

Bankruptcy Rule 2014(a). "It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources." B.E.S. Concrete, 93 B.R. at 236.

### iv. Harm to the estate

MNAT contends nonetheless that no sanctions are warranted because there was no harm to the estate. MNAT was successful in collecting part of the success fee from Goldman and no release of any other claims was given to Goldman. MNAT also asserts that the Committee was kept informed of the issue and that, therefore, when the Committee had to take over the representation, there was no delay.

The Court rejects MNAT's arguments. Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest. See, e.g., Leslie Fay, 175 B.R. at 531 (holding that failure to disclose representation of parties who were materially adverse to the debtors mandated disallowance of fees awarded to counsel for debtors even though counsel "caused the debtors no actual injury, and represented them in an exemplary fashion.").

The Court notes, further, that MNAT's actions did result in harm to the estate because of the duplication of effort during the summer of 2001 caused by MNAT's continued work on the Goldman

matter while keeping the Committee advised at every turn.  If
MNAT had simply withdrawn, the Committee counsel alone would have
been billing the estate for this work.

v.    <u>Remedy</u>

Because the case is now over, disqualification of MNAT as
counsel to the Debtors is not practical.  Although the Court
could order disgorgement of all fees earned by MNAT after it
ceased being disinterested, the Court finds that is unwarranted
because MNAT did ultimately recuse itself from Goldman matters in
September, 2001.  Therefore, after that time it was not laboring
under a conflict of interest.  Because it had an actual conflict
for several months (which it failed to timely disclose), the
Court concludes that MNAT should disgorge all fees received in
this case for work done by it on matters involving Goldman.  11
U.S.C. §328(c) ("the court may deny allowance of compensation . .
. if, at any time during such professional person's employment
under section 327 . . . such professional person is not a
disinterested person, or represents or holds an interest adverse
to the interest of the estate with respect to the matter on which
such professional person is employed.").  <u>See also</u>, <u>In re Granite
Partners, L.P.</u>, 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998)
(holding that court has discretion under section 328(c) to deny
fees to counsel where a conflict of interest is found); <u>B.E.S.</u>

29

Concrete, 93 B.R. at 237 (holding that court has discretion to
deny fees for failure to disclose).

    b. GECC

 With respect to GECC, MNAT admits that it did not disclose
the connection.  It asserts, however, that it failed to disclose
the relationship because it was not aware that GECC was a
creditor.  GECC was not listed as a creditor on the Debtors'
schedules or matrix because it apparently had received an
assignment of another creditor's position.  Therefore, MNAT
asserts that it had no reason to disclose any connection at the
time it filed its retention application.

 MNAT did, however, become aware of GECC's involvement when
GECC filed a notice of appearance in the case on June 4, 2001,
and a motion to compel the assumption or rejection of its lease
with the Debtors on June 20, 2001.  Notwithstanding that notice,
MNAT admits that it did not file any additional disclosure.

 Instead, MNAT continued to represent the Debtors in
connection with matters involving GECC.  Those matters apparently
included discussions with GECC which resulted in its withdrawal
of the motion to compel and the Debtors' agreement to surrender
the equipment to GECC.  MNAT also represented the Debtors in
connection with GECC's administrative claim of $72,909.87.  The
Debtors, represented by MNAT, objected to that claim, which was

30

ultimately settled for $57,767.89.  At no time did MNAT disclose (to the Court, creditors and perhaps even the Debtors) its concurrent representation of GECC in the Finova case.

Because MNAT was representing GECC in another case at the same time, its representation of the Debtors against GECC in this case constituted an actual conflict of interest, in the absence of a conflict waiver executed by the parties after full disclosure.  See, e.g., B.E.S. Concrete, 93 B.R. at 235 ("Although the parties can waive the conflict upon appropriate disclosures, the waiver is more difficult to obtain in a chapter 11 case because the debtor in possession stands in a fiduciary capacity that constrains its ability to make such a waiver.")

MNAT asserts that its failure to conduct an additional conflicts search and to make a supplemental disclosure of the GECC relationship was "an inadvertent oversight."  That does not excuse the failure.  See, e.g., BH & P, 949 F.2d at 1318 (finding that failure to disclose may result in disallowance of fees or disqualification, even if the failure was negligent and not willful); In re Jore Corp., 298 B.R. 703, 729 (Bankr. D. Mont. 2003) (same).

Because there was an actual conflict and no disclosure was made, the Court will require MNAT to disgorge the fees the firm has received for work done on behalf of the Debtors in the

31

matters involving GECC.   See, e.g., In re Kaiser Group Int'l,
Inc., 272 B.R. 846, 850 (Bankr. D. Del. 2002) (concluding that
court has inherent power to supervise attorneys who appear before
it).

    C.   Traub, Bonaquist, Fox LLP

        1.   Alber Motion

Although his pleadings are replete with hyperbole[6] and
assertions that were revealed to be false when tested at trial,[7]
the crux of Alber's Motion against TBF has some merit: it asserts

------

[6]  An example is Alber's joinder to the UST Motion for
disgorgement of fees by TBF:

    44.   While I, ALBER, sympathize with the far reaching
        implications to the system (and cases as a whole
        throughout) of the blatant scheming that I, ALBER, feel
        is overwhelming proved positive by the blatant
        audacious disregard for the system as a whole such as
        the language of the hiring letter, by the vastly
        experienced attorney professionals of the TB&F, MNAT
        members in bankruptcy as legal extensive experienced
        professionals having filed many disclosure, fee
        applications, oaths etc. where even TB&F, ADA disclosed
        their relationship by the ADA letter in the Homelife
        case which ran basically almost concurrent with the
        eToys ESTATE and TB&F complied in part with 11 U.S.C. §
        327 and Rule 2014 in Homelife and certainly was
        preconfirmation to the eToys PLAN of 2002, along with
        the admittance on March 1, 2005 of the payments by TB&F
        to GOLD in 2001, along with the subsequent admittance
        that reimbursement of the $120,000 was paid by ADA back
        to TB&F, creating a triangle of affiliations, along
        with TB&F admittance that it made a conscious decision
        not to disclose even after the issue came to public
        light in the Bonus Sales [sic] case. . . .

[7]  See Discussion at Part E, infra.

that there is reason to disqualify TBF as counsel to the PEDC and
to require disgorgement of all fees earned while TBF was counsel
to the Committee because of TBF's failure at any time to disclose
its relationship with Gold.

The relationship between Gold and TBF extends over many
years and involves several bankruptcy cases where they were
retained by the same or adverse parties. Alber refers to that
relationship as "incestuous." The Court, however, differs. It
is not unusual for professionals and turnaround specialists to
work on the same cases. In fact, given the specialized nature of
the bankruptcy practice, it is inevitable.

There is, however, one aspect of the parties' relationship
that is unusual. In late 2000 or early 2001, Paul Traub, a
partner in TBF, discussed with Gold the possibility of a joint
venture for marketing inventory control and asset disposition
services to distressed companies. Traub and Gold formed a
limited liability corporation called ADA; Gold and Traub are the
sole, and equal, members in ADA. Although ADA was not
incorporated until April 26, 2001, Gold was compensated by ADA at
the rate of $30,000 per month beginning in February 2001.
Because ADA had not been formed and had no assets at that time,
the compensation was actually paid by TBF. Gold and Traub
testified that the funds were lent by TBF to ADA and were

33

ultimately repaid by ADA from revenues ADA earned.

Despite being members of ADA, Gold and Traub are not required to work full time for ADA and may (and do) obtain work individually. Any work done by Gold and Traub individually is not required to be shared with the other or with ADA. ADA has no offices of its own, but conducts its business from the offices of TBF. Traub testified that ADA maintains its own books and records, separate from TBF. TBF does provide administrative services for ADA which ADA reimburses, from time to time. ADA has also used TBF personnel as non-legal consultants on its cases and has paid TBF, from time to time, for those services.

In addition to the ADA relationship, in early 2001 TBF retained Gold as a consultant in connection with the OfficeMax, Inc., and Drug Emporium, Inc., cases. It is unclear when that relationship ended.

At the same time that ADA was being formed, TBF was retained (in January, 2001) by an informal committee of creditors of the Debtors. When the Debtors ultimately filed their chapter 11 petitions, TBF was retained by the Committee. Shortly thereafter, it became clear that the Debtors' senior management would not remain with the companies beyond May, 2001. The Debtors considered candidates for a restructuring executive from the Committee's and the Debtors' financial advisors. TBF, at the

34

suggestion of Traub, recommended Gold for the position.  After

conducting interviews, the Debtors hired Gold on June 11, 2001,

as wind-down coordinator and, after obtaining insurance, as their

president and chief executive officer.

In addition, Alber asserts that TBF has failed to disclose

its relationship with Fleet Retail Finance, an affiliate of

FleetBoston.  That failure to disclose is significant, Alber

asserts, because the PEDC is pursuing litigation against Goldman

and FleetBoston Financial arising from the Debtors' initial

public offering.  TBF was one of the firms representing the PEDC

in that case.[6]

At no time did Gold or TBF reveal any of these

relationships.  Alber asserts that TBF's failure to disclose

these relationships violates the disclosure requirements of Rule

2014 and constitutes a conflict of interest warranting

disgorgement of all fees earned in the case.  He also asserts

that the failure to disclose constitutes perjury and obstruction

of justice mandating a referral of this case to the U.S.

Attorney.

a.    Failure to Disclose

TBF admits that it did not disclose the relationship with

---

[6]  As a result of the Alber Motion, TBF has withdrawn as counsel
in the IPO litigation and the PEDC is represented by others in
that suit.

ADA. At the time of their retention, TBF notes that there was no connection with ADA to be disclosed. Further, even after the Debtor hired Gold, TBF asserts that no disclosure was mandated, because TBF has no relationship with ADA and ADA is not involved in this case. ADA is an entity in which Traub, not TBF, has an interest. TBF asserts it is not a member of and never obtained any income from ADA. Further, the Debtors retained Gold, not ADA. Therefore, TBF asserts the "connection" between this case and ADA is remote.

TBF did have a direct relationship with Gold, however, having hired him as a consultant on several of its cases. TBF does admit, in hindsight, that it should have disclosed its relationship with Gold when the potential employment of Gold by the Debtors arose. It contends that its failure to do so was a mistake and not intentional wrongdoing. It argues that if it had intended to keep its relationship secret, it would not have disclosed it in the many cases in which ADA and TBF were involved. See, e.g., Bonus Stores, No. 03-12284; In re Homelife Corp., No. 01-2412.

The duty of professionals to disclose is an ongoing one. Fed. R. Bankr. P. 2014(a); L. R. 2014-1(a). The Court and parties in interest rely on the duty to disclose to help them monitor potential and actual conflicts. Thus, the duty to

disclose is broader than the disclosure of actual conflicts, it
mandates the disclosure of all connections a professional may
have with the other parties in the case.

> All facts that may have any bearing on the
> disinterestedness of a professional must be disclosed.
> Consistent with the duty placed on the professional, it
> is the responsibility of the professional, not of the
> court, to make sure that all relevant connections have
> been brought to light. . . . So important is the duty
> of disclosure that the failure to disclose relevant
> connections is an independent basis for the
> disallowance of fees or even disqualification.

Leslie Fay, 175 B.R. at 533. See also, BH & P, 949 F.2d at 1317-
18 (noting that professional may not leave court to search the
record for undisclosed relationships); Jore, 298 B.R. at 725-26
(holding that professional must disclose all connections; he may
not pick and choose which to disclose and which to ignore as
unimportant).

Failure to disclose may result in disallowance of fees or
disqualification, even if the failure was negligent and not
willful. See, e.g., BH & P, 949 F.2d at 1318; Jore, 298 B.R. at
729. Where the failure to disclose is willful, disallowance of
fees is almost assured. In re Crivello, 134 F.3d 831, 836-37
(7th Cir. 1998) (stating that "a bankruptcy court should punish a
willful failure to disclose the connections required by Fed. R.
Bankr. P. 2014 as severely as an attempt to put forth a fraud on
the court."). Accord In re ACandS, Inc., 297 B.R. 395, 405

(Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and
ordering disgorgement of all fees of professional which willfully
concealed relationships and potential and actual conflicts).

### b.   Disqualification

TBF asserts that there is no basis under the Code for its
disqualification as counsel to the Committee on the facts of this
case.  It notes preliminarily that section 327(a) is not
applicable because it was counsel to the Committee not counsel to
the Debtors.  11 U.S.C. § 327(a).  Instead, it asserts that the
proper standard for retention of counsel for a committee is
section 1103 which provides:

> An attorney . . . employed to represent a committee
> under section 1102 of this title may not, while
> employed by such committee, represent any other entity
> having an adverse interest in connection with the case.
> Representation of one or more creditors of the same
> class as represented by the committee shall not per se
> constitute the representation of an adverse interest.

11 U.S.C. § 1103(b).  This provision is different from section
327(a) because (unlike counsel for the debtor) it does not
require that counsel to a committee be disinterested.

Section 1103(b) does, however, require that counsel for the
committee not hold or represent an adverse interest in connection
with the case. An adverse interest is "any economic interest
that would tend to lessen the value of the bankruptcy estate or
that would create either an actual or potential dispute in which

the estate is a rival claimant." TWI Int'l, 162 B.R. at 675;

National Liquidators, 182 B.R. at 192.

TBF asserts that there is no evidence of any actual or
potential conflict between its representation of the Committee
and the Debtors' hiring of Gold.  It argues that Gold's
employment by the Debtors was completely unrelated to his work
for ADA (or TBF).  ADA had no involvement with this case, and,
even if it did, TBF had no interest in ADA.  No one at TBF, other
than Traub, had an interest in ADA.  While the relationships may
raise an appearance of a conflict, they are not actual conflicts
and disqualification is not warranted.  See, e.g., In re Marvel
Entm't Group Inc., 140 F.3d 463, 476 (3d Cir. 1998) (holding that
disqualification cannot be premised on the mere appearance of
conflict alone though court has discretion to disqualify counsel
with a potential conflict and must disqualify counsel with an
actual conflict).

2.    UST Motion and Settlement

The UST Disgorgement Motion was based, like Alber's, on
TBF's failure to disclose the relationship TBF and Traub had with
Gold.  Even if, as TBF asserts, the relationship did not
constitute a conflict or adverse interest, the UST asserted that
it had to be disclosed.  Cf., In re CF Holding Corp., 164 B.R.
799, 806-07 (Bankr. D. Conn. 1994) (holding that debtor's counsel

39

should be sanctioned, by a reduction in fees awarded, for failure
to disclose another professional's conflict of interest).

Shortly after filing the Disgorgement Motion, the UST
settled that dispute. Under the settlement, TBF agreed to
disgorge $750,000 of the fees received by it in this case. That
amount represents approximately 50% of the total post-petition,
pre-confirmation fees earned by TBF.

Settlements are favored as a means of minimizing litigation,
expediting administration of estates, and providing for the
efficient resolution of bankruptcy cases. In re Martin, 91 F.3d
389, 393 (3d Cir. 1996). To approve a settlement, the Court must
consider four criteria: "(1) the probability of success in
litigation; (2) the likely difficulties in collection; (3) the
complexity of the litigation involved, and the expense,
inconvenience and delay necessarily attending it; and (4) the
paramount interest of the creditors." Id. Because the
Disgorgement Motion is a sanctions motion, the Court should also
consider the deterrent value that approval of the Settlement
would have. Pearson, 200 F.3d at 42 & n.7, quoting John's
Insulation, Inc. v. L. Addison & Assoc., Inc., 156 F.3d 101, 110
(1st Cir. 1998) ("The purpose of sanctions, moreover, is not
merely to penalize violations of court procedures, but also to
deter future violations by other parties, and thus sanctions do

not have to be strictly proportional to the severity of a given party's violations.").

Consideration of all these factors convinces the Court that approval of the Settlement is appropriate in this case. There is a strong probability that the UST will succeed in part on its Disgorgement Motion. TBF has admitted its failure to disclose its relationship with Gold. As discussed above, TBF vehemently disputes that the relationship with Gold ever constituted an actual conflict. Therefore, the Court concludes that there is a risk to both sides if this issue is litigated.

There is no suggestion that there will be any difficulty in collecting any judgment which the UST may obtain on its Disgorgement Motion. TBF is an established bankruptcy firm. It is aware that its failure to obey a court order of disgorgement in a bankruptcy case would have serious effects on its ability to practice in this Court or any other Bankruptcy Court in the future.

While the litigation is complex, the settlement will not save any expenses because Alber's Motion is virtually identical to the Disgorgement Motion. Discovery has been conducted and a full hearing has been held on Alber's Motion. Therefore, no savings are attendant to approval of the Settlement.

41

The paramount interests of creditors are served by approval of the Settlement, because the Court finds that it is a reasonable penalty for the transgression committed by TBF.

The Settlement also furthers the deterrent goal of a sanctions motion. The Court is convinced that the ordeal of defending the Alber Motion, coupled with the significant repayment of fees earned, will cause TBF to assiduously follow the disclosure requirements of the Code and Rules in the future. The settlement also serves as a "lighthouse" to others warning them to avoid the "rocks" of non-disclosure.

Consequently, the Court will grant the UST Motion for approval of the Settlement with TBF and will deny the Alber Motion to the extent it seeks to impose any additional penalty on TBF.

D.    Barry Gold

Alber also alleges that Gold should be disqualified and ordered to disgorge all fees received in this case because of his undisclosed relationship with TBF, ADA and Traub. Alber asserts that Gold: (1) had numerous conflicts of interest; (2) breached his duty of loyalty to the Debtors; (3) violated section 327(a) and Bankruptcy Rule 2014; (4) committed perjury and other bankruptcy crimes; and (5) wasted estate assets. Gold denies all of the allegations.

42

### 1.    Conflicts of Interest

Alber alleges that Gold had numerous conflicts of interest
which should have prevented him from serving as the Debtors' CEO
and president.    Alber asserts that the relationships among TBF,
Traub, Gold and ADA constituted an actual conflict of interest
that had to be disclosed and would have disqualified Gold from
being retained by the Debtors.

Gold acknowledged that he has a relationship with counsel
for the Committee but denies that it was a disabling conflict of
interest.    Gold argues specifically that his relationships with
ADA, TBF and Traub did not create a conflict of interest.    He was
hired by the Debtors in this case, ADA was not.    Therefore, Gold
asserts that there was no conflict to be disclosed.

Gold seeks to distinguish this case from the Coram case.    In
re Coram Healthcare Corp., 271 B.R. 228, 236 (Bankr. D. Del.
2001).    In Coram, the debtor's CEO had a written consulting
agreement with one of the largest creditors by which he was paid
$1 million in consulting fees.    Though the CEO insisted that the
relationship was unrelated to the bankruptcy case, there was
little evidence of what the CEO did to earn the fee, other than
his work for the debtor.    Further, there was significant evidence
that the CEO caused the debtor to take actions favorable to the

43

creditor that were not in the best interest of the debtor.[9]

The Court agrees that this case is distinguishable from the Coram case. The business relationship between Gold and Traub involved the split of profits from ADA. ADA earned its fees from work performed by Gold and/or Traub when it was retained in bankruptcy cases. Therefore, unlike the contract in Coram, Gold was not receiving compensation from Traub simply for "consulting" with him or otherwise doing his bidding. Gold earned compensation from ADA for work performed by ADA.

Further, Gold's business relationship is with a professional in the case, not with a creditor. ADA and Traub have no direct claim against the Debtors in this case and, therefore, there is less possibility that they will pressure Gold to promote their personal interests over the interests of other creditors in the case. In addition, TBF is acting as counsel for the Committee and has a fiduciary duty to all creditors. This is significantly different from acting as counsel for one individual creditor or group of creditors.

Furthermore, the instant case is a liquidation case where the interest of the Debtors and the creditors is the same: to

---

[9] An example is the payment of interest in cash to the noteholders immediately before the bankruptcy filing when the debtor was contractually required only to pay in kind by the issuance of new notes.

44

realize the maximum recovery from the Debtors' assets.   In
contrast, Coram was a reorganization case where the creditors and
shareholders disagreed over the enterprise value and, therefore,
what recovery shareholders should receive.

The parties did, however, acknowledge that Gold was working
as a consultant to TBF on two cases at the time he was hired by
the Debtors.   That relationship, together with the fact that Gold
was being paid $30,000 per month by TBF (albeit on behalf of
ADA), does create at a minimum a potential conflict of interest.
Given Gold's extensive business relationship with TBF, his
loyalty to the Debtors could be questioned.

### 2.   Breach of Loyalty

Alber asserts that Gold's relationship with Traub (and
failure to disclose that relationship) constituted a breach of
Gold's duty of loyalty to the Debtors.   Gold denies that he had
any disqualifying conflict of interest which he was required to
disclose.

Under Delaware law "[c]orporate officers and directors are
not permitted to use their position of trust and confidence to
further their private interests. . . . and stand in a fiduciary
relation to the corporation and its stockholders."   Guth v. Loft,
Inc., 5 A.2d 503, 510 (Del. 1939).   The duty of loyalty "requires
an undivided and unselfish loyalty to the corporation [and]

45

demands that there shall be no conflict between duty and self-interest."  Id.

In the instant case, there was a potential conflict between Gold's position as president and CEO of the Debtors and his business relationships with counsel for the Committee.  "When faced with such divided loyalties, directors [and officers] have the burden of establishing the entire fairness of the transaction to survive careful scrutiny by the courts."  Mills Acquisition Co. v. Macmillan, Inc., 559 A.2d 1261, 1280 (Del. 1989).  The duty of loyalty is usually tested in cases where an officer or director has an interest in a party involved in a sale transaction with his company.  In that context, courts focus on "fair dealing and fair price" in determining the entire fairness of the transaction.  Id.

In this case, there was no transaction between the Debtors and ADA.  Therefore, the Court need not determine if the dealings between the two were fair and for a fair price.  Gold's position as a partner at ADA did not constitute a breach of his duty of loyalty to the Debtors under Delaware law.  Nor is there any other evidence that Gold's other relationships with TBF and Traub caused him to violate his duty of loyalty to the Debtors.  Consequently, the Court concludes that no breach has been established.

3.    Section 327 and Bankruptcy Rule 2014

Alber asserts that, because of his conflict of interest, Gold also violated section 327 and Bankruptcy Rule 2014 by failing to disclose his relationships with TBF, Traub and ADA at the time he was hired by the Debtors.

Gold argues that he is not required to comply with section 327(a) or Bankruptcy Rule 2014 because he was hired as an employee of the Debtor and is not a professional as that term is used in section 327(a). See, e.g., In re All Seasons Indus., Inc., 121 B.R. 822, 825 (Bankr. N.D. Ind. 1990) (concluding that section 327(a) could not apply to officers, because it would result in wholesale removal of all pre-petition officers who are insiders and not disinterested); In re Phoenix Steel Corp., 110 B.R. 141, 142 (Bankr. D. Del. 1989) (holding that officers employed by debtor pre-petition could continue to be employed post-petition under section 327(b) without court approval); In re Midland Capital Corp., 82 B.R. 233, 239 n.10 (Bankr. S.D.N.Y. 1989) ("Executive officers are simply not 'professional persons'."). See generally, Collier on Bankruptcy § 327.02[6][c] (15th ed. rev.) (stating that the correct analysis is that executives of the debtor are not professionals whose employment is subject to approval under section 327(a)).

47

Alber asserts, however, that Gold should have known that his relationship with ADA and Traub was inappropriate and should be disclosed because of his experience in the Bonus Stores case. That case, however, is distinguishable.

In Bonus Stores, the Debtor sought to retain both TBF and ADA (not Gold) as professionals under section 327(a). The Court denied the ADA application and permitted retention of TBF as special counsel only. That denial was not predicated on the relationship among TBF, Traub, Gold and ADA.[10] Instead, it was because ADA and TBF had performed pre-petition services for the debtor's secured creditor in connection with the debtor. The Court found that their representation of a creditor in matters relating to the debtor was a direct conflict of interest precluding their retention by the debtor under section 327(a).

In this case, ADA was not retained by the Debtors; Gold was. In addition, there is no evidence in this case that Gold ever represented any creditor of the Debtors in dealings with the Debtors. Thus, the facts of this case are distinguishable from Bonus Stores.

There are courts, however, which have held that the retention and/or the compensation of the debtor's executives must

---

[10]  There could have been an issue of improper fee-sharing in that case had both ADA and TBF been retained.  See 11 U.S.C. § 504(a). Because ADA was not retained, the issue was moot.

48

be approved by the bankruptcy court.  See, e.g., In re The Crouse Group, Inc., 75 B.R. 553 (Bankr. E.D. Pa. 1987) (holding that, although compensation of debtor's officers is subject to court scrutiny, disqualification under section 327 is not automatic because of lack of disinterestedness); In re Zerodec Mega Corp., 39 B.R. 932, 935 (Bankr. E.D. Pa. 1984) (holding that employment of officers and their compensation are subject to bankruptcy court approval because "the statutory framework established by §§ 327 and 328 provides an express treatment of the subject of employment [of officers] with the requisite safeguards and restrictions.") and cases cited therein.  See generally, 5 Collier on Bankruptcy § 1107.03 (15th ed. 1983) (stating that section 1107 permits employment of officers under section 327(a) even though they had been employed by the debtor pre-petition).

Even the courts which hold that section 327(a) does not apply conclude that they have authority to review the compensation paid to officers for reasonableness.  See, e.g., Phoenix Steel, 110 B.R. at 142-43 (holding that compensation of debtor's officers is subject to section 330 review by court); Midland Capital, 82 B.R. at 238 (concluding that compensation of officers is subject to review for reasonableness under section 503(b)(1)(A)).

The Court agrees with those courts that conclude that an officer is not a professional who needs to be retained by the debtor under section 327(a). Nonetheless, the Court does have the power to supervise and deny compensation to officers of a debtor in appropriate circumstances. The extent of relationships that might affect an officer's loyalty (and the failure to disclose those relationships) are factors that the Court should consider in supervising officers of the debtor. In order to properly exercise such a role, as well as to permit other parties in interest to evaluate the officer, the disclosure of relationships that an officer may have with creditors, professionals, and other parties in interest in the case is necessary. If officers do not have to disclose conflicts of interest, the Court would not be able to evaluate the reasonableness of the compensation being paid to the officer or prevent improper conduct. The facts of this case, as well as others, convince the Court that without a disclosure requirement much mischief can occur. Coram, 271 B.R. at 236.

In this case, Gold acknowledges that he failed to disclose to the Debtors, their counsel or any other party his relationship with TBF, Traub and ADA at the time he was hired by the Debtors. Unlike TBF and MNAT, as an officer of the Debtors Gold was not required at the time to disclose that relationship. In the

50

future, however, the failure of an officer of a debtor to disclose such relationships will subject that officer to review and possible disgorgement of compensation if the Court concludes that the relationship constitutes an actual conflict of interest.

In this case, the Court concludes, upon review of the relationships among Gold, TBF, Traub and ADA, that the evidence fails to establish any actual conflict of interest held by Gold that caused any harm to the estate.  Therefore, the Court concludes that there is no basis to reduce Gold's compensation or otherwise sanction him under the general equitable concepts of the Bankruptcy Code.

### 4.    Perjury and Bankruptcy Crimes

Alber asserts that Gold committed perjury and other bankruptcy crimes.  Among the other "crimes" Alber asserts Gold committed are obstruction of justice, bankruptcy fraud, concealment of assets, false oaths and claims, and bribery. Absolutely no evidence of any of these purported crimes was, however, adduced at trial.

The essence of Alber's allegations is that Gold failed to disclose his relationship with ADA, Traub, and TBF in his retention application and in the biography he submitted in connection with his retention as Plan Administrator.  As noted above, no rule existed at that time requiring an officer of the

51

debtor to disclose any relationship in a case.  Therefore, the
failure to disclose cannot be considered perjury or any other
bankruptcy crime.  Consequently, the Court finds no reason to
refer this matter to the U.S. Attorney.

     5.   <u>Waste of Estate Assets</u>

Alber asserts that Gold wasted assets of the estate by
preparing a form 10k which the Debtors never filed with the SEC.
Gold testified that work was done on the 10k because the SEC
denied the Debtors' request for exemption.  Ultimately, however,
the 10k was never filed because it was determined after
consultation with counsel that the SEC filing requirements could
be satisfied by filing the Debtors' monthly operating reports
under an 8k rather than finishing the costly task of filing the
10k.  Gold testified that the work on the 10k was used in other
filings and was not a waste.

The Court does not fault Gold for having taken the
precaution of doing preliminary work on the 10k until it could be
clarified whether the filing would be required.  Further, Gold
was on salary so there was no additional expenditure by the
estate for that work.  Nor is there any suggestion that Gold
failed to perform other necessary tasks because of it.  In fact,
Gold points to the efforts he has expended in this case which has
resulted in a 16% recovery for general unsecured creditors, when

it was originally estimated that they would receive only 10%.
Gold asserts that his efforts in maximizing value for creditors
belies any suggestion that he was conflicted, failed to fulfill
his fiduciary duties, or wasted assets of the estate.  The Court
agrees that Alber has failed to establish any basis for his
allegation that estate assets have been wasted.

Alber does raise, in his post-trial submission,[11] that Gold
has failed to adequately represent the interests of the estate by
allowing the Debtors' corporate registration to lapse in May
2002.  This was apparently occasioned by the resignation of the
Debtors' agent, without notice to the Debtors.

Even if this occurred through negligence of the Debtors or
Gold, however, the Court concludes that there has been no harm to
the estate.  The Debtors in this case are liquidating.  Under
Delaware law, a dissolved company "remains a viable entity
authorized to possess property as well as sue and be sued
incident to the winding up of its affairs."  City Investing Co.
Liquidating Trust v. Continental Cas. Co., 624 A.2d 1191, 1195
(Del. 1993).  See also Del. Code Ann. tit. 8, § 278 (2004)
(providing an automatic three year extension of corporate
existence after dissolution, which may be extended for any

_____

[11]  This is one example of pleadings filed by Alber alleging
wrongdoing without presenting any evidence of it at the hearing.
The Court has entered Orders striking similar submissions.

53

purpose relating to litigation and the winding up of its
affairs). Consequently, even if the Debtors had been dissolved
under Delaware law they are authorized to continue to perform all
things necessary to finish liquidating the estate and paying
creditors. Thus, there is no basis to conclude that Gold has not
performed appropriately in this case.

For the reasons stated above, the Court concludes that Gold
had a potential conflict of interest that should have been
disclosed at the time of his retention. Because there is no
evidence that an actual conflict of interest arose or that any
harm occurred as a result of the potential conflict of interest,
the Court concludes that no reduction in Gold's compensation is
warranted. The Court further does not find that Gold committed
any bankruptcy crime or wasted assets of the estate. Therefore,
it will deny Alber's Motion as to Gold.

E.    Goldman Settlement

As noted above, the Committee has reached a settlement with
Goldman by which Goldman will remit an additional $200,000 to
settle the request for return of the success fee and expenses
paid pre-petition. Alber objects to the settlement asserting (1)
that a member of the Committee had an actual conflict of interest
at the time the Goldman settlement was approved and (2) that the
estate has other claims against Goldman.

Despite Alber's allegations, the evidence presented at trial established that there was no conflict on interest.  Alber asserted that one of the members of the Committee (and later the PEDC), R.R. Donnelly & Sons Co. ("Donnelly"), had two Goldman directors on its board of directors at the time the Committee approved the Goldman settlement.  In fact, the affiliation was with GS Capital Partners, an entity which has no relationship or connection with Goldman.  Further, Donnelly was not even a member of the PEDC at the time the Goldman settlement was approved.  Donnelly left the Committee, not because of any conflict, but because the individuals serving on the PEDC for Donnelly left its employ.

Further, the Settlement with Goldman does not contain a general release.  Therefore, approval of it will have no adverse effect on the action brought by the PEDC against Goldman and others for damages resulting from the failed IPO.

There being no other objections and the Court being convinced that the Goldman settlement is in the best interest of the estate, it will approve the Goldman settlement.

IV.    CONCLUSION

For the reasons stated above, the Court will grant, in part, Alber's Motion to disqualify and for disgorgement of fees from

MNAT and require the repayment of all fees earned for services rendered in connection with the Goldman and GECC matters.  The Court will grant the UST's Motion for approval of the Settlement with TBF and will deny Alber's Motion for sanctions against TBF to the extent it seeks any further relief from TBF.  The Court will deny Alber's motion for sanctions and other relief against Gold.  Finally, the Court will approve the Goldman settlement.

An appropriate Order is attached.

BY THE COURT:

Dated: October 4, 2005

Mary F. Walrath
United States Bankruptcy Judge

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------------------------------------X

In re:

                                                    Chapter 11

ETOYS, INC., et al.,                                Case Nos. 01-0706 (RB)
                                                    Through 01-0709 (RB)
                  Confirmed Debtors.
                                                    **Hearing Date: August 22, 2005 at 2:00 p.m.**
                                                    **Objection Deadline: August 10, 2005 at 4:00 p.m.**

-------------------------------------------------------------X

## MOTION BY THE POST EFFECTIVE DATE COMMITTEE
## TO DISMISS CLAIMS FILED BY COLLATERAL LOGISTICS, INC.

The Post Effective Date Committee (the "PEDC"), acting pursuant to the First

Amended Consolidated Liquidating Plan of Reorganization on behalf of EBCI, Inc., f/k/a

eToys, Inc. and its affiliated confirmed debtors (the "Debtors"), by its undersigned

counsel, hereby moves pursuant to Rule 41(b) of the Federal Rules of Civil Procedure to

dismiss, for failure to prosecute, the proofs of administrative claim filed by Collateral

Logistics, Inc. ("CLI"), and respectfully states as follows:

### Preliminary Statement

1.    CLI was retained by these estates as a professional to provide

transportation and security services in connection with the liquidation of estate inventory.

CLI's retention order expressly requires CLI to file both interim and final fee applications

with all supporting records and invoices. **See Exhibit "A"**. CLI has failed to do so. CLI

filed two bare bone proofs of administrative claim on February 14, 2002 and on March 1,

2002. **See Exhibit "B"**. In derogation of the requirements of Bankruptcy Rule 3001(c),

these proofs of claim completely lack any supporting documentation. The PEDC does

#14201.1

not believe that CLI has evidence to support the amounts set forth in CLI's proofs of claim (e.g. the amounts that CLI claims it paid as salary were, in all likelihood, never actually paid). In any event, any amount CLI claimed it was owed was paid in full as part of a compromise. In fact, the estate paid more to CLI than was warranted specifically to prevent the estates from continuing to incur fees and expenses in connection the CLI's reimbursement requests and to avoid any further requests from CLI for fees or costs.

2.     More than four years after CLI ceased rendering services, it still has not filed any fee application -- expressly required by its retention orders -- and has not prosecuted its proofs of claim. CLI has failed to provide any meaningful evidence that it is entitled to a single dollar of payment beyond the $400,000 CLI already was paid in these cases. There simply is no excuse for CLI's conduct. To the extent business records legitimately were lost, they could have been re-created within the past four years from bank accounts or tax returns.

3.     The problems created for these estates by reason of CLI's failure to file its fee applications and lack of prosecution of its frivolous proofs of claim are compounded by its revolving door approach to hiring and firing lawyers to represent it. During the past year, CLI has hired and subsequently parted company with five law firms.[1] CLI's practice of hiring counsel, starting up the prosecution of its claims, firing counsel, and asking this Court for additional time to find new counsel has cost these estates tens of thousands of dollars in legal fees. CLI's numerous false starts in prosecuting its claims has prolonged the administration of these estates because CLI's disputed claims are the only claims that remain against these estates.

---

[1] CLI has hired and fired the following firms: (i) Heiman, Gouge & Kaufman, LLP; (ii) Fainsbert Mase & Snyder, LLP; (iii) Fox Rothschild LLP; (iv) Brook & Hochman LLP; and (v) The Bayard Firm.

4.     CLI's bad faith in this matter is further evidenced by its disingenuous responses to the PEDC's legitimate discovery requests and its complete disregard of this Court's Order Regarding Motion by Post-Effective Date Committee to Compel Responses to Discovery and for Other Appropriate Relief.  **See Exhibit "C"**.  CLI's responses have been lacking; either ignoring discovery requests completely or providing non-responsive answers.

5.     Like the proverbial student that has not done his homework but is asked to hand it in, CLI offers up incredible and unsubstantiated excuses.  For example, CLI has claimed that the records that purport to support its claims either were "lost by a moving company"; or "a fire destroyed its documents"; or a computer hard drive containing the records was damaged beyond repair.  **See Exhibit "D"**.  CLI has failed to provide any proof that any of the alleged events actually occurred.

6.     Finally, upon information and belief, CLI is no longer a valid corporate entity under the laws of the State of California, its state of incorporation.  A computer search of records maintained by the California Secretary of State reveals that CLI's corporate status is listed as "suspended".  **See Exhibit "E"**.  Because CLI is no longer a corporation in good standing under the laws of the State of California, and its substantial bad faith in ignoring its own retention order by failing to file fee applications and failing to prosecute its proofs of claim, the PEDC requests that CLI's proofs of administrative claim be dismissed for failure to prosecute.

### Relevant Background

7.     On March 7, 2001, the Debtors filed their respective voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

A.    **CLI Is An Estate Retained Professional**

8.    On April 5, 2001, the Debtors retained CLI to assist in the liquidation of estate inventory and to establish security measures and other controls to ensure there was no diminution of assets during the liquidation process.

9.    Pursuant to CLI's Retention Order, see **Exhibit "A"**, CLI was required to file with the Court every month a copy of all invoices evidencing all expenses incurred during the prior month.  CLI also was required to serve upon parties in interest the documentation supporting the invoices in the form required by the United States Trustee for professional fee applications.  CLI also was required to file a final fee application. CLI never has filed any fee applications.

B.    **The Supplemental Retention Agreement with CLI**

10.    On June 18, 2001, CLI again was retained to provide security for, supervise, coordinate and manage the Debtors' surrender, release, transfer and re-location of leased furniture, fixtures and equipment ("FF&E"); the sale of (i) all FF&E owned by the Debtors and (ii) FF&E that a third party may have had an interest in but which was deemed abandoned; and the sale and/or re-location of unsold inventory as of May 15, 2001.

11.    As with its prior retention, CLI was retained as an estate professional, required to submit to the Debtors and Committee all invoices together with documentation supporting its request for reimbursable Out of Pocket Expenses all to be provided in the format required by the United States Trustee. CLI also was required to file such invoices with the Bankruptcy Court. Following the termination of its services, CLI was required to provide the Debtor, the Committee and the United States Trustee

with a final accounting of all expenses incurred in connection with services rendered, and file a final fee application with this Court.

12.     CLI failed to file its final accounting and <u>any</u> fee application in contravention of its retention order.

## C.    Services Performed By CLI Were Sub-Standard

13.     The Debtor and Committee advised CLI that they had substantial concerns regarding the quality of the services being rendered by CLI, and the amounts, types and bona fides of the fees and expenses that CLI sought to charge to the Debtors' estates (e.g. duplicate expenses, expenses without documentary support, amounts that do not match the receipt, hotel rooms in luxury resorts not near any of the Debtors' facilities or business meetings and charges for personal items). At times, these disputes were brought before the Court as angry lessors and financiers of equipment complained that equipment they owned or had a security interest in had been sold or "lost" by the estate without an accounting.

## D.    CLI's Disputed Fees and Expenses Were Compromised and Paid

14.     The dispute between the representatives of the estates and CLI eventually was resolved and memorialized in the Affidavit of Steven Haas in Support of Collateral Logistics, Inc.'s Request for Payment of Expenses dated November 28, 2001 (the "Affidavit"). Pursuant to the Affidavit, CLI acknowledged that it was solely responsible for the payment of payroll and any other charges, including taxes related to the employment by CLI of its employees and that CLI would not seek any payroll expenses from these estates except to the extent the payroll expenses sought were approved, <u>in</u> <u>writing</u>, by the Debtors and the Committee <u>prior</u> to CLI's incurrence of such expenses.

Similarly, CLI agreed not to seek any reimbursement for non payroll expenses from the estate except to the extent that such non payroll related expenses were approved, in writing, by the Debtors and the Committee prior to CLI's incurrence of such expenses.

**E.      CLI's Proofs of Claim are in Direct Contradiction
to the Affidavit and Lack any Supporting Documentation**

15.      Notwithstanding the express terms of its retention agreement and the Affidavit, pursuant to which CLI expressly agreed not to seek further payment in respect of payroll except amounts pre-approved by the Debtors and the Committee in writing, by proof of claim dated February 14, 2002 [Docket No. 902], CLI asserted an administrative expense claim in the amount of $783,500, including $550,500 for labor. The proof of claim contains no supporting documentation. **See Exhibit "B"**.

16.      On or about March 1, 2002, CLI filed a "supplemental" proof of administrative claim in the same amount [Docket No. 923]. The "supplemental" proof of claim also lacks supporting documentation. **See Exhibit "B"**.

**F.      CLI Fails to Respond to the PEDC's Discovery Requests**

17.      On June 1, 2004, the PEDC served upon CLI its (a) First Request for Admissions, (b) First Set of Interrogatories, and (c) First Request for Production of Documents (the "Initial Discovery Requests").

18.      CLI defaulted in its obligation to respond to the Initial Discovery Requests.

**G.      The PEDC's Motion to Compel**

19.      Due to CLI's noncompliance with the Initial Discovery Requests, the PEDC filed a motion, dated October 22, 2004 seeking an order of this Court, *inter alia*, to

compel CLI to produce documents and otherwise respond to the PEDC's discovery requests.

20.    The Court held a hearing on the Motion to Compel on November 19, 2004. At the hearing, Steven Haas, a representative of CLI, represented to the Court that CLI, among other things, would produce all documents within CLI's possession, custody or control or otherwise respond in writing to the Initial Discovery Requests. This Court entered an Order dated December 6, 2004 ordering CLI to produce all documents or respond in writing to the Initial Discovery Requests within 10 days after the entry of the Order. A true and correct copy of the Order is attached hereto as **Exhibit "C"**. CLI did not produce any of the documents by the deadline set by the Court in the Order.

21.    CLI's also has provided woefully inadequate responses to the PEDC's discovery requests.

22.    In sharp contrast, the PEDC has produced over 4,500 pages of documents to CLI's counsel, including many documents and correspondence that originated from CLI.

## Argument

23.    Ample cause exists for dismissing CLI's two proofs of claim with prejudice under Fed. R. Civ. P. 41(b).

24.    Rule 41(b) provides for the dismissal of any claim "for failure of the plaintiff to prosecute or to comply with these rules or any order of court." In determining whether dismissal is appropriate, courts in this jurisdiction have considered the following six factors: (1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a

history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal and (6) the meritoriousness of claim or defense. Workman v. Biles, No. 00-1030, 2004 U.S. Dist. LEXIS 4948 at *3 (D. Del. March 18, 2004) (citing Poulis v. State Farm Fire and Cas. Co., 747 F. 2d 863, 868 (3d Cir. 1984)). Not all of these factors need to be satisfied for the court to conclude that dismissal is warranted. Poulis, 747 F.2d at 868. As set forth below, these factors weigh heavily in favor of dismissal of CLI's claims.

25.    First, CLI's responsibility in delaying the prosecution of its claims is substantial. CLI was retained in year 2001 and during the past four years has ignored its own retention orders and failed to file any fee applications. There is no excuse for CLI's inaction. If CLI lost documents, they could have been re-created during the past four years from its filed tax returns and bank records. The proofs of claim it filed are bare bones and CLI has failed to produce any back-up documentation. CLI also has ignored the PEDC's legitimate discovery requests, and disregarded this Court's December 6, 2004 Order which required CLI to respond to the PEDC's discovery requests no later than December 16, 2004.

26.    As to the second and third factors, CLI's numerous substitutions of counsel and refusal to respond to the PEDC's discovery requests has cost these estates tens of thousands of dollars in legal fees. In sharp contrast, throughout this matter the PEDC has diligently responded to all court orders and discovery propounded by CLI's numerous counsel including the production of 4,500 pages in discovery. Due to CLI's repeated delays in prosecuting its claim and its numerous substitutions of counsel, the PEDC has expended a substantial amount of time appearing in Court and extra effort in

preparing its defense to this action. The estate clearly has been prejudiced by CLI's dilatory conduct. CLI is also prolonging the administration of these estates as CLI's disputed claims are the only claims that remain against the estates.

27.    Fourth, CLI's bad faith is evidenced by the following: (a) CLI ignored its own retention orders by failing to file interim and final fee applications; (b) CLI's proofs of claim lack the supporting documentation required by the Bankruptcy Rules; (c) CLI's numerous substitutions of counsel; (d) CLI's repeated failure to respond to the PEDC's discovery requests requiring the PEDC to file a motion to compel and (e) CLI's blatant disregard of this Court's Order requiring CLI to respond to the PEDC's discovery requests.

28.    Fifth, alternate sanctions would not be effective based on the fact that CLI has already ignored various orders of this Court.

29.    Sixth, the PEDC has objected to CLI's proofs of claim asserting, among other things, that CLI already has been paid all that it is owed by theses estates. Since the inception of this claim dispute, CLI has not once produced any evidence demonstrating that its proofs of claim are anything but frivolous.

30.    Accordingly, having satisfied all six factors, this Court should dismiss CLI's claims under Rule 41(b).

WHEREFORE, the PEDC respectfully requests that this Court dismiss

CLI's claims with prejudice, and grant the PEDC such other relief as is appropriate.

Dated: Wilmington, DE
      July 21, 2005

                    **JASPAN SCHLESINGER HOFFMAN, LLP**

          By:    /s/ Frederick B. Rosner
                  Frederick B. Rosner (No. 3995)
                  913 North Market Street, 12th Floor
                  Wilmington, DE 19801
                  Telephone:   (302) 351-8000
                  Facsimile:    (302) 351-8010

                  Delaware Counsel to the Post-Effective Date
                  Committee

United States District Court Federal for the District of Wilmington Delaware

In re: eToys 01-706 through 01-709 (jointly adminitstrated)

I Steve Haas Pro Se and as 100% owner for Collateral Logistics, Inc ("CLI")
As collectively and separately are the Plaintiff (the "Plaintiff")

v

, ebc1, Inc, formerly known as eToys, Inc. DE Fed Dist case # 01-706 thru 01-709 and
the confirmed Plan Committee thereof the Post Effective Date Committee (the "PEDC")
as collectively and separately are the Defendant (the "Defendant")

### Notice of Intent of Appeal

Whereas the Plaintiff appeals to the United States District Court for the  District of
Wilmington Delaware from the Judgement/order/decree of Randolph Baxter as visiting
Justice assigned to the CLI claim in the eToys ESTATE case where His Honor Randolph
Baxter in the Bankruptcy Court of Wilmington Delaware did rule to void and expunge
the CLI claim on August 22, 2005 and did sign an Order to such effect on August 25,
2005.

Whereas I , Steven Haas, also known as Laser Steven Haas as 100% owner of CLI did
perform work in compliance with a Court Order signed by Her Honor Mary F Walrath do
this day, August 31, 2005 declare  the intent to appeal and raise issue with His Honor
Randolph Baxter's ruling against CLI and I , Steve Haas.

Dated _August 31, 2005_

Signed _____
Pro Se Litigant.

Service Sent electronically (email) to Fred Rosner of the Firm Jaspen Schellisnger as
local counsel for the Post Effective Date Committee (PEDC)

And also to Fred Rosner by mail.

While also sending this letter, signed and dated by overnight carrier to the US
Bankruptcy Court Clerks Office with the appropriate filing fee of $250 as required by the
US Delaware Bankruptcy Court website.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

---------------------------------------------------------------X

In re:

                              Chapter 11

ETOYS, INC., et al.,                  Case Nos. 01-0706 (RB)
                              Through 01-0709 (RB)

          Confirmed Debtors.

                             **Re: Docket Nos. 2287 & 2301**

---------------------------------------------------------------X

## ORDER (A) DISMISSING CLAIMS FILED BY COLLATERAL LOGISTICS, INC. AND (B) DENYING EMERGENCY MOTION BY COLLATERAL LOGISTICS, INC. FOR AN EXTENSION OF TIME TO SEEK NEW COUNSEL AND/OR TO ACT PRO SE

                Upon the Motion by The Post Effective Date Committee to Dismiss Claims Filed

by Collateral Logistics, Inc. [Docket No. 2301] (the "Motion to Dismiss") and the Emergency

Motion by Collateral Logistics Inc. for an Extension of Time to Seek New Counsel and/or to Act

Pro Se (the "Emergency Motion"); and due and sufficient notice of the hearing on the Motion to

Dismiss having been given; and for the reasons set forth in the Motion to Dismiss and at the

hearing thereon held on August 22, 2005 (the "August 22 Hearing"); and after due deliberation

and good and sufficient cause having been shown, the Court hereby finds as follows:

             A.      CLI was retained by Orders dated April 25, 2001 [Docket No. 249] and

July 9, 2001 [Docket No. 515] to provide transportation and security services in connection with

the liquidation of estate inventory (together, the "CLI Retention Orders");

             B.      The CLI Retention Orders require CLI to file and serve periodic and final

applications for payment of its fees for services rendered and reimbursement of expenses,

including with such applications all supporting documentation;

             C.      CLI failed to file any fee applications as required by the CLI Retention

Orders;

#14606.1

*H- 8/22/05 -*
*/mr*

D.    A dispute arose between the estate and CLI as to the amount of fees and expenses, if any, owed to CLI;

E.    Representatives of the estate and CLI negotiated a compromise of the disputed fees and expenses as set forth in the Affidavit of Steven Haas in Support of Collateral Logistics, Inc.'s Request for Payment of Expenses dated November 28, 2001 (the "Affidavit") filed with the Court [Docket No. 2133];

F.    CLI thereafter filed two "bare bone" proofs of claim dated February 14, 2002 and March 1, 2002 seeking payment beyond the amounts CLI previously was paid and the amounts agreed to as set forth in the Affidavit (together, the "CLI Claims");

G.    The CLI Claims lack any supporting documentation as required by the Bankruptcy Rules;

H.    The PEDC filed objections to the CLI Claims and thereafter sought discovery against CLI;

I.    When CLI failed to properly and fully respond to the PEDC's discovery requests the PEDC filed a Motion to: (A) Compel Production of Documents and Responses to Discovery Requests; (B) Quash Subpoenas, and (C) Stay Third Party Discovery Requests Propounded By Collateral Logistics, Inc. (the "Motion to Compel") and a Supplement to the Motion to Compel;

J.    The Motion to Compel was granted by Order dated December 6, 2004 [Docket No. 2133];

K.    CLI failed to comply with the December 6, 2004 Order Granting the Motion to Compel;

#14606                                    2

L.      By Order dated June 6, 2005 [Docket No. 2274], CLI was directed to obtain new counsel on or before June 20, 2005 at 4:00 p.m. with no further extensions;

M.      CLI failed to obtain substitute counsel on or before the June 20, 2005 deadline;

N.      By Order dated July 26, 2005 [Docket No. 2302] (the "Order Granting Motion to Strike"), the Court ruled that CLI could not appear *pro se* and specifically prohibited CLI from causing any future filings in this matter and specifically prohibited Steven Haas from representing or causing any future filings on behalf of CLI;

O.      The Order Granting the Motion to Strike specifically provided that any future pleadings by CLI *pro se* or Haas on behalf of CLI, shall result in the imposition of sanctions;

P.      The Order Granting Motion to Strike is in accord with the oral ruling made by Chief Judge Walrath on March 1, 2005 that CLI cannot appear *pro se*;

Q.      CLI filed its Emergency Motion on June 17, 2005 [Docket No. 2287];

R.      Following the entry, and in violation of, the Order Granting Motion to Strike, Steven Haas submitted the following pleadings on behalf of CLI and *pro se*:

        a.      Response by Collateral Logistics to PEDC Motion to Dismiss Collateral Logistics Claim; and

        b.      Motion by Steve Haas to Seek Compensation by 503(b) Substantial Contribution and to Object to the Post Effective Date Committee Motion to Dismiss Collateral Logistics;

S.      CLI had sufficient time to secure substitute counsel;

T.      CLI had ample opportunity to providing supporting documentation, if any, for the CLI Claims;

U.    Rule 41(b) of the Federal Rules of Civil Procedure and relevant case law,

*see, e.g.*, *Workman v. Biles*, No. 00-1030, 2004 U.S. Dist. LEXIS 4948 (d. Del. March 18, 2004),

identify its factors for a Court to consider in connection with dismissal of a claim for future to

prosecute. Application of those factors to the facts presented here demonstrate cause to dismiss

CLI claims; and

following:

V.    In connection with these findings, the Court takes judicial notice of the

(a)    Order Authorizing and Approving Employment of Collateral Logistics, Inc. as Liquidation Consultant to the Debtors [Docket No. 249];

(b)    Order Authorizing and Approving Employment of Collateral Logistics, Inc. as Liquidation Agent for the Debtors [Docket No. 515];

(c)    Proof of Claim of Collateral Logistics, Inc. dated February 14, 2002;

(d)    Proof of Claim of Collateral Logistics, Inc. dated March 1, 2002;

(e)    Order Regarding Motion by Post-Effective Date Committee to Compel Responses to Discovery and for Other Appropriate Relief [Docket No. 2133];

(f)    Order Granting Motion of The Bayard Firm and Brook & Hockman LLP for Leave to Withdraw as Counsel to Collateral Logistics, Inc. [Docket No. 2274]; and

(g)    Order Dated July 25, 2001 [Docket No. 2302].

ACCORDINGLY, BASED ON THE FOREGOING AND THE RECORD

MADE AT THE AUGUST 22 HEARING, IT IS HEREBY

ORDERED, that the Motion to Dismiss is granted, with prejudice, and the

Emergency Motion is denied; and it is further

#14606                                      4

ORDERED, that the CLI Claims, including any administrative claim or other claim it has asserted or may assert against these estates, are disallowed and expunged in their entirety; and it is further

ORDERED, that this Court shall retain jurisdiction over any dispute relating to this Order.

Dated: August 25, 2005
        Wilmington, Delaware


_____
United States Bankruptcy Judge