# Appeal by Steven Haas/ Collateral Logistics, Inc

## to

# U.S. District Court of Appeals Wilmington Delaware

In Re:  eToys 01-706 thru 01-709., Debtor.
Whereas
Collateral Logistics, Inc/ Steve Haas Plaintiff-Appellant,
v.
The Post Effective Date Committee (the "PEDC"), the ESTATE of eToys 01-706 jointly administrated.

Where Plaintiff has requested that the Appeal be heard by the District Federal Court removed from Bankruptcy Court
United States Court of Appeals,

## I. STATEMENT

1.     This case presents an issue of fraud, subterfuge and an attack upon the integrity of the system as a whole.  Whereas the Attorney for the Creditors Committee Traaub Bonacquist & Fox ("TBF") did place in as CEO of the Debtor, post petition one Barry F Gold, that Paul Traub has admitted to the Court was paid directly by TBF over $100,000 in 4 separate payments prior to Barry Gold becoming CEO and President of the ESTATE of eToys 01-706 (the "DEBTOR").  While everyone does not want to hear of such matters, the truth of this case is the FRAUD which is abundant, blatant, flagrant and now encouraged as the Plaintiff has been dismissed by the perpetrators of the FRAUD and it is only with the knowledge of the fact that such wholesale conspiracies exists that justice can occur here.

2.     The validity of that deception(s)/Fraud is no longer a matter of conjecture as TBF has admitted, under oath, to the Court that such did occur and on October 4, 2005 the Court, after taking more than 5 months, the matter under advisement, did hand down a ruling, (the "OPINION") with a detailed opinion that did disgorge both the Attorney for the Creditors, TBF along with the Counsel for the DEBTOR of Morris Nichols Arsht & Tunnel ("MNAT").   While the matter of the inadequate punishment/deterrent is for another Appellant review – the OPINION of October 4, 2005 is additional proof positive of the core issue at hand that is germane to this appeal by Plaintiff and will be attached as an additional EXHIBIT

3.     The following items have occurred, which by themselves are of their own significance and the Plaintiff is sure that all the parties named will disagree that they were caused by this case, however – the fact remains they occurred and are Connected by this case as a common thread.  Their significance is self explanatory! More importantly one

has to ask "how many million to one shots have to occur before someone see's the connection(s) and the cause(s).

a.      Roberta DeAngelis was replaced by Lawrence Friedman as Trustee of Region 3 by Kelly B Stapleton over Wilmington DE, where the Press release stated that Kelly Stapleton was proficient in Fraud prosecution. The press release came to light on December 22, 2004 which was the same hearing date on the initial allegations of Conflicts, Non Disclosure and the Fraud thereof.

b.      Goldman Sachs is being sued by the DEBTOR for hundreds of millions of dollars. RR Donnelley was listed as one of the Board members of the DEBTORS confirmed PLAN Committee the Post Effective Date Committee (the "PEDC"). It was discovered by an eToys shareholder, one Robert Alber that RR Donnelley had 2 members on their board from Goldman Sachs. This was divulged to the Court by Plaintiff and Robert Alber. RR Donnelley and Goldman Sachs divested themselves of one another on January 6, 2005.

c.      The Court permitted depositions of TBF and others by Robert Alber and Collateral Logistics, Inc. ("CLI")/ Steve Haas the sole, Court approved Liquidator for the ESTATE, which was hired "nunc pro tunc" by 2 separate orders. The first order permitted CLI to secure the ESTATE assets, the 2nd Order defined the commission structure and was drafted by Barry Gold and Susan Balaschak of TBF. The deposing of the Counsel in the case occurred after the Court had Ordered that Counsels respond to the allegations by January 25, 2005. The depositions were taken at the Wilmington DE Bankruptcy Court location on Feb 9, 2005.

d.      The US Trustee's Chief Administrator, Lawrence Friedman gave me, Steve Haas his personal assurance that the matters would be dealt with accordingly.

e.      On February 15, 2005, having before it overwhelming evidence to deception(s) of failure to disclose, False Oaths, perjury statements and more resulted in prompting the US Trustee Office by Kelly B Stapleton and Mark Kenney (the assigned Counsel for the US Trustee in this case) to Motion the Court for disgorgement & disqualification of TBF, post petition however, not Post Plan! The US Trustee stated in their Motion support that the penalties to TBF were inadequate due to the Rule 1144 that says a confirmed Plan (the PEDC) cannot be amended, even for Fraud after 180 days. The Trustee sought sanctions of $1.6 million on TBF.

f.      During the month of February 2005 the Court did permit TBF to engage a second counsel. This Counsel along with the US Trustee did, on February 25, 2005 come forward with a Motion to settle their own earlier Motion of February 15, 2005, (which they had stated was inadequate.) for only $750,000 and broad

based indemnification language that was insulting to the integrity of the System as a whole.

g.      Subsequently I sent the contradictory motions to many parties, including the press, Senators and Lawrence Friedman.

h.      Lawrence Friedman has resigned for "personal reasons" where I assume he was as appalled as everyone else with the way the system had run amuck.

i.      The Plaintiff, that is I, Steve Haas, did also place the notes about the non disclosed relationships in the KB Toy Case DE Dist. 04-10120.   Which was reviewed by His Honor Donald Sullivan.

j.      The US Trustee did not argue the merits of the motions, rather the US Trustee just stated that 3rd parties are not allowed to bring the item to the Courts attention.

k.      His Honor Sullivan had a hearing on the Motion I raised in KB and did expunge my statements.  The appalling note is that the Clerks record already had the signed Court Order expunging, before His Honor heard my testimony.

l.      His Honor Sullivan was replaced from the Case one week later by Her Honor Walrath.

m.      The CLI claim was set to be heard by the Court in June 2005.

n.      My counsel, who was on contingency at that time, along with the PEDC, did push back the trial on the CLI claim to September 2005.

o.      Then said counsel, Brook Hoffman LLP, withdrew.

p.      His Honor Randolph Baxter did permit the withdrawal and then ordered that I obtain Counsel within 10 days.

q.      The Wall Street Journal came out with an article on the Conflicts and Non Disclosure (even though the Court had not yet made a ruling) on July 25, 2005.

r.      The PEDC then, subsequently, sought the dismissal of the CLI Claim.

s.      CLI had counsel to appear telephonically at the Hearing of August 22, 2005 where His Honor Baxter did hear the PEDC Motion to dismiss the CLI claim.

t.      His Honor did not permit counsel to appear for CLI and dismissed the CLI claim even though it was set for Trial the following month of September 2005.

## II. BACKGROUND

4       .Appellant, the Plaintiff was hired by the Creditors Committee, (please see EXHIBIT 1, the former Chairman's Affidavit of the Creditors Committee (the "CASTILLO AFFIDAVIT"), the hiring was done "nunc pro tunc" (please see EXHIBIT 2 the "CLI HIRING ORDERS"). The contracts were drafted by TBF & MNAT. The first CLI HIRING ORDER was to get CLI authorized to take control of ESTATE assets. The 2nd CLI HIRING ORDER covered the contract which was negotiated by the Former Chairman of the Creditors Committee and finalized by Barry Gold, TBF & MNAT at the DEBTORS headquarters in Los Angeles CA on Olympic Blvd. (this was prior to Barry Gold becoming officially on Board where he said Dave Gatto had to sign the Contract as D&O insurance was not yet Court approved..) (please see EXHIBIT 3 the "CLI CONTRACTS".)

5.      The Chairman of the Creditors Committee did retire, unexpectedly, from Mattel in the Fall of 2001. The Chairman did ask that CLI, that is I, Steve Haas abate one commission and estimate the remaining money that I would bill the DEBTOR for at the end of the case. (please see EXHIBIT 1 – the CASTILLO AFFIDAVIT.)

6.      CLI, that is I, Steve Haas did agree to abate the Wilkerson commission as long as all other fee's were paid. The Wilkerson commission was initially to be $125,000 in accordance with the CLI success fee contract. (please see both the EXHIBIT 1 CASTILLO AFFIDAVIT and the CLI fee payment schedule in EXHIBIT 3 the CLI CONTRACTS specifically the 2nd Contract which is hereafter referred to as the "CLI AMEND CONTRACT" wherein the part C defines the commission fee structure on asset sales.)

7.      After the occurrence of the events noted above the PEDC did petition the Court to dismiss the CLI/Steve Haas motions/claims based on the application of Rule 41(b) the rule of Federal Civil procedure.

8.      His Honor Randolph Baxter did hear the PEDC Motion on August 22, 2005 and did not permit Steve Haas legal standing on behalf of CLI Claim, His Honor Baxter did also forbid the counsel that was present that day from acting as counsel for CLI. (please see EXHIBIT 4 -the Transcript of August 22, 2005 that has been transcribed at the request of the Appellee –as it has not entered the record this day it will be forwarded to you upon either the enter of record or the failure, which will require that I endure the procedure to procure.)

9.      His Honor Randolph Baxter did sign an Order on August 25, 2005 which is attached here as EXHIBIT 5 the BAXTER ORDER. Wherein His Honor lists many reasons for his ruling, itemized.

## III. *JURISDICTION*

10.    As an initial matter, CLI notes that this court has jurisdiction to hear this appeal pursuant to 28 U.S.C. § 158(d). Section § 158(d) grants this Court jurisdiction to hear appeals from final orders. In a bankruptcy case, a final order is defined as an order that terminates any particular adversary proceeding. *See In re Hillsborough Holdings Corp.*, 116 F.3d 1391, 1393 (11th Cir.1997). The denial of CLI Admin Claim is such an order, and jurisdiction is appropriate.

### IV. STANDARD OF REVIEW

11.    This Court can Review an award or refusal to award attorney's for abuse of discretion. *In re Hillsborough Holdings Corp.*, 127 F.3d 1398, 1401 (11th Cir.1997). A bankruptcy judge abuses his discretion if he fails to apply the correct legal standard or his factual findings are clearly erroneous. *Id. See also In re Prince*, 40 F.3d 356, 359 (11th Cir.1994) (holding that we review factual findings for clear error and legal conclusions *de novo* ).

12.    In the application of Rule 41(b) in involuntary circumstance it is required that the dismissal shall make findings of fact and separate conclusions of law. Failing to make findings of fact is reversible error and requires a new trial. See Hill v Lassiter, 135 N.C. App. 515, 520 S.E. 2d 797 (1999); and Dept. of Transportation v. Overton, 111 N.C. 237, 439 S.E. 2d 144 (1993) and disc. Review improvidently granted, 336 N.C. 598, 444 S.E. 2d 448 (1994), that a trial court's basis for its decision could be found in the transcript. In those cases, the transcripts did not reveal an adequate basis for the trail court's grant of involuntary dismissal.

### V. SUBSTANTIAL CONTRIBUTION

13.    A.The Standard of substantial contribution by CLI was completed.

14.    Section 503 of Chapter 11 of the bankruptcy code provides that certain administrative expenses "*shall* be allowed" after notice and a hearing. 11 U.S.C. § 503(b) (emphasis added). Included in the list of administrative expenses awarded under § 503(b) are the expenses incurred by "a creditor, an indenture trustee, an equity security holder, or a committee representing creditors or equity security holders ... in making a substantial contribution in a case under Chapter 9 or 11 of this title...." *Id.* at § 503(b)(3)(D).. In creating these provisions, Congress did not specifically define the term "substantial contribution." As such, a conflict has developed among the circuits regarding whether the motivation behind a creditor's actions should disqualify him from receiving fees where a contribution has been made to the resolution of the bankruptcy proceeding. *Compare In re DP Partners, Ltd.*, 106 F.3d 667, 673 (5th Cir.1997) (noting that the plain language of the statute does not require "a self-deprecating, altruistic intent as a prerequisite to recovery ....") with *Lebron v. Mechem Financial, Inc.*, 27 F.3d 937, 944 (3d Cir.1994) (finding that the benefit to the estate "must be more than an incidental one" arising out of the pursuit of self-interest) and *In re Lister*, 846 F.2d 55, 57 (10th Cir.1988) ("Efforts undertaken by a creditor solely to further his own self-interest ... will not be compensable,

notwithstanding any incidental benefit accruing to the bankruptcy estate) Efforts here were always done by CLI at the best interest of the ESTATE and the sale items of Court record are the proof that they occurred.

15.     In interpreting a statute, we begin by examining the text and assigning the "plain, ordinary, and most natural meaning" to terms not otherwise defined in the text itself. *Boca Ciega Hotel, Inc. v. Bouchard Transp. Co.,* 51 F.3d 235, 237 (11th Cir.1995). In applying the plain meaning of the text, other circuits have held that a substantial contribution is one that " 'foster[s] and enhance[s], rather than retard[s] or interrupt[s] the progress of reorganization.' " *In re Consolidated Bancshares, Inc.,* 785 F.2d 1249, 1253 (5th Cir.1986) (quoting *In re Richton Int'l Corp.,* 15 B.R. 854, 856 (Bankr.S.D.N.Y.1981)). *See also Lebron,* 27 F.3d at 944 (quoting *Consolidated Bancshares* ).

16.     This holding is consistent with common sense. Congress chose to include creditors, *but did not restrict it to Creditors Only,* in the class of those who may receive administrative expenses and fees for a substantial contribution, *see* 11 U.S.C. § 503(b)(3), and it is difficult to imagine a circumstance in which a creditor will not be motivated by self-interest in a bankruptcy proceeding. To impose an altruism requirement on the ability to obtain administrative expenses under § 503(b)(3)-(4) would effectively render the section meaningless as to creditors, or to those that have Court Approved contracts to perform the work and receive payment after the fact, instead of during.

## V1 Issues and Records of Plaintiff

17.     The first issue the Plaintiff address here is to ask the Court to review whether or not a sole shareholder has the right to be heard. For CLI was a corporation in good standing when the duties were performed for the DEBTOR. The sales for only $5.4 million that were to occur of the entire ESTATE prior to CLI is documented by the Auction Motions in the Public Court Pacer record, which are NOT retrieveable by CLI through Pacer due to some restriction of cases prior to September of 2001. How many sales did occur is noted by the quarterly report of the DEBTOR within that same restricted Public Record timeframe. I, Steve Haas remain the sole shareholder of CLI and CLI has no debt of consequence that would hinder myself from receiving the asset return if CLI were to be paid the monies due for the work performed. The work was done, the benefits of substantial contribution were received by the DEBTOR. The counsels and other professionals involved herein could not have received the more than $14 million in fee's, etc that have occurred, had it not been for the work of CLI. CLI has the EXHIBIT of the CASTILLO AFFIDAVIT which shows the Creditors were more than content with the results of CLI endeavors.

18.     Rule 41(b) was applied by His Honor Baxter as that was the sole basis for the PEDC to ask the Court to dismiss the CLI claim. CLI, that is I, Steve Haas state that Rule 41(b) was not applied lawfully as His Honor did make many statements that were not consistent with the facts. Herewith the Plaintiff lists the reasons, line item match with the incorrectness of His Honor's Baxter's ruling Order.

a.     CLI was retained as stated by His Honor in accordance with the "Retention Orders", however CLI was hired to "secure", "protect" assets, as well as sell FF&E and Assets, along with ESTATE inventory, while also being charged with the replacing of over 1000 employee's, downsizing locations, transporting assets to secure locations and the "return" of over 10,000 units of equipment to lease holders while researching which units belonged to the ESTATE and which belonged to claim holders, after the ESTATE was permitted by the Court to destroy "all non financial records" which invariably lead to ciaos and arguments and CLI being the inflexible wall of refusal to hold to a procedure that was NOT designed by CLI. The destruction of Records Order is again one of those documents that CLI cannot retrieve. However it is there.

b.     CLI was required to file interim applications, what is not noted, that is a fact, is that the CLI CONTRACTS provide that it is done 'with assistance of debtors counsel" the Counsels for the DEBTOR and TBF discouraged CLI from obtaining counsel as a "cost saving benefit to the ESTATE" (please see the CASTILLO AFFIDAVIT). The counsels on both sides constantly remarked that they were buried in the thousands of claims and that they mutually would direct when it was necessary for CLI to file a claim. (It is noteworthy to point out that the ONLY claim documents that the DEBTORS counsel MNAT provided to the Court was the HAAS AFFIDAVIT which the Plaintiff will refer to as EXHIBIT    ) Also CLI was excused from certain Local Rule requirements as part of the CLI contracts and the COURT HIRING ORDERs, which was Rule 2016 as CLI had no outside counsel CLI had to rely on TBF and MNAT to inform. (again please see the CASTILLO AFFIDAVIT which specifically references this matter). CLI did hire the firm of Henry Heiman after MNAT refused to file the final fee application. I Steve Haas, flew to Delaware and hired an attorney that was formerly a Trustee. The Plaintiff has done good faith all along. The Plaintiff further notes that the CLI contracts required only a "description of the services performed generally". The Plaintiff also notes that his Honor states in his item B that CLI filed none but in His Honor's item F. His Honor states that CLI filed 2 (two) 'bare bones" claim documents.

c.     The Plaintiff notes that B & C of His Honor's Order is repetitive and would note that MNAT did file the HAAS AFFIDAVIT which listed the services performed by CLI, generally, and the expenses involved in payroll. Again, it is noteworthy to consider the speciousness that this is the only document outside of the contracts that MNAT filed, as required by the CLI contracts that it be done with the assistance of DEBTORS counsel as a cost saving measure to the DEBTOR and is affirmed by the CASTILLO AFFIDAVIT.

d.     A dispute never arose, the Plaintiff hereby contends to this Court that the Fraud on Non-Disclosure of Conflicts (abundant, willful and harmful to the DEBTOR) is the true dispute. I was offered a bribe in a manner that if you were sitting there, you would debate it greatly, even after knowing the non disclosures. After that they were caught. They had one ACE, the Chairman of the Creditors Committee Lee Castillo had retired. So they were the sole decision makers for the ESTATE (they being collectively, TBF and Barry Gold)..Their subterfuge was compounded upon the Plaintiff as the Plaintiff did, in a great naïve manner, tell Barry Gold that he had to be careful of TBF,

when Barry Gold was coming aboard the Estate.  Barry Gold spoke with both myself and met with the Former Chairman of the Creditors Committee on separate occasions.  Both Barry Gold and Paul Traub of TBF did go to extensive measures to hide the subterfuge of the relationship of Barry Gold to Traub.  (please again see the CASTILLO AFFIDAVIT as it refers to the deception in it's final paragraph.)

      e.     When his Honor Baxter states that representatives of the Estate negotiated with CLI a compromise of "disputed fee's and expenses" it takes liberality with multiple items and stretches the conclusion.  Representatives of the ESTATE would mean, Barry Gold, MNAT and TBF (the ESTATE was in essence a liquidating Chptr 11 Creditor controlled).  While also stating that it compromised the disputed "fee's" and refers to the HAAS AFFIDAVIT, wherein, such is not Entitled as a waiver, but a submission for payment of Expenses (please see the HAAS AFFIDAVIT) wherein on line item 11 within the HAAS AFFIDAVIT it states that CLI is <u>entitled to "success fee's"</u>!

      f.     His Honor states in His Item "F" that CLI filed 2 "bare bones" proof of Claims.  Where Plaintiff contends that this is contradictory to the previous item and gives great cause for alarm, for if the claims and Affidavit had been read it would be noted that they resubmitted the attached items from the HAAS AFFIDAVIT.  Furthermore, reiterated here again is the fact that line item 11 in the HAAS AFFIDAVIT <u>it specifically states that CLI is entitled to success Fee's</u>!

      g.     His Honor in his item "G" states that CLI lacks any support, which is contravened by the HAAS AFFIDAVIT, the "bare bones" proof of claims, the CASTILLO AFFIDAVIT, the "nunc pro tunc" CLI retention ORDERS which being done after the fact is more than proof positive the work was done, along with the fact that the CLI AMEND CONTRACT and Orders state that CLI was the "sole liquidation" agent for the ESTATE.  Furthermore in the CLI AMEND CONTRACT it specifically states the ONLY item CLI was NOT to be paid upon and that is the Lease equipment in the location known as "Blairs A"!

      h.     The PEDC filed objections, which is to say that TBF, Paul Traub, Barry Gold & MNAT filed objections.....CLI subsequently delivered discovery by Henry Heiman to the PEDC.  The PEDC complained that the discovery was "woefully inadequate" their own words and furthermore, the PEDC refused to give Discovery to CLI, even after CLI made a motion to compel the PEDC.  The PEDC stated that even though there were new "Stipulated Scheduling Orders" that the old timeline of the Henry Heiman era was the only one that mattered.  The PEDC also moved the Court to Quash the Motion to Compel and the Supeano's stating they required third parties.  The parties that CLI sought were Barry Gold, the p/m/k of Crossroads, who is the finance professional of the Estate, the p/m/k of MNAT, the p/m/k of TBF and Richard Cartoon.  All of which are professionals paid extensive monies by the ESTATE for their services and required, as a matter of law, to appear if the Court so designates.  (Henry Heiman asked CLI to drop the CLI claim after he placed the CASTILLO AFFIDAVIT in the Court record and had discussions with TBF) (another specious turn of events is that

Heiman at such time was Heiman Aber Goldust & Baker – a few months after he
discussed matters with TBF he became Heiman & Kaufman)

    i.    Again this item is repetitive and addresses the issue of the Quashed
subpoenas and is not in keeping with the facts. CLI always provided discovery, with
Heiman, with Weiss and the withdrawing Brook Hoffman. Yet to date, the Plaintiff is
still without the Discovery requested of the PEDC. They cannot find fault with the
"woefully inadequate" of CLI having never supplied any themselves.

    j.    All Orders were complied with and the counsel for CLI at that time,
Michael Weiss sent the answers to the PEDC, while noting in a letter to the PEDC that he
was withdrawing as counsel of CLI and that the PEDC had not yet provided any
responses to CLI. The PEDC replied that they would deliver theirs to CLI if and when
they felt that they had everything from CLI they desired. This became moot when a new
stipulated scheduling Order was done by Brook Hoffman LLP for June 2005 and
certainly when the PEDC conspired with Brook Hoffman to postpone the Trial of the CLI
claim to September 2005, again the old timeline for discovery would have been rendered
moot.

    k.    Again this item K by His Honor is repetitive and the same answers apply.
Asked, stated, answered. CLI sent the answers, always that the PEDC sent to CLI.
While the PEDC has never, once supplied CLI with any.

    l.    His Honor did permit Brook Hoffman to withdraw, after permitting a new
scheduling order. Which is great cause for concern. As Brook Hoffman was on
contingency, the Court should not have permitted the withdrawal. Furthermore, the
Court had always provided for 30 days to obtain new counsel. In light of the harshness of
the allegations and the small knit of the community in DE, CLI began to seek counsel
outside of DE and did obtain one that his Honor Baxter did not permit to represent CLI
on the August 22, 2005 hearing date. Even after TBF was permitted to add counsel at
will by such counsel just showing up to Court at leisure.

    m.    Again this item M by his Honor Baxter is repetitive. The Plaintiff feels
that the Court should have taken into consideration the severity of all the issues before
placing such undue hardship requirements on CLI. Nonetheless CLI did have counsel for
the hearing of August 22, 2005. It is obvious that His Honor had already made up his
mind and furthermore, it appears that this document was drafted by CLI opposing parties.
It does not keep with the facts, nor does it take into consideration that with the presence
of the conflicts, Fraud and the US Trustee Motions, the Court should be inclined to assure
that there appeared no measure of retalitory ability by the PEDC participants.
Furthermore the Trial date for CLI was only a month away. This Order would have had
much more ability of success had the Court allowed discovery, Trial date etc.

    n.    The Plaintiff responds to His Honors item "N" that I, Steve Haas am a
party of interest, at worst a third party as sole stock holder of CLI, more importantly the
employee of the ESTATE if the claim of CLI is allowed to be quashed then certainly I,

Steve Haas, am entitled under 503(b) to be compensated for the 9 months I worked physically for more than 40 hours per week, on the DEBTORS and for the DEBTORS benefit. The ESTATE, the System cannot function if the premise of hiring one that benefits the ESTATE, then subsequently and end run is done by those that "just don't like HAAS" so that he cannot be paid at a rate that is less than ½ of everyone else involved. CLI , that is I, Steve Haas, though being prevented, was caught by the scheme to unrightfully defeat payment earned, that is now, more apparent than ever, done under duress. As one may have not believed that there was a conspiracy by both the DEBTOR and the counsel for the Creditors committee to unrigheously punish me, however in the light that it was the person collectively of Paul Traub and his partner. It has to at least cross one's mind as possible, even probable. For I, Steve Haas sold my services to Creditors in the fashion that I understood their goals, such as stalking horse and did work with TBF in the previous case of Toytime.com where they were going to sell everything for only $2 million. I note only assisted the Creditors in getting a $5 million bid, at the same time, when the scheming tried to defeat the count I was performing I made the buyer pay an additional $150,000 for holding things up. In essence I have set 2 world records, where in Toytime and Etoys, I made the bidders pay more than they originally bid. Which is never, ever accomplished in a bankruptcy case. EVER, except through someone like me. If I cannot act Pro Se, when it is apparent that the collective counsels are in multiple counts of non disclosure. Then the system is doomed and jurisprudent review cannot occur.

o.    In this repetitive remark on Pro Se, I assume the Court means that the sanction is the expunging of the CLI claim. Again the Plaintiff feels it has a lawful right to be heard as the companies sole shareholder, when counsel refuses to be engaged Pro Se is the only recourse.

p.    This remark by His Honor Baxter refers to James Garrity requesting that the Court stop CLI from having Steve Haas speak on it's behalf. When no attorney, or the US Trustee would take up the issues that CLI did allege on the non disclosure, conflicts of the various parties in this matter. The Court did not raise the issue "sua sponte" as the US Trustee did in the KB Toys case. It was prompted to by James Garrity as counsel for TBF. Her Honor Walrath did not make any ruling that stated that CLI/Plaintiff/Haas could not respond to allegations by another.

q.    The Plaintiff did try to raise issues that needed to be addressed. When the US Trustee, as Mark Kenney has as attorney for the Trustee tells you for 3 years there is no wrong as there is no conflict, then you find out that he has in essence lied to you, when you become wise enough to go to the website of the DOJ and read the US Trustee Handbook and the Bankruptcy Code, when you find cases such as In re: Bucyrus, where Gellene went to jail for a situation that was $1/100^{th}$ of the offenses here. Your only pathway is to speak up. Even at risk of expungment, dismissal, sanctions. Or you can remain silent as the US Trustee office has about the perjury that Barry Gold has done as Plan Administrator, where he signed, under penalty of perjury that the Plan was negotiated in "good faith" "arms length" negotiation between DEBTOR and Creditor.

That is to say "arms length" between Barry Gold and Paul Traub of TBF. I ask this Court what does one do?

R.    CLI did respond as the Plaintiff had no choice.

S.    This is false, 10 days, in light of the circumstances and Fraud, was extremely insufficient and the Plaintiff feels that it violates the Code of Law, the application of Law and Justice. Furthermore CLI, as the Transcript of August 22, 2005 shows, had counsel, but His Honor refused to allow representation thereby.

t.    The HAAS AFFIDAVIT, the Court ORDERS of retention, the Court approval of Sales that occurred to KB, Wilkerson, Dove, Yellow Knife and more, along with the former Chairman of the Creditors Committee the CASTILLO AFFIDAVIT, who is retired from Mattel and has nothing to gain, while also having the experience of being Chairman in 10's of committee's and maybe even more than 100.

u.    Where his Honor Baxter applies rule 41(b) the Plaintiff prays this Appeals Court see that there is more than just one reversible error, but many. That His Honor Baxter did not comply with the "sine qua non" of the Code, or Rule 41(b) which is designed for finding of facts and conclusions of law. Had the Court permitted the Trial of CLI to go forward, even without discovery by PEDC and just relied on the CASTILLO AFFIDAVIT and the fact that TBF, Barry Gold & MNAT drafted the CLI Hiring contracts. Ambiquity has to be held against them and not CLI. The facts are that CLI did the work, the abundance of returns (benefit to the DEBTOR) is clear cut proof positive of the success of CLI. While the mere fact that the participants in the PEDC have been paid over $14 million to date, where they have perpetrated Fraud upon the Court by their "willful" "conspiracy" to circumvent the Code at the minimum of benefit TBF admitted during the March 1, 2005 that it paid Barry Gold 4 separate $30,000 payments prior to Barry Gold becoming CEO of the DEBTOR, where the payments to Barry Gold ceased once Barry Gold was at the DEBTOR , which is benefit to TBF of no longer paying Barry Gold. Where Barry Gold states that he was paid $40,000 per month, which is the Benefit to Barry Gold of the extra $10,000 per month. Where the hiring letter submitted by Barry Gold in his response of January 25, 2005 states that he could "willfully" of his own volition, choose whether or not, to apply to the Court for approval to be hired. These 3 items are concrete, proof positive, total requirements to prosecute and convict someone of the Janet Reno Reform Act of 1994 **18 USC 155 Fee Fixing.**

VII. *CONCLUSION*

19. The Plaintiff argues that the bankruptcy judge abused his discretion by applying the wrong legal standard, that 41(b) did not apply, that such being applied also works to encourage the corruption at hand and that at a minimum the Court was required to take note of the subterfuge and go further to assure that this dismissal of Plaintiff's claim could in no way be perceived as retaliatory..The Plaintiff also argues that Rule 41(b) required that findings of fact along with conclusions of law be done judiciously jurisprudent with the highest of ethics applied. That there is more than 1 reversible item within His Honor Baxter's dismissal of Plaintiff.

20. Accordingly the Plaintiff asks that this Appeal District Court REVERSE and REMAND for further proceedings consistent with this opinion and take both steps to assure Plaintiff will receive a fair, jurisprudent hearing of the merits of the CLI claim, while additionally taking whatever judicial steps necessary to assure that this corruption cease and the proper authorities do justice righteously and ethically as the CLI contracts required all paperwork to be filed with the "assistance of DEBTORS counsel" that was drafted by TBF, MNAT and Barry Gold, that as such TBF, MNAT & maybe even Barry Gold became the Plaintiff's attorney of record. Surely a counsel cannot testify against the client.

21. As these counsel(s) have deceived the Plaintiff, the ESTATE, the shareholders, the Court and abused the system as a whole, surely the amount of leniency should be in the direction of the one violated and not on behalf of those that did the violations.

22. The Court did approve the Contracts that they did draft which made the Plaintiff the "sole" liquidation agent of the ESTATE, designed the only item the Plaintiff was not to be paid upon (Blairs A FF& E) and the integrity of the system must uphold such contractual arrangements or the system would demolish. For if one cannot count upon the Federal Courts Judge approve contract to do one's work, what can one rely upon?

23. The PEDC always stated in the OMNI objections that the HAAS AFFIDAVIT was a waiver. When it came down to trial time, they could not permit themselves to go on the stand and risk further counts of perjury, therefore this dismissal was done to keep justice at bay.

24. The HAAS AFFIDAVIT specifically states in Item 11 that CLI is entitled to it's "success fee's". That along with the Court approved hiring Orders of retention, along with the CASTILLO AFFIDAVIT and the many items that the Court processed as completed sales is proof positive of supporting documentation.

25. That the CLI 'bare bones" was support.

26. That His Honor Baxter did (as is testified to in the Transcript of August 22, 2005) wrongfully state that the Plaintiff had received a $400,000 settlement.

27.    The $400,000 was a partial payment of the CLI AMEND CONTRACT as designed by part "A" thereof to secure assets of the ESTATE and mitigate the return of items (over 10,000 units) to lease holders. That such misrepresentation of the facts alone is reversible error as His Honor Baxter seems to imply that $400,000 was paid as a settlement.

28.    That the US Trustee and maybe even the Court have failed the Department of Justice guidelines and Handbook to do the duty of "Notify & Refer as is required by the Code as anyone can see this is a case of the most extensive, multiple party, ugly conflicts case that anyone could ever imagine.

29.    That any interpretation of the ambiguity of the CLI duties or contracts should be held against the drafters, (that is Barry Gold, TBF & MNAT) especially when we have the evidence that they encouraged the Plaintiff not to seek counsel which is testified to, under oath by the CASTILLO AFFIDAVIT.

30.    Finally the HAAS AFFIDAVIT was improperly serviced, as is witnessed by the witness list in docket item 816, which was supplied by MNAT and argued by MNAT, the PEDC, TBF and Barry Gold that Docket item 816, the HAAS AFFIDAVIT was a waiver.

31.    The Plaintiff prays the Court render justice in ALL aspects of the case and as one that is Pro Se as a David v Goliath, petitions this Appeals Court to take into consideration that the Plaintiff is between a rock and a hard place at the mercy of the Court. As I am in fear for my well being, have lost all business contacts due to this case and the bad faith perpetuated upon my by all the parties involved.

Oct 11, 2005

Respectfully Submitted
/s/ Steven Haas

CEO and President
Collateral Logistics, Inc (CLI)

bhaass@aol.com

laserhaas@msn.com

This item was sent overnight to the Clerk of Court, by email to Rosner, by mail to the service list provided and the US Trustee office.

### Listing of Items to be heard on Appeal as Record and Issues

In re: eToys 01-706 thru 01-709 Jointly Administrated

RE: Concerning the Appeal by Steven Haas/ Collateral Logistics, Inc.

United States District Court Federal for the District of Wilmington Delaware

In re: eToys 01-706 through 01-709 (jointly administrated)

I Steve Haas Pro Se and as 100% owner for Collateral Logistics, Inc ("CLI")
As collectively and separately are the Plaintiff (the "Plaintiff")

v

. ebc1, Inc. formerly known as eToys, Inc. DE Fed Dist case # 01-706 thru 01-709 and
the confirmed Plan Committee thereof the Post Effective Date Committee (the "PEDC")
as collectively and separately are the Defendant (the "Defendant")

### Record and Issue Items of Appeal

Whereas the Plaintiff appeals to the United States District Court for the  District of
Wilmington Delaware from the Judgment/order/decree of Randolph Baxter as visiting
Justice assigned to the CLI claim in the eToys ESTATE case where His Honor Randolph
Baxter in the Bankruptcy Court of Wilmington Delaware did rule to void and expunge
the CLI claim on August 22, 2005 and did sign an Order to such effect on August 25,
2005.
Whereas I , Steven Haas, also known as Laser Steven Haas as 100% owner of CLI did
perform work in compliance with a Court order signed by Her Honor Mary F Walrath do
this day, August 31, 2005 declare the intent to appeal and raise issue with His Honor
Randolph Baxter's ruling against CLI and I , Steve Haas.
Having Timely filed the Notice of Appeal and paid the Appropriate Fee of $255 as
required I/We, Steven Haas/Collateral Logistics, Inc. (CLI) (the Plaintiff) request that the
Appeal of the Judgment by His Honor Randolph Baxter of August 22, 2005 dismissing
the CLI claim be heard in the United States District Court of Wilmington Delaware.
WHEREAS the Plaintiff does now hereby list the following items to be heard as record
and issues on Appeal

1.  Whether or not the sole shareholder of a corporate entity has the right to be
    heard as sole entitled beneficiary to such in a Bankruptcy Case.  Specifically I
    Steve Haas as sole 100% stock holder of Collateral Logistics, Inc, whether the
    Corporate veil has been pierced or not pierced, has the right to be heard in the
    eToys Case as Collateral Logistics, Inc was contracted , with approval of the
    Court and had performed the duties and was denied payment after the
    performance.  Whereas His Honor Baxter did unlawfully, unrighteous, lacking
    of Justice did dismiss the CLI claim as part of 41(b) Rules of Procedure.

2.  Issues of Fraud which are the basic motivation for the denial of the CLI claim. Where CLI performed the work and the Estate of eToys hired as it's CEO the partner of the Attorney for the Creditors, in secret , without Court approval.

3.  Issues of Fraud where the US Trustee Office designated Mark Kenney and having informed Mark Kenney repeatedly as Attorney for the US Trustee office and was told by Mark Kenney there was nothing wrong. Whereas to this date Mark Kenney has not sought sanctions against Barry Gold the CEO of the Debtor and Plan Administrator even when the Plan provides for his removal.

4.  As a matter of law an attorney (Traub Bonacquist & Fox and his associates) cannot use the Bankruptcy Court as a personal tool for a personal vendetta in a retaliatory manner.

5.  Whereas Traub Bonacquist & Fox, Barry Gold, Fred Rosner (and his various related firms), Morris Nichols Arsht & Tunnel and the Firm of Irell & Manella cannot testify against, or be witness against CLI or Steve Haas as they became my Attorney of record, having discouraged me from seeking Counsel as a cost saving measure to the ESTATE and have drafted CLI contracts, submitted same to Court, as such is even part of the CLI contract as a matter of law.

6.  Whereas it is not permitted for the Court to approve an entity (CLI) to perform duties for an ESTATE and then to hire CLI and refuse to pay for services completed. Especially when the ESTATE has the means to pay.

7.  That the HAAS Affidavit of Docket 816 is NOT a Waiver as has been stipulated by the opposing parties as part of the OMNI objections.

8.  That His Honor Baxter did find wrong when he did state that there was no supporting documentation for CLI where CLI had multiple Affidavits by the former Chairman of the Creditors Committee.

9.  This His Honor Baxter was incorrect in whole and/or in part in stating that the partial payment to CLI of $400,000.00 was a settlement along with the various other justification statements he made on August 22, 2005 and in His Honor Baxter's signed ORDER of August 25, 2005.

10. That the duties to Notify & Refer, along with the duties of sufficient Deterrent have been violated in the extreme and that this unlawful, unjust endeavor to dismiss the CLI claim actually serves as an encouragement to Fraud participants in the future.

11. That any interpretations of ambiguity is to be against the legal professional drafters and NOT CLI or Steve Haas.

12. That the HAAS AFFIDAVIT was improperly done as CLI was not serviced.

Items to be included for this Appeal are the following Court records.

13  The Original CLI "nunc pro tunc" orders (2) two separate items in 2001.

14  The Original CLI "nunc pro tunc" contracts (2) in 2001.

15  The Chairman of the Creditors Committee initial Affidavit.

16  The Chairman of the Creditors Committee follow up Affidavit which certifies the Fraud and Deception by Barry Gold and Paul Traub.

17  The Haas Affidavit docket number 816.

18    The CLI responses in Feb 2002, Fall 2002, throughout 2003, 2004 and 2005.

19    The Transcripts of the fall of 2002 which shows the intent to conceal on the part of Traub Bonacquist & Fox and Barry Gold

20    The Transcript of Dec 22, 2004 which documents the US Trustee acknowledgement of the concealed non disclosure of conflict and the changing of the Post Effective Date Committee.

21    The Court record responses that were directed by Her Honor Walrath for January 25, 2005 by the firm of Traub Bonacquist & Fox, Barry Gold, the Post Effective Date Committee and the firm of Morris Nichols Arsht & Tunnel.

22    The Transcript of the hearing of Feb 1, 2005.

23    The Depositions of the parties in question on Feb 9, 2005.

24    The US Trustee first Motion to Sanction (inadequately) on Feb 15. 2005.

25    The 2nd US Trustee Motion to Sanction Traub Bonacquist & Fox, insulting the Court, The System and all parties of interest with a settlement Motion on over 50 felonies. On Feb 25 thru 27 2005.

26    The Transcript of March 1, 2005. Where Paul Traub of Traub Bonacquist & Fox admits that he paid Barry Gold 4 separate payments of $30,000 each prior to placing Barry Gold on board the ESTATE as CEO at $40,000. per month verifying violation of the Scheme to Fix Fee's Statue.

27    Various other documents that support the allegations made and beg this Honorable Court to intercede and pursue Justice.

We also pray the Court to hear oral arguments by Steve Haas and/or CLI as we are without counsel, where no one will represent us in the pursuit of Justice against such overwhelming corruption. So that a clear presentation of the facts can be made.

Dated _Sept. 11, 2005_

Signed _[signature]_

Pro Se Litigant. Steve Haas as President and Sole Shareholder 100% of Collateral Logistics, Inc. (CLI)

Service Sent electronically (email) to Fred Rosner of the Firm Jaspen Schellisnger as local counsel for the Post Effective Date Committee (PEDC) and a copy hand delivered to the Court on September 12, 2005.

**Motion** For Designation for Appeal to be heard in the US District Court of Wilmington Delaware.

In re: eToys 01-706 thru 01-709 Jointly Administrated

RE: Concerning the Appeal by Steven Haas/ Collateral Logistics, Inc.

United States District Court Federal for the District of Wilmington Delaware

In re: eToys 01-706 through 01-709 (jointly adminitstrated)

I Steve Haas Pro Se and as 100% owner for Collateral Logistics, Ino ("CLI")
As collectively and separately are the Plaintiff (the "Plaintiff")

v

, ebc1, Inc. formerly known as eToys, Inc, DE Fed Dist case # 01-706 thru 01-709 and the confirmed Plan Committee thereof the Post Effective Date Committee (the "PEDC") as collectively and separately are the Defendant (the "Defendant")

### MOTION for APPEAL to be Heard in Federal District Court

Whereas the Plaintiff appeals to the United States District Court for the District of Wilmington Delaware from the Judgement/order/decree of Randolph Baxter as visiting Justice assigned to the CLI claim in the eToys ESTATE case where His Honor Randolph Baxter in the Bankruptcy Court of Wilmington Delaware did rule to void and expunge the CLI claim on August 22, 2005 and did sign an Order to such effect on August 25, 2005.

Whereas I , Steven Haas, also known as Laser Steven Haas as 100% owner of CLI did perform work in compliance with a Court Order signed by Her Honor Mary F Walrath do this day, August 31, 2005 declare the intent to appeal and raise issue with His Honor Randolph Baxter's ruling against CLI and I , Steve Haas.

Having Timely filed the Notice of Appeal and paid the Appropriate Fee of $255 as required I/We, Steven Haas/Collateral Logistics, Inc. (CLI) request that the Appeal of the Judgment by His Honor Randolph Baxter of August 22, 2005 dismissing the CLI claim be heard in the United States District Court of Wilmington Delaware.

Dated _Sept 11, 2005_

Signed _____

Pro Se Litigant. _For Collateral Logistics & Sole Shareholder_

Service Sent electronically (email) to Fred Rosner of the Firm Jaspen Schellisnger as local counsel for the Post Effective Date Committee (PEDC)

United States District Court Federal for the District of Wilmington Delaware

In re: cToys 01-706 through 01-709 (jointly adminitstrated)

I Steve Haas Pro Se and as 100% owner for Collateral Logistics, Inc ("CLI")
As collectively and separately are the Plaintiff (the "Plaintiff")

v

. ebc1, Inc. formerly known as eToys, Inc. DE Fed Dist case # 01-706 thru 01-709 and
the confirmed Plan Committee thereof the Post Effective Date Committee (the "PEDC")
as collectively and separately are the Defendant (the "Defendant")

### Notice of Intent of Appeal

Whereas the Plaintiff appeals to the United States District Court for the District of
Wilmington Delaware from the Judgement/order/decree of Randolph Baxter as visiting
Justice assigned to the CLI claim in the eToys ESTATE case where His Honor Randolph
Baxter in the Bankruptcy Court of Wilmington Delaware did rule to void and expunge
the CLI claim on August 22, 2005 and did sign an Order to such effect on August 25,
2005.

Whereas I , Steven Haas, also known as Laser Steven Haas as 100% owner of CLI did
perform work in compliance with a Court Order signed by Her Honor Mary F Walrath do
this day, August 31, 2005 declare the intent to appeal and raise issue with His Honor
Randolph Baxter's ruling against CLI and I , Steve Haas.

Dated _August 31, 2005_

Signed _____
Pro Se Litigant.

Service Sent electronically (email) to Fred Rosner of the Firm Jaspan Schellianger as
local counsel for the Post Effective Date Committee (PEDC)

And also to Fred Rosner by mail.

While also sending this letter, signed and dated by overnight carrier to the US
Bankruptcy Court Clerks Office with the appropriate filing fee of $250 as required by the
US Delaware Bankruptcy Court website.

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

-----------------------------------------------------------X

In re:                                          Chapter 11

ETOYS, INC., et al.,                            Case Nos. 01-0706 (RB)
                                                Through 01-0709 (RB)

        Confirmed Debtors.

                                                Re: Docket Nos. 2287 & 2301

-----------------------------------------------------------X

## ORDER (A) DISMISSING CLAIMS FILED BY COLLATERAL LOGISTICS, INC. AND (B) DENYING EMERGENCY MOTION BY COLLATERAL LOGISTICS, INC. FOR AN EXTENSION OF TIME TO SEEK NEW COUNSEL AND/OR TO ACT PRO SE

Upon the Motion by The Post Effective Date Committee to Dismiss Claims Filed

by Collateral Logistics, Inc. [Docket No. 2301] (the "Motion to Dismiss") and the Emergency

Motion by Collateral Logistics Inc. for an Extension of Time to Seek New Counsel and/or to Act

Pro Se (the "Emergency Motion"); and due and sufficient notice of the hearing on the Motion to

Dismiss having been given; and for the reasons set forth in the Motion to Dismiss and at the

hearing thereon held on August 22, 2005 (the "August 22 Hearing"); and after due deliberation

and good and sufficient cause having been shown, the Court hereby finds as follows:

        A.    CLI was retained by Orders dated April 25, 2001 [Docket No. 249] and

July 9, 2001 [Docket No. 515] to provide transportation and security services in connection with

the liquidation of estate inventory (together, the "CLI Retention Orders");

        B.    The CLI Retention Orders require CLI to file and serve periodic and final

applications for payment of its fees for services rendered and reimbursement of expenses,

including with such applications all supporting documentation;

        C.    CLI failed to file any fee applications as required by the CLI Retention

Orders;

#14606.1

H- 8/22/05 -

D.    A dispute arose between the estate and CLI as to the amount of fees and expenses, if any, owed to CLI;

E.    Representatives of the estate and CLI negotiated a compromise of the disputed fees and expenses as set forth in the Affidavit of Steven Haas in Support of Collateral Logistics, Inc.'s Request for Payment of Expenses dated November 28, 2001 (the "Affidavit") filed with the Court [Docket No. 2133];

F.    CLI thereafter filed two "bare bone" proofs of claim dated February 14, 2002 and March 1, 2002 seeking payment beyond the amounts CLI previously was paid and the amounts agreed to as set forth in the Affidavit (together, the "CLI Claims");

G.    The CLI Claims lack any supporting documentation as required by the Bankruptcy Rules;

H.    The PEDC filed objections to the CLI Claims and thereafter sought discovery against CLI;

I.    When CLI failed to properly and fully respond to the PEDC's discovery requests the PEDC filed a Motion to: (A) Compel Production of Documents and Responses to Discovery Requests; (B) Quash Subpoenas, and (C) Stay Third Party Discovery Requests Propounded By Collateral Logistics, Inc. (the "Motion to Compel") and a Supplement to the Motion to Compel;

J.    The Motion to Compel was granted by Order dated December 6, 2004 [Docket No. 2133];

K.    CLI failed to comply with the December 6, 2004 Order Granting the Motion to Compel;

L. By Order dated June 6, 2005 [Docket No. 2274], CLI was directed to obtain new counsel on or before June 20, 2005 at 4:00 p.m. with no further extensions;

M. CLI failed to obtain substitute counsel on or before the June 20, 2005 deadline;

N. By Order dated July 26, 2005 [Docket No. 2302] (the "Order Granting Motion to Strike"), the Court ruled that CLI could not appear *pro se* and specifically prohibited CLI from causing any future filings in this matter and specifically prohibited Steven Haas from representing or causing any future filings on behalf of CLI;

O. The Order Granting the Motion to Strike specifically provided that any future pleadings by CLI *pro se* or Haas on behalf of CLI, shall result in the imposition of sanctions;

P. The Order Granting Motion to Strike is in accord with the oral ruling made by Chief Judge Walrath on March 1, 2005 that CLI cannot appear *pro se*;

Q. CLI filed its Emergency Motion on June 17, 2005 [Docket No. 2287];

R. Following the entry, and in violation of, the Order Granting Motion to Strike, Steven Haas submitted the following pleadings on behalf of CLI and *pro se*:

  a. Response by Collateral Logistics to PEDC Motion to Dismiss Collateral Logistics Claim; and

  b. Motion by Steve Haas to Seek Compensation by 503(b) Substantial Contribution and to Object to the Post Effective Date Committee Motion to Dismiss Collateral Logistics;

S. CLI had sufficient time to secure substitute counsel;

T. CLI had ample opportunity to providing supporting documentation, if any, for the CLI Claims;

#14606         3

U.    Rule 41(b) of the Federal Rules of Civil Procedure and relevant case law,

*see, e.g., Workman v. Biles*, No. 00-1030, 2004 U.S. Dist. LEXIS 4948 (d. Del. March 18, 2004),

identify its factors for a Court to consider in connection with dismissal of a claim for future to

prosecute. Application of those factors to the facts presented here demonstrate cause to dismiss

CLI claims; and

V.    In connection with these findings, the Court takes judicial notice of the
following:

(a)    Order Authorizing and Approving Employment of Collateral
Logistics, Inc. as Liquidation Consultant to the Debtors [Docket
No. 249];

(b)    Order Authorizing and Approving Employment of Collateral
Logistics, Inc. as Liquidation Agent for the Debtors [Docket No.
515];

(c)    Proof of Claim of Collateral Logistics, Inc. dated February 14,
2002;

(d)    Proof of Claim of Collateral Logistics, Inc. dated March 1, 2002;

(e)    Order Regarding Motion by Post-Effective Date Committee to
Compel Responses to Discovery and for Other Appropriate Relief
[Docket No. 2133];

(f)    Order Granting Motion of The Bayard Firm and Brook &
Hockman LLP for Leave to Withdraw as Counsel to Collateral
Logistics, Inc. [Docket No. 2274]; and

(g)    Order Dated July 25, 2001 [Docket No. 2302].

ACCORDINGLY, BASED ON THE FOREGOING AND THE RECORD

MADE AT THE AUGUST 22 HEARING, IT IS HEREBY

ORDERED, that the Motion to Dismiss is granted, with prejudice, and the

Emergency Motion is denied; and it is further

#14606                                    4

ORDERED, that the CLI Claims, including any administrative claim or other claim it has asserted or may assert against these estates, are disallowed and expunged in their entirety; and it is further

ORDERED, that this Court shall retain jurisdiction over any dispute relating to this Order.

Dated: August 25, 2005
      Wilmington, Delaware

_____
United States Bankruptcy Judge

#14606

5

## AFFIDAVIT OF LISANDRO "LEE" CASTILLO

I, Lisandro "Lee" Castillo reaffirm now in June 2005 and says:

1. I was the Director of Corporate Credit at Mattel, Inc. until November 2001.

2. I was elected Chairperson of the Official Creditors Committee of eToys, Inc. ("eToys").

3. The Creditors Committee sought to engage the services of Collateral Logistics, Inc.("CLI") and Steve Haas ("Mr. Haas") in the eToys matter.

4. As Chairperson of the Official Creditors Committee I approved all negotiations on behalf of the committee.

5. Prior to eToys, Mr. Haas and his companies worked for other Creditors committees in which I was involved, such as ToyTime.com.

6. It was not uncommon to settle with Mr. Haas and his companies at the end of the case.

7. Both his non pro tunc contracts were done with my approval and input as Chairperson of the Creditors Committee.

8. As Chairperson of the Creditors Committee I asked Mr. Haas to abate the $125,000.00 commission that Michael Fox had negotiated down to $80,000.00 in the B. W. Ventures matter. Mr. Haas agreed under the sole condition that no other reductions would take place.

9. I am also aware of the stipulation that was signed by Mr. Haas as settlement on partial expenses shortly before my retirement from Mattel.
    a. The agreement was based on the understanding that it was to settle junior labor fees and establish a procedure going forward that the new CEO would accept in the future (Barry Gold was not present in the beginning of the case).
    b. CLI was always entitled to receive their fees net of all expenses, including but not limited to senior management salary.

10. I am aware that Mr. Haas was on location on a daily basis, generally more than 50 hours per week. It was never intended that his labor or time or that of CLI management would occur at a discounted fee.

11. CLI is directly credited with millions of dollars in additional returns to the Estate for which they have not yet been paid. Some of the additional returns are:
    a. CLI achieved a higher return for the Committee in the endeavor to sell the intellectual property to KB. It was on CLI's recommendation and insight that we sold the bulk assets to KB instead of Consolidated Stores (where Consolidated had a higher bid for goods only).
    b. CLI initiated the sale to Yellow Knife with was twice the return of other bidders, Yellow Knife paid to the Estate $500,000.00
    c. CLI did a lot of work in the endeavor to sell the FF&E and is entitled to the 20% commission on the sale even though the estate prevented them from completing the task.

12. I believe CLI not only obtained the $1 million they projected and was part of their contract, but, in addition boosted B W Ventures to $1.25 million and saved the Estate extended additional count and warehouse expenses.

13. CLI was always on target with projected returns and the removal of the FF&E. CLI is therefore entitled to all commissions earned on the sale of the FF&E.

14. CLI is owed additional funds beyond the last two payments of $4,000.00 and $31,000.00 received at the beginning of this year. At a minimum Mr. Haas salary should be paid either at a flat annual salary such as that of Barry Gold or at an hourly rate of $350.00 for an exceptional performance beyond what was required of Mr. Haas or CLI.

15. Where I, Lisandro "Lee" Castillo now state, after this long elapsed time, on an item I wish had been settled properly long ago, that it is currently June 2005 and unless Mr. Haas or CLI has received a payment from the Estate since March of 2002, that CLI and Mr. Haas are owed commissions, success fees, etc on multiple sales that were part of the CLI agreement. Particularly the Domain Name of eToys to KB Toys, FF&E, assets and more. While also being owed, for a job I will testify to and affirms now was excellent agreed to by the firm of Traub Bonacquist & Fox and myself as Chairman of the Creditors Committee.

16. Furthermore, it appears that CLI and Mr. Haas are now paying a penalty for services rendered to the Estate of eToys and the Creditors Committee, where Mr. Haas sought for the negotiations to provide for his entity to have a lawyer and accountant paid for. Where both I and the firm of Traub Bonacquist discouraged Mr. Haas from the need of counsel. Where we mutually agreed that the firm of Traub Bonacquist & Fox would supply any necessary items to the Court and I, believed it was to be part of the contract of CLI. Part of which never occurred because both contracts for CLI were basically done after the fact of sales or endeavors and the Amended contract for CLI, which was to define the commission schedules had to wait for sales to be redesigned, due to halted auction processes. Making what Mr. Haas and I believed to be moot. As the counsel for the Estate and the Committee, stated they were inundated with paper work and they would inform I or Mr. Haas when paperwork was to be completed. It was not until after I retired from Mattel that Mr. Haas told me he was meeting with resistance, even though Michael Fox of Traub Bonacquist & Fox and Barry Gold both gave their words to me that CLI and Mr. Haas would be correctly settled at the end of 2001. It was at that time I informed Mr. Haas that it was apparent that my input to those parties was ignored and suggested he seek counsel in Dec of 2001 in order to enforce the original agreements.

17. Furthermore, I have somewhat followed the case from a distance and it has been represented that Barry Gold and the firm of Traub Bonacquist & Fox had a relationship that they have admitted to and state has no bearing on any matter(s) at hand. Whereby I, Lisandro "Lee" Castillo do hereby state and affirm that such is false. Had I had any inkling, whatsoever, that Barry Gold was anywhere connected to any party of the case, I would have, as a fiduciary duty sought advice how to correct the matter and would have not approved the hiring of Barry Gold. I had direct discussions with Paul Traub of the firm of Traub Bonacquist & Fox regarding the hiring of Barry Gold and I am amazed at the level of deception that has occurred and the apparent lack of interest to halt it.

Dated: 6/11/05

LISANDRO "LEE" CASTILLO

SUBSCRIBED AND SWORN TO BEFORE ME

THIS 11th DAY OF JUNE 2005

BY LISANDRO LEE CASTILLO

NOTARY PUBLIC

ALAN H. UEHARA
COMM. 61460611
NOTARY PUBLIC-CALIFORNIA
LOS ANGELES COUNTY
My Comm. Expires Mar. 31, 2006

**eToys, Inc., et al.**

**Case No. 01-0706**

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 1 | 539 BRYANT LP<br>ATTN: KIM C BOWERSOX/JBL REAL ESTATE<br>539 BRYANT ST, STE 102<br>SAN FRANCISCO, CA 94107 | 01-0706 | 1598 | UNKNOWN | Books and Records<br>No liability: leases assigned to Johnson & Johnson in BabyCenter sale. Guarantee is moot. |
| 2 | ADECCO EMPLOYMENT SVCS INC<br>THE OLSTEN CORP<br>175 BROADHOLLOW RD<br>MELVILLE, NY 11747-8905 | 01-0706 | 1396 | $17,473.07 | Books and Records<br>No Liability: Debtor's books and records do not show any amount owed. |
| 3 | ADVANCE FIRE PROTECTION CO<br>C/O JAMES A HAYES JR<br>28202 CABOT RD STE 100<br>LAGUNA NIGUEL, CA 92677 | 01-0706 | 1430 | $29,011.00 | Books and Records<br>No Liability: Claimant is sub-contractor of Swinerton & Walberg, general contractor on etoys Olympic Blvd bldg; no agreement exists between etoys and claimant; S&W included claimant's amount in S&W's claim 272. |
| 4 | AIR CONDITIONING CO<br>REGAN MOLATORE, ESQ<br>HUNT, ORTMANN, BLASCO, ET AL<br>301 N LAKE AVE 7TH FLR<br>PASADENA, CA 91101 | 01-0706 | 928 | $304,732.00 | Books and Records<br>No Liability: Claimant was a subcontractor of Swinerton & Walberg, general contractor on the eToys Olympic Blvd bldg; no contract exists between eToys and claimant; S&W included ACC's claim in S&W's claim #272. |
| 5 | AMERICAN EXPRESS TRAVEL RELATED<br>SVCS CO INC CORP CARD<br>ATTN: SANDRA K CURTIN<br>C/O BECKET & LEE LLP<br>PO BOX 3001<br>MALVERN, PA 19355-0701 | 01-0706 | 83 | $2,270.53 | Books and Records<br>Paid: Account balance was paid in full by eToys - check #200080 on 4/19/01 (incl 21.95 later refunded by Amex). |
| 6 | AMERICAN EXPRESS TRAVEL RELATED<br>C/O BECKET & LEE LLP<br>PO BOX 3001<br>MALVERN, PA 19355-0701 | 01-0706 | 1424 | $78,840.75 | Books and Records<br>Paid: Payment of $76,592.17 made on check #103617 on 2/22/01 (cleared 2/27/01), leaving balance of $2,248.58, which Amex has filed another claim for and eToys has paid. |
| 7 | AMERICAN MOTORISTS INS CO<br>LAW OFFICES OF MICHAEL OCONNOR<br>10 ESQUIRE RD STE 14<br>NEW CITY, NY 10956 | 01-0707 | 1359 | $50,000.00<br>C | Books and Records<br>No Liability: claim is for contingent amount based upon potential exposure as surety for bond. |
| 8 | ANDERSON, LINDA L<br>1061 WHITE RIDGE RD<br>SUTHERLIN, VA 24594 | 01-0707 | 650 | $280.92 | Books and Records<br>No liability - employee had a negative vacation accrual balance on 3/6/01 |

10/29/2002 10:51:16 AM

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.                  **EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**
Case No. 01-0706                          **CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 9 | APPAREL SOLUTIONS<br>12 MANITOU RD<br>WESTPORT, CT 06880 | 01-0706 | 1016 | $516.00 | Books and Records<br>No liability - documentation provided are invoices billed to Toy Time. No record of open a/p with claimant |
| 10 | ARTCRAFTERS CABINETS INC<br>FRANCIS J CUNNINGHAM<br>21800 OXNARD ST STE 840<br>WOODLAND HILLS, CA 91367 | 01-0706 | 1312 | $58,534.18 | Books and Records<br>No Liability: Artcrafters Cabinets is subcontractor of Swinerton & Walberg, general contractor on etoys Olympic Blvd bldg; Artcrafter's claim is included in total claim of Swinerton & Walberg, claim 272. |
| 11 | BANQUE SAFRA-LUXEMBOURG S.A.<br>10A BOULEVARD JOSEPH II<br>BP 887<br>L-2018 LUXEMBOURG.<br>LUXEMBOURG | 01-0706 | 1194 | $232,377.17 | Books and Records<br>No liability - debtor's books and records show no liability to this creditor |
| 12 | BASAT-SHAPIRO, BEN<br>7015 VALJEAN AVE<br>VAN NUYS, CA 91406 | 01-0706 | 601 | $93,805.00 | Books and Records<br>No Liability: sub-contractor of Swinerton & Walberg, Debtor's have no agreement with claimant to pay claim. |
| 13 | BATCHELDER, CHARLES L<br>1369 HYDE ST #20<br>SAN FRANCISCO, CA 94109 | 01-0706 | 1233 | $5,287.69 | Books and Records<br>No Liability: not an employee of Debtors; BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |
| 14 | BERGELECTRIC CORPORATION<br>C/O SHAFFER GOLD & RUBAUM LLP<br>12011 SAN VICENTE BLVD SUITE 600<br>LOS ANGELES, CA 90049-4948 | 01-0706 | 836 | $45,399.41 | Books and Records<br>No Liability: BergElectric was subcontractor of Swinerton & Walberg, no contract between eToys and BergElectric; Swinerton & Walberg included BergElectric's claim in S&W's claim #272. |
| 15 | BRIAN WALLOS & CO INC<br>60 ETHEL RD WEST<br>SUITE 5<br>PISCATAWAY, NJ 08854 | 01-0706 | 877 | $17,318.25 | Books and Records<br>No Liability: Claimant fails to credit $29,000 debit amounts owed to etoys from the invoices included in this claim. |
| 16 | CAMPBELL, LARRY<br>908 MEADOW LANE<br>FT WALTON BEACH, FL 32547 | 01-0706 | 720 | $18,000.00 | Books and Records<br>No Liability: no record of claimant as vendor or employee of eToys |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.                                        **EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

Case No. 01-0707                                                              **CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 17 | CAPCOM<br>475 OAKMED PKWY<br>SUNNYVALE, CA 94085 | 01-0707 | 920 | $13,333.90 | Books and Records<br>No liability - after further review, Debtor's records reflect a debit balance for this vendor. |
| 18 | CENTURY BUSINES CREDIT CO<br>119 W 40TH ST<br>NEW YORK, NY 10018 | 01-0706 | 1425 | $30,009.70 | Books and Records<br>No Liability: Factored creditor (Uncle Milton) issued credit memos totaling $41,870.29 that were not honored; demand letter sent to Uncle Milton by Debtors for credit amount. |
| 19 | CLAYCO CONSTRUCTION CO<br>WOODS ROGERS & HAZLEGROVE<br>530 MAIN ST STE 201<br>DANVILLE, VA 24543 | 01-0706 | 1383 | $544,782.00 | Books and Records<br>No Liability: Claim satisfied in sale of Blairs, Virginia property to Unique Industries Inc. |
| 20 | CLAYCO CONSTRUCTION CO INC<br>C/O WOODS ROGERS & HAZLEGROVE PLC<br>ATTN RJ LACKEY, ESQ<br>530 MAIN ST #201<br>DANVILLE, VA 24543 | 01-0706 | 84 | $625,387.00 | Books and Records<br>No Liability: Claim satisfied in sale of Blairs, Virginia property to Unique Industries Inc. |
| 21 | CLAYCO CONSTRUCTION CO INC<br>C/O WOODS ROGERS & HAZLEGROVE PLC<br>ATTN RJ LACKEY, ESQ<br>530 MAIN ST #201<br>DANVILLE, VA 24543 | 01-0706 | 85 | $544,782.00 | Books and Records<br>No Liability: claim satisfied in sale of Blairs Virginia property to Unique Industries, Inc. |
| 22 | COFFEE TIME<br>DIV RCA COFFEE CORP<br>780 SOUTH GLADYS AVE<br>LOS ANGELES, CA 90021-1414 | 01-0706 | 177 | $907.37 | Books and Records<br>No liability - debtor's books show all invoices paid & no balance due to this vendor. |
| 23 | COLLATERAL LOGISTICS, INC.<br>R STEVEN HAAS<br>3308 WILLOW PARK CIRCLE<br>CORONA, CA 92881 | 01-0706 | 1794 | $783,500.00 | Books and Records<br>No Liability: Books and records show all amounts due were paid. Affidavit signed by CLI evidencing same. |
| 24 | COLLETT, ALVIN<br>805 S PETERS BR RD<br>HELTON, KY 40840 | 01-0706 | 870 | $14,000.00 | Books and Records<br>No liability: Debtor's search of records finds no record of claimant as vendor or employee |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

Case No. 01-0707

**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 25 | CROWN CREDIT CO<br>C/O JEFF BAILEY<br>115 S MAIN ST<br>NEW BREMEN, OH 45869 | 01-0707 | 1468 | $900,378.62 | Books and Records<br>No Liability   Equipment surrendered to claimaint in August 2001 and re-let to KB Toys; mitigated damages in full |
| 26 | DELTA DENTAL PLAN OF CALIFORNIA<br>ATTN  MARY MILLER ACCOUNTING<br>100 FIRST ST<br>SAN FRANCISCO, CA 94105 | 01-0706 | 1780 | $27,280.63<br>BLANK | Books and Records<br>No liability - final reconciliation of vendor account shows negative balance due as vendor applied post-petition payment to pre-petition balance not on Debtor's books.  Demand letter has been sent to Delta Dental to attempt to recover this amount. |
| 27 | DEPT OF REVENUE SERVICES<br>C&E DIVISION, BKY SECTION<br>25 SIGOURNEY ST<br>HARTFORD, CT 06106 | 01-0706 | 1637 | $7,188.00 | Books and Records<br>No liability - pursuant to debtor's phone call with Pamela Calachan on 7/2/02 (860-297-5921), claim was supposed to have been withdrawn on 5/1/02 |
| 28 | DISNEY PUBLISHING WORLDWIDE<br>ATTN STEPHANIE WALKER SHEPHARD<br>500 S BUENA VISTA ST<br>BURBANK, CA 91521-9750 | 01-0706 | 1381 | $84,073.50 | Books and Records<br>No Liability:  Debtors had agreement with R2 Media who subcontracted with Disney Publishing; this claim included in the R2 Media claim 1018. |
| 29 | DK MECHANICAL CONTRACTORS INC<br>REGAN A MOLATORE ESQ<br>HUNT, ORTMANN, BLASCO, ET AL.<br>301 N LAKE AVE 7TH FLR<br>PASADENA, CA 91101 | 01-0706 | 927 | $49,866.00 | Books and Records<br>No Liability:  DK Mechanical is subcontractor of Swinerton & Walberg, the general contractor on etoys Olympic Blvd bldg; no contract between eToys & DK Mechanical; claim is included in S&W's claim 272. |
| 30 | EBATES<br>5 THOMAS MELLON CIRCLE<br>STE 225<br>SAN FRANCISCO, CA 94134 | 01-0706 | 1371 | $8,307.79 | Books and Records<br>No liability - docs provided is a statement listing BabyCenter as billing party; any past due invoices are Johnson and Johnson's responsibility. |
| 31 | FIDELITY INVESTMENTS<br>200 MAGELLAN WAY<br>COVINGTON, KY 41015 | 01-0706 | 1418 | $6,439.50 | Books and Records<br>No liability - invoice provided as back up has been paid in full by eToys; records show no balance due. |
| 32 | FUJII, SHARI<br>123 BEAUMONT AVE<br><br>SAN FRANCISCO, CA 94118 | 01-0706 | 1271 | $4,331.25 | Books and Records<br>No Liability:  not an employee of Debtors; BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |

10/29/2002 10:51:17 AM

Page 4 of 11

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.

Case No. 01-0706

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 33 | GAINEY TRANSPORTATION SERVICES INC ATTN: JENNIFER P BENNETT COLLECTION AGENT 6000 CLAY AVE SW GRAND RAPIDS, MI 49548 | 01-0706 | 599 | $3,011.76 | Books and Records No liability - invoice provided as documentation for claim amt was paid in full by Profit Recovery Group on behalf of debtor |
| 34 | GERAK, PEGGY WORKMAN PUBLISHING 708 BROADWAY NEW YORK, NY 10003 | 01-0707 | 1414 | $991.75 | Books and Records No liability - Debtor's books and records show Workman Publishing (actual creditor) with no balance due |
| 35 | GERSTEN, STEVEN P 357 RIDGE RD MIDDLETOWN, CT 06457 | 01-0706 | 1265 | $0.00 BLANK | Books and Records No Liability: no record of any amount owed on Debtor's books and records |
| 36 | GHAHRAMAN, LISA 811 14TH ST #12 SAN FRANCISCO, CA 94114 | 01-0706 | 1051 | $2,301.59 | Books and Records No Liability: not an employee of Debtors; BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |
| 37 | HALLMARK MARKETING CORPORATION P.O. BOX 419535 KANSAS CITY, MO 64141 | 01-0707 | 966 | $2,764.51 | Books and Records No liability - Debtor's books and records show no balance due. |
| 38 | HAMILTON, KARIE 10732 TODTKARLE RD SE OLYMPIA, WA 98513 | 01-0706 | 303 | $155.00 | Books and Records No liability - Debtor's books and records show no balance due for this 1999 invoice. |
| 39 | HAMMER PAC INC ATTN: ARLENE KAPLAN 350 FIFTH AVENUE SUITE 1219 NEW YORK, NY 10118 | 01-0706 | 415 | $115.26 | Books and Records No liability - Debtor's books and records show no balance due |
| 40 | HANDELSMAN, MICHAEL J 41 ARGUELLO BLVD #3 SAN FRANCISCO, CA 94118 | 01-0706 | 202 | $6,661.07 | Books and Records No Liability: not an employee of Debtors; BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |

10/29/2002 10:51:18 AM

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.

Case No. 01-0706

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 41 | HARRIS, MICHELLE<br>4015 BAYVIEW AVENUE<br>SAN MATEO, CA 94403 | 01-0706 | 269 | $22,080.00 | Books and Records<br>No liability - Debtor's books and records show no balance due |
| 42 | HARTFORD LIFE & ACCIDENT INS CO<br>ATTN: KIM BOWEN, ASSOC COUNSEL<br>BANKRUPTCY UNIT<br>PO BOX 2073<br>HARTFORD, CT 06145-2073 | 01-0707 | 46 | $34,727.32 | Books and Records<br>No liability:  claim is to be withdrawn by creditor - filed in error per Jim Spillane @ Hartford Ins Co. Debtor's books and records show no balance due. |
| 43 | HOUSEWORKS LTD<br>ATTN: DEAN BENAMY<br>PRESIDENT<br>2388 PLEASANTDALE ROAD<br>ATLANTA, GA 30340 | 01-0706 | 326 | $15,514.52 | Books and Records<br>No liability - Debtor's books and records show no balance due |
| 44 | INTERNET BUSINESS ASSOCIATES INC<br>ATTN: HARVEY YESOWITZ, PRES<br>29 POLO CLUB DR<br>FREEHOLD, NJ 07728 | 01-0706 | 76 | $2,778.00 | Books and Records<br>No Liability:  BabyCenter vendor - claim amt is liability of Johnson & Johnson, the purchaser of BabyCenter |
| 45 | J SCOTT BOND<br>1224 DELACHAISE ST<br>NEW ORLEANS, LA 70115 | 01-0706 | 1661 | BLANK | Books and Records<br>No liability - no record of claimant as vendor or employee |
| 46 | JACK OF ALL GAMES INC<br>EULER/AMERICAN CREDIT INDEMNITY, AGENT OF<br>100 EAST PRATT ST, 5TH FLR<br>BALTIMORE, MD 21202 | 01-0706 | 838 | $24,929.92 | Books and Records<br>No liability - documentation provided is a statement of account for Zany Brainy, not for eToys. |
| 47 | JON BYK ADVERTISING<br>ATTN: JON BYK<br>140 S BARRINGTON AVE<br>LOS ANGELES, CA 90049 | 01-0706 | 158 | $1,002.26 | Books and Records<br>No Liability:  Debtors books and records show no record of this vendor or amounts claimed. |
| 48 | KAWASUGI, JEFFREY<br>3233 SCOTT STREET #4<br>SAN FRANCISCO, CA 94123 | 01-0707 | 654 | $1,066.23 | Books and Records<br>No liability - debtor's books and records show no balance due as final analysis of employee vacation accrual data shows claimant had a negative accrual balance on 3/6/01. |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.                    **EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

Case No. 01-0707                              **CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 49 | KID GALAXY INC<br>ATTN: PAULA HAYMANN<br>CREDIT MANAGER<br>1 SUNDIAL AVENUE SUITE 310<br>MANCHESTER, NH 03103 | 01-0707 | 374 | $5,608.32 | Books and Records<br>No liability - Debtor's books and records show no balance due |
| 50 | KNAPP, THOMAS MICHAEL<br>3311 ELM ST<br><br>OAKLAND, CA 94609 | 01-0706 | 1235 | $5,537.76 | Books and Records<br>No liability: not an employee of Debtors;<br>BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |
| 51 | KNOWLEDGE WORKERS, INC<br>F/K/A SSDS INC<br>391 INVERNESS DR SO STE 300<br>ENGLEWOOD, CO 80112 | 01-0706 | 949 | $19,705.13 | Books and Records<br>No liability - Debtor's books and records show no balance due. |
| 52 | LA MODELS<br>7700 SUNSET BLVD<br>LOS ANGELES, CA 90046 | 01-0706 | 176 | $2,700.00 | Books and Records<br>No Liability: Accounts aging presented shows invoices dated 3/9/01; etoys had no ads at that time; no documentation to support aging provided. |
| 53 | LIFETIME ENTERTAINMENT SVCS<br>ATTN: ELISE S SOLOMON<br>VP LEGAL<br>309 W 49TH ST<br>NEW YORK, NY 10019 | 01-0706 | 39 | $255,000.00 | Books and Records<br>No Liability: R2 Media is Debtor's agent. Lifetime was contracted by R2, no agreement exists between Lifetime and Debtors; R2 included Lifetime's claim in claim 1018 filed by R2 |
| 54 | LIFETIME TELEVISION 3653<br>ATTN: MARILYN ZIMMERMAN<br>3355 LENOX ROAD 9TH FLR<br>C/O SZABO ASSOCIATES INC<br>ATLANTA, GA 30326 | 01-0706 | 40 | $255,000.00 | Books and Records<br>No Liability: R2 Media is Debtor's agent; R2 contracted with Lifetime and therefore bears the liability; Debtor's have no agreement to pay Lifetime directly; R2 included this claim in its claim 1018 filed in the cases. |
| 55 | MATHEWS CONVEYOR, DIV OF FKI IND INC<br>C/O MCCARTER & ENGLISH LLP<br>ATTN DAVID J ADLER ESQ<br>4 GATEWAY CENTER, 100 MULBERRY ST<br>NEWARK, NJ 07102-4096 | 01-0706 | 1523 | $514,092.84 | Books and Records<br>No Liability: satisfied by terms included in sale of Blairs, Virginia warehouse to Unique Industries Inc |
| 56 | MIDWAY HOME ENTERTAINMENT INC<br>ATTN EUGENE FREEMAN<br>VICE PRESIDENT AND CFO<br>800 NORTH MAIN ST<br>CORSICANA, TX 75110 | 01-0707 | 102 | $15,232.75 | Books and Records<br>No liability - Debtor's books show negative balance for creditor, due to merchandise shortages & returned goods. |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.
Case No. 01-0706

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**
**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 57 | MILOS, LAUREL<br>589 OCEAN ST<br>SOUTH PORTLAND, ME 04106 | 01-0706 | 384 | $450.00 | Books and Records<br>No Liability: Debtor's books and records show no amounts owed to this creditor. |
| 58 | MTV NETWORKS<br>1515 BROADWAY 34TH FLR<br>ATTN BONNY PLOSKER<br>NEW YORK, NY 10036 | 01-0706 | 1275 | $382,846.80 | Books and Records<br>No Liability: R2 Media is Debtor's agent and contracted with MTV for the amounts claimed; R2 filed claim 1018 which includes MTV's claimed amount; Debtor has no agreement or obligation directly to MTV |
| 59 | MTV NETWORKS<br>ATTN BONNY PLOSKER<br>1515 BROADWAY 34TH FLR<br>NEW YORK, NY 10035 | 01-0706 | 1277 | $382,846.80 | Books and Records<br>No Liability: R2 Media, the agent for Debtors, filed claim 1018 which includes the claim of MTV; Debtors have no agreement or direct relationship with MTV and MTV must seek payment from R2 Media |
| 60 | NATHAN, SHARIN<br>1000 LAKE SHORE DR<br>UNIT 1001<br>CHICAGO, IL 60611 | 01-0706 | 1244 | $230.96 | Books and Records<br>No liability - claimant has provided invoices from CyberRebate.com as back up for claim |
| 61 | NATIONAL BROADCASTING CO INC<br>ATTN: MARY MCKENNA<br>SR MGR CFS<br>30 ROCKEFELLER PLAZA RM 5129E<br>NEW YORK, NY 10112 | 01-0706 | 188 | $1,201,315.00 | Books and Records<br>No Liability: Debtor's have no agreement to pay NBC for advertisement; NBC is a creditor of R2 Media, Debtor's ad agency; R2 filed claim 1018 which includes amount claimed by NBC. |
| 62 | NEW YORK DEPT OF FINANCE<br>BKY & ASSIGNMENT UNIT<br>345 ADAMS ST 10TH FLR<br>BROOKLYN, NY 11201 | 01-0706 | 1404 | $24,200.00 | Books and Records<br>No Liability: BabyCenter creditor-commercial real estate tax only owed if annual rent exceeded $100,000, annual BabyCenter rent was $36,300; corporation tax-received a tax refund for the same tax period asserted in the claim. |
| 63 | NG LAND LLC<br>C/O EDWARD B RASCH<br>1464 COMSTOCK AVE<br>LOS ANGELES, CA 90024-5366 | 01-0707 | 1242 | $2,119,135.00 | Books and Records<br>No Liability: pursuant to sale of Blairs, Virginia property to Unique Industries, Inc., claimant waived claim, including the claims of mechanics liens included in this claim. |
| 64 | OTT, JULIAN A<br>C/O HOSPITALITY MANAGEMENT<br>ASSOCIATES INC<br>2664 ST MATTHEWS RD<br>ORANGEBURGH, SC 29118 | 01-0706 | 452 | $0.00<br>BLANK | Books and Records<br>No liability - no record of claimant as employee or vendor |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.
Case No. 01-0706

**EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**
**CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 65 | OVERNITE TRANSPORTATION BANKRUPTCY AGENT PO BOX 1216 RICHMOND, VA 23218 | 01-0706 | 35 | $2,684.21 | Books and Records No liability - invoice provided as documentation for claim amount was paid in full by Profit Recovery Group on behalf of debtor. |
| 66 | PANLINE USA INC ATTN: WILLIAM DUNLEH CREDIT MANAGER 251 UNION ST NORTHVALE, NJ 07647-2210 | 01-0707 | 307 | $18,422.28 | Books and Records Paid: Debtor's books reflect invoice #194449 paid in full (check #106528). Creditor shows balance due of $18,422.28 on this invoice but no explanation for charge back. |
| 67 | PETITE AMIE ATTN: SANDRA K EVANS OWNER 3565 DALBERGIA ST SAN DIEGO, CA 92113-3812 | 01-0706 | 212 | $751.93 | Books and Records No liability - Debtor's books and records show no balance due |
| 68 | PETTY, LINDA 1420 ABBOTT PLACE CHATHAM, WA 24531 | 01-0707 | 668 | $251.35 | Books and Records No liability - debtor's books and records show no balance due as final analysis of employee vacation accrual data shows negative vacation accrual balance as of 3/6/01 |
| 69 | PHILLIPS DRAPERIES ATTN: EVA GEE TREASURER 161 NO SIERRA MADRE BLVD PASADENA, CA 91107 | 01-0706 | 489 | $19,957.00 | Books and Records No Liability: Contract for services performed was between eToys and Swinerton & Wallberg, none between eToys and Phillips Draperies. |
| 70 | POPOVICH, MICHAEL 119 GREENLAWN BLVD WEIRTON, WV 26062 | 01-0706 | 913 | $6,850.00 | Books and Records No Liability: Debtor has no record of claimant as either employee or vendor of eToys. |
| 71 | PURI, KRIS 1143 BYRNWYCK RD ATLANTA, GA 30319 | 01-0706 | 665 | $20,000.00 | Books and Records No liability - no record of this individual ever having been an eToys employee or vendor. |
| 72 | RAM SPORTS 3660 EAST 40TH AVE DENVER, CO 80205 | 01-0707 | 683 | $5,909.63 | Books and Records No liability - Invoice was paid on 12/5/00, check #107224 for $2,574.48; short paid $3,335.15 due to merchandise shortage. |

10/29/2002 10:51:19 AM

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.                    EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)
Case No. 01-0707                                      CLAIMS TO BE EXPUNGED

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 73 | RAPISTAN SYSTEMS<br>507 PLYMOUTH AVE<br>GRAND RAPIDS, MI 49505 | 01-0707 | 824 | $5,774.48 | Books and Records<br>No liability - debtor had ongoing dispute with claimant regarding freight charges. No documentation is provided that debtor agreed to recompensate for claimed freight charges. |
| 74 | RAYMOND, FRANK<br>315 MONTANA AVE<br>APT 210<br>SANTA MONICA, CA 90403 | 01-0706 | 1043 | $48,437.50 | Books and Records<br>Expunge: Claim is for value of stock options granted to the employee as part of his compensation package. Stock has no value. |
| 75 | RAYMOND, FRANK<br>315 MONTANA AVE<br>APT 210<br>SANTA MONICA, CA 90403 | 01-0706 | 1044 | $131.00 | Books and Records<br>No Liability: Claim was for health benefit claim denied by Blue Cross; Debtor resolved the issue with Blue Cross and claimant's counsel confirmed Blue Cross issue resolved. |
| 76 | ROADWAY EXPRESS INC<br>1077 GORGE BLVD<br>PO BOX 3552<br>AKRON, OH 44309-3552 | 01-0706 | 1024 | $49,726.60 | Books and Records<br>Expunge: $40,000 claimed was paid by Profit Recovery Group; unable to ascertain any further amt owed as docs provided are insufficient. |
| 77 | ROMERO, ALEJANDRO<br>15921 VIA ALAMITOS<br>SAN LORENZO, CA 94580 | 01-0706 | 970 | $3,700.00 | Books and Records<br>No Liability: not an employee of Debtors; BabyCenter employee terminated at pre-petition sale of BabyCenter to Johnson & Johnson. |
| 78 | THE BOSTON GLOBE<br>PO BOX 2378<br>BOSTON, MA 02107-2378 | 01-0707 | 522 | $34,215.45 | Books and Records<br>No Liability: Debtor's have no agreement with Boston Globe; R2 Media, Debtor's agent, entered into agreement with Boston Globe and included amts in R2's claim 1018. |
| 79 | THE BOSTON GLOBE<br>ATTN JOSEPH ASTINO<br>135 MORRISSEY BLVD<br>BOSTON, MA 02107 | 01-0706 | 1366 | $34,215.45 | Books and Records<br>No Liability: Debtor's have no agreement for services with The Boston Globe; R2 Media, Debtor's agent, contracted with The Boston Globe, and therefore is liable for amounts asserted by The Boston Globe. |
| 80 | THE FOR ALL KIDS FOUNDATION<br>500 LAKE ST<br>SUITE C<br>RAMSEY, NJ 07446 | 01-0706 | 793 | $1,000,000.00 | Books and Records<br>No Liability: contract provides no liability clause if contract breached. |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

eToys, Inc., et al.                          **EXHIBIT TO 5TH OMNIBUS OBJECTIONS (BOOKS AND RECORDS)**

**Case No. 01-0706**                             **CLAIMS TO BE EXPUNGED**

| | Claimant Name and Address | Case Number | Claim Number | * Claim Amount | Reason for Proposed Disallowance |
|---|---|---|---|---|---|
| 81 | TURI INSTALLATION<br>C/O ROBERT M RUSSAK<br>CANYON BLVD #340<br>WOODLAND HILLS, CA 91367 | 01-0706 | 803 | $50,898.10 | Books and Records<br>No Liability: claimant is sub-contractor of Swinerton & Walberg, the general contractor on the etoys Olympic Blvd bldg; no agreement exists between Debtor and claimant; Swinerton & Walberg included Turi's claim in S&W's claim 272. |
| 82 | UNIGLOBE<br>1299 OCEAN AVE STE 105<br>SANTA MONICA, CA 90401 | 01-0706 | 1041 | $7,473.44 | Books and Records<br>No Liability: $30,000 in airline coupons held by eToys not honored by vendor - Debtor's books and records show no balance due. |
| 83 | UTAH DEPT OF WORKFORCE SVCS<br>PO BOX 45288<br>SALT LAKE CITY, UT 84145-0288 | 01-0707 | 1402 | $1,314.53 | Books and Records<br>No liability - All reports due have been received by Utah Dept of Wkforce (confirmed by Gary Waters @ 801-526-9370), account is now in balance. ProBusiness Payroll Svc sent a check on 7/24/01 to resolve issue. |
| 84 | VIRTUALLY SHOPPING<br>ATTN ANTHONY IASSO<br>PO BOX 12434<br>FORT HUACHUCA, AZ 85670-2434 | 01-0706 | 1083 | $13,149.46 | Books and Records<br>No Liability: no basis for Priority claim, $3,900 of claim for unpaid commissions from BabyCenter, which are the responsibility of Johnson & Johnson, not etoys |
| 85 | W A SCHMIDT<br>38 SOUDERTON PIKE<br>SOUDERTON, PA 18964-1912 | 01-0707 | 500 | $25,485.00 | Books and Records<br>No Liability: Records reflect payment was held back until problems with equipment installation were solved - no documentation provided by claimant that issues were resolved. |
| 86 | WASSERMAN, PAUL<br>BUSINESS ANALYST<br>2032 ARROYO AVE<br>SAN CARLOS, CA 94070 | 01-0706 | 455 | $6,221.03 | Books and Records<br>No liability; claimant was a member of eToys affiliate program - records reflect no balance due |

*Plus, in certain instances, additional contingencies, unliquidated amounts, interest, penalties and/or fees.

EXHIBIT F

UNITED STATES BANKRUPTCY COURT
DISTRICT OF DELAWARE

----------------------------------x

In re

ETOYS, INC., *et al.*,

                Debtors.

----------------------------------x

Chapter 11

Case Nos. 01-706 (MFW) through
01-709 (MFW)

Jointly Administered

**AFFIDAVIT OF STEVEN HAAS IN SUPPORT
OF COLLATERAL LOGISTICS, INC.'S REQUEST
FOR PAYMENT OF EXPENSES**

STATE OF California    )
                        )
COUNTY OF _Los Angeles_ )

**STEVEN HAAS**, being duly sworn, deposes and says:

1.     I am over twenty-one (21) years of age, of sound mind, capable of making this Affidavit and fully competent to testify to the matters stated herein, and I have personal knowledge of the matters set forth herein.

2.     I am an officer and shareholder of Collateral Logistics, Inc ("CLI"), and I am the person at CLI in charge of the proposed engagement of CLI, by the debtor and debtors in possession in these chapter 11 cases (the "Debtors").

3.     CLI has been retained in these cases to render services to the Debtors, in accordance with the terms of the Amendment to Collateral Maintenance and Liquidation Services Agreement (the "Agreement") that was approved by order of this Court.

4.     The contents and statements contained in Exhibits "A" and "B", which are both annexed hereto and incorporated herein by reference, as if fully set forth herein are true and correct.

5.     In furtherance of rendering such services, CLI has incurred the payroll expenses set forth in greater detail on the attached Exhibit A, "Payroll for Collateral Logistics, Inc.", and is seeking payment of such in the amount of $50,312.40.

6.    CLI has incurred the payroll expenses for each and every one of the employees listed on Exhibit "A", each of whom have performed the services, for the period identified on set forth on Exhibit "A", which services were necessary to CLI's rendition of services and have benefited the estates.

7.    CLI understands that it is solely responsible for the payment of the payroll and any other charges, including taxes related to the employment by CLI of those individuals identified on Exhibit "A".

8.    CLI will not seek any additional payroll expenses from these estates, except to the extent that the payroll expenses sought are approved, in writing, by the Debtors and the Committee *prior* to CLI's incurrence of such expenses.

9.    CLI has received the approval of the Debtors and the Committee to the reimbursement of non payroll related expenses set forth on Exhibit "B" incurred by CLI since the commencement of CLI's services in the amount of $82,642.65, of which the Debtors have paid $66,570.47 to CLI.

10.    CLI will not seek any additional reimbursement of non payroll expenses from the estates, except to the extent that such non payroll related expenses are approved, in writing, by the Debtors and the Committee *prior* to CLI's incurrence of such expenses.

11.    Except as otherwise identified herein, the only other amounts CLI may seek to recover from the estates are those amounts that constitute a "success fee" under, and in accordance with the Agreement. Specifically the commission on the sale of assets, inventory & FF&E of the estate which are part of the Amendment Agreement.

12.    CLI understands and acknowledges that any payments by the Debtors to CLI for, and /or approved by the Debtors and Committee of, payroll and non payroll related expenses are subject to review by the Court, in accordance with the procedures contained in the Agreement and Order approving the Agreement and, are therefore subject to disgorgement, if such is so ordered by the Court.

Dated: November 28, 2001

R STEVEN HAAS

SWORN AND SUBSCRIBED to before me
on this 28 day of November, 2001

NOTARY PUBLIC

2

DENNIS R. DUCKWORTH
Commission # 1314632
Notary Public - California
Los Angeles County
My Comm. Expires Jul 23, 2005

O:\2405.0011\Legal\Affidavit.HAAS.doc

## AMENDMENT TO COLLATERAL MAINTENANCE AND
## LIQUIDATION SERVICE AGREEMENT

This AMENDMENT TO COLLATERAL MAINTENANCE AND LIQUIDATION SERVICE AGREEMENT (the "AMENDMENT AGREEMENT") is entered into as of May __, 2001 by and between Collateral Logistics, Inc. ("CLI") and eToys, Inc. ("eToys") and hereby amends the Collateral Maintenance and Liquidation Service Agreement (the "Initial Service Agreement"), dated March 30, 200, between CLI and eToys, pursuant to the terms hereof.

WHEREAS, pursuant to the Initial Service Agreement, which was approved by the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court") on April 25, 2001 (the "Approval Order"), eToys and its affiliated debtors and debtors-in-possession (collectively, the "Debtors") retained the services of CLI to assist the Debtors in the maintenance and liquidation of, among other things, the Debtors' furniture, fixtures and equipment, intellectual property, and inventory (collectively, the "Collateral") located at the Debtors' three warehouses, one located in Ontario, California (the "Ontario Warehouse") and two located in Blairs, Virginia (the "Blairs A Warehouse" and the "Blairs B Warehouse", and together with the Ontario Warehouse, the "Warehouses") (collectively, the "Initial Services");

WHEREAS, pursuant to the Initial Service Agreement, in consideration of the services to be performed by CLI, eToys agreed to pay CLI a flat fee of $200,000, plus reimbursement of all reasonable out of pocket expenses incurred by CLI (the "Initial Fee");

WHEREAS, in light of complications and delays that have arisen in connection with the disposition of the Collateral, which complications and delays had not been anticipated prior to the execution and Bankruptcy Court's approval of the Initial Service Agreement, the Debtors and CLI have agreed to amend and supplement the Initial Service Agreement in accordance with the terms and provisions of the within Amendment Agreement;

NOW, THEREFORE, in consideration of the foregoing, the covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Additional Services.** In addition to the Initial Services to be provided pursuant to the Initial Service Agreement, CLI agrees to act as the Debtors' agent in connection with the following additional services relating to the disposition of the Remaining Collateral:

a.    coordination and supervision of the Debtors' surrender and release of leased furniture, fixture and equipment located at: (i) the Debtors' corporate offices; (ii) the Ontario Warehouse; and (iii) the Blairs B Warehouse (collectively, the "Leased FF&E");

b.  coordination and supervision of the transfer and relocation of all furniture, fixture and equipment (the "FF&E"), whether owned or leased, to the extent it becomes necessary for the Debtors to relocate to another facility or downsize its occupancy of a facility presently being occupied by the Debtors;

c.  coordination and supervision of the transfer or relocation of the Remaining Inventory (as defined in subparagraph (d) below), to the extent same is necessary;

d.  coordination and supervision of the sale at the Warehouses or such other facility as the Debtors, the Committee and CLI agree, either by means of a private sale or public auction, of: (i) the remaining inventory in Lots _____ (the "Remaining Inventory"); (ii) the Debtors' owned FF&E, other then the owned FF&E located in the Blairs A Warehouse (the "Owned Blairs A FF&E"); (iii) in the event that the Second Asset Closing, contemplated pursuant to that certain asset purchase agreement between the Debtors and KB Toy_____, does not occur, the Owned Blairs A FF&E; and (iv) any leased FF&E for which the lease has been rejected but which FF&E the lessor has abandoned to the Debtors (the "Abandoned FF&E"), including, but not limited to the Abandoned FF&E, if any, located at the Blairs A Warehouse (the "Abandoned Blairs A FF&E") in the event that the Second Asset Closing does not occur.

Assets identified in subparagraph (i) through (iv) hereof shall be referred to as "Remaining Collateral."

2.  **Additional Fee.** In consideration of the Additional Services to be provided by CLI hereunder, in addition to the Initial Fee payable under the Initial Service Agreement, the Debtors agree to pay CLI:

a.  a flat fee of two hundred thousand dollars ($200,000) (the "Additional Fee"), which amount shall be paid in two installments, each in the amount of $100,000, with the first installment due on the first business day after entry of an Order of the Bankruptcy Court approving the within Amendment Agreement (the "Amended Approval Order") and the second installment due on the first business day following the thirtieth (30th) day after entry of the Amended Approval Order; plus

b.  a commission in the amount of twenty percent (20%) of the Proceeds generated from the sale of the Owned FF&E and Abandoned FF&E, other than the Owned Blairs A FF&E and Abandoned Blairs A FF&E;

c.  in the event that CLI performs the Additional Services provided for

in paragraphs 1(b)(i) hereof, in connection with the disposition of the Remaining Inventory, the Debtors shall pay CLI a success fee, which shall be calculated as follows:

i.     In the event that the aggregate Proceeds generated from the sale of the Remaining Inventory pursuant to paragraph 1(b)(i) above exceed the sum Expenses (as defined in the paragraph 4 below) incurred in connections with such sale, plus twenty-five percent (25%) of the aggregate Cost Value of the Remaining Inventory (the "Sharing Threshold"), then the Debtors and CLI shall share equally in such excess sale proceeds above the Sharing Threshold (the "Sharing Percentage"); provided however, in the event that the aggregate Cost Value of the Remaining Inventory exceeds Four Million Five Hundred Thousand Dollars ($4,500,000) (the "Inventory Threshold"), then the Debtors and CLI shall mutually agree upon a downward adjustment to the Sharing Percentage attributable to the sale of the Remaining Inventory above the Remaining Inventory Threshold.

3.     **Extended Retention Period**.  The Debtors shall retain the services of CLI to perform the Additional Services pursuant to the withing Amendment Agreement, commencing on May 14, 2001 through and including the earlier of: (i) the date on which the Debtors' chapter 11 cases are closed; or (ii) December 31, 2001 (the "Extended Retention Period")

4.     **Definitions**.  For the purpose of the Amendment Agreement, the following words have the following meanings:

a.     **"Cost Value"** shall mean, with respect to each item of Inventory, the average cost per invoice, which both the Debtors and CLI acknowledge to be an average of the cost of purchasing the Remaining Inventory by the Debtors, including taxes and any freight and shipping and handling or other costs or charges included by Debtors in their books as part of the purchase price for any of the Remaining Inventory, which "Cost Value" for each item of Remaining Inventory shall be the amounts set forth by the Debtors on its auction website.

b.     **"Proceeds"** shall mean the total amount (in dollars) of all sales of the Remaining Inventory made under the Amendment Agreement, exclusive of (i) Sales Taxes, (ii) credit card and bank card fees and chargebacks, (iii) returns, allowances and customer credits, (iv) Delivery Costs, and (v) proceeds from Debtors' insurance directly attributable to loss or damage to the Remaining Inventory.

c.      **"Sales Taxes"**.  All sales, excise, gross receipts and other taxes attributable to sales of the Remaining Inventory (other than taxes on income) payable to any taxing authority having jurisdiction (collectively, "Sales Taxes") shall be added to the sales price of the Remaining Inventory and collected by CLI, on the Debtors' behalf, and deposited into Debtors' existing accounts, trust accounts or other accounts, as designated by the Debtors.  Provided that CLI has collected all Sales Taxes and remitted the proceeds thereof to the Debtors, Debtors shall promptly pay all Sales Taxes and file all applicable reports and documents required by the applicable taxing authorities.  Debtors will be given access to the computation of gross receipts for verification of all such Sales Tax collections. Provided CLI performs its responsibilities in accordance with this Paragraph 3(b), the Debtors shall indemnify and hold harmless CLI from and against any and all costs, including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which CLI sustains or incurs as a result or consequence of the failure by Debtors to promptly pay such taxes to the proper taxing authorities and/or the failure by Debtors to promptly file with such taxing authorities all reports and other documents required, by applicable law, to be filed with or delivered to such taxing authorities.  If CLI fails to perform its responsibilities in accordance with this Paragraph 3(b), CLI shall indemnify and hold harmless Debtors from and against any and all costs including, but not limited to, reasonable attorneys' fees, assessments, fines or penalties which Debtors sustains or incurs as a result or consequence of the failure by CLI to collect Sales Taxes and/or, to the extent CLI is required hereunder to prepare reports and other documents, the failure by CLI to promptly deliver any and all reports and other documents required to enable Debtors to file any requisite returns with such taxing authorities.

5.                      **Payment of Expenses.**  The Debtors shall be obligated to: (a) pay all costs and expenses incurred in connection with the disposition of the Remaining Collateral, pursuant to the budget annexed hereto as Exhibit 4.1(a) (collectively, the "Remaining Collateral Disposition Expenses"); and (b) reimburse CLI for its reasonable and documented out of pocket expenses incurred in connection with the Additional Services provided hereunder (collectively, "CLI Out-of-Pocket Expenses", and together with the Remaining Collateral Disposition Expenses, the "Expenses"); provided however on the first day of each month during the Extended Retention Period (as defined below), CLI shall submit to the Debtors and the Committee an invoice and supporting documentation supporting the reimbursable CLI Out-Of-Pocket Expenses provided for pursuant to paragraph 4(b) above, in the form required by the Office of the United States Trustee, for the Debtors' and the Committee's review.  Following the Debtors and the Committee's approval thereof, the Debtors shall reimburse CLI for the CLI Out-

Of-Pocket Expenses within fifteen (15) days of receipt of the invoice and supporting documentation therefor. Promptly following the Debtors' approval of the requested reimbursement of CLI Out-Of-Pocket Expenses, CLI shall also file the invoice with the Bankruptcy Court and serve it on the Office of the United States Trustee.

6.        **Court Filings.** Not less than every four months during the Extended Retention Period, CLI will file an application with the Bankruptcy Court seeking an allowance of the Additional Fees and the Success Fee provided for hereunder and paid pursuant to the monthly payment procedure provided for herein. In addition, at the earlier of the conclusion of the Extended Retention Period or the conclusion of the Bankruptcy Case, CLI shall file an appropriate application seeking final allowance of all fees and costs, regardless of whether interim compensation has been paid to CLI. CLI will serve notice of its final application on: (i) the Debtors; (ii) the Committee; (iii) the Office of the United States Trustee; (iv) all parties-in-interest; and (v) all parties required to be notified pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. Upon final allowance of such fees and costs, the Debtors shall pay to CLI the amounts allowed by the Bankruptcy Court that were not previously paid to CLI as interim cost reimbursements. CLI understands and agrees that the proposed compensation arrangement will be subject to the provisions of Section 328 of the Bankruptcy Code. CLI further understands and agrees that, to the extent that the aggregate interim payments made to CLI by the Debtors exceeds the amount that is ultimately allowed by the Bankruptcy Court, then CLI will be required to, and shall, promptly repay such overpayment amounts to the Debtors.

7.        **Bankruptcy Court Approval.** Promptly following the execution of this Agreement by all parties hereto, the Debtors shall file an application with the Bankruptcy Court for entry of the Amended Approval Order, approving the terms of the within Amendment Agreement, nunc pro tunc to May 14, 2001. Notwithstanding anything to the contrary contained herein, the parties agree that the Amendment Agreement shall not be binding upon the Debtors unless and until the Bankruptcy Court enters the Amended Approval Order.

8.        **Indemnification.** The Debtors shall defend, indemnify and hold CLI and its affiliates, the officers, directors, agents and employees of each, harmless from and against any and all claims, suits, damages, losses, liabilities, obligations, fines, penalties, costs and expenses (whether based in tort, breach of contract, product liability or otherwise), including reasonable attorneys fees and expenses, arising out of or based on any loss of the Remaining Collateral other than any such loss arising from or in connection with CLI's, its agents and/or employee's negligence or intentional misconduct.

9.        **Miscellaneous.**

COLLATERAL.CONTROL.AMEND.529

9.1    **Agreement.** The Amendment Agreement sets forth the entire agreement with respect to the Additional Services. Except as expressly modified herein, all terms and conditions of the Initial Service Agreement remain in full force and effect.

9.2    **Notice.** Any notice, approval, request, authorization, direction or other communication under the Amendment Agreement will be given in writing and will be deemed to have been delivered and given for all purposes (i) on the delivery date if delivered by confirmed facsimile; (ii) on the delivery date if delivered personally to the party to whom the same is directed; (iii) one business day after deposit with a commercial overnight carrier; or (iv) five business days after the mailing date, whether or not actually received, if sent by U.S. mail, return receipt requested, postage, and charges prepaid, or any other means of rapid mail delivery for which a receipt is available. In the case of eToys, such notice will be provided to Barry Gold, Responsible Officer (fax no. 724/898-0015), 2485 Matterhorn Drive, Wexford, Pennsylvania 15090. In the case of CLI, such notice will be provided to the address for notice set forth on the signature page hereto. Such addresses for notice may be changed at any time by notification to the other party in accordance with the terms hereof.

9.3    **Appointment of CLI**. Pursuant to the terms hereof the Debtors hereby appoint CLI, and CLI hereby agrees to serve, as the Debtor's exclusive agent to perform the Additional Services provided for herein. The Debtors' and CLI's obligations hereunder are subject to the approval of the Bankruptcy Court and shall be of no force and effect in the event that the Amended Approval Order is not entered.

9.4    **No Waiver.** The failure of either party to insist upon or enforce strict performance by the other party of any provision of this Agreement or to exercise any right under this Agreement will not be construed as a waiver or relinquishment to any extent of such party's right to assert or rely upon any such provision or right in that or any other instance; rather, the same will be and remain in full force and effect.

9.5    **Amendment.** No change, amendment or modification of any provision of this Agreement will be valid unless set forth in a written instrument signed by the party subject to enforcement of such amendment.

9.6    **Reporting.** CLI shall prepare weekly reports including, without limitation, reports that comply with the Debtor's current weekly cash reporting to its central office, reflecting the progress of the sale which shall specify (a) the identity of the Remaining Collateral sold; and (b) the Proceeds received therefor. During the course of the sale of the Remaining Collateral, the Debtors shall have the right to have representatives continually act as observers of the sale of the Remaining Collateral.

9.7    **Assignment**.  Neither party may assign this Agreement or any right, title or interest hereunder without the prior written consent of the other party, which consent shall not be unreasonably withheld or delayed.  Subject to the foregoing, this Agreement will be fully binding upon, inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.

9.8    **Construction; Severability.**  In the event that any provision of the Amendment Agreement conflicts with the law under which the Amendment Agreement is to be construed or if any such provision is held invalid by a court which jurisdiction over the parties to the Amendment Agreement, (i) such provision will be deemed to be restated to reflect as nearly as possible the original intentions of the parties in accordance with applicable law, and (ii) the remaining terms, provisions, covenants and restrictions of the Amendment Agreement will remain in full force and effect.

9.9    **Applicable Law.**  The Amendment Agreement will be interpreted, construed and enforced in all respects in accordance with the laws of the State of Delaware.

9.10    **Headings.**  The captions and headings used in the Amendment Agreement are inserted for convenience only and will not affect the meaning or interpretation of the Amendment Agreement.

9.11    **Counterparts.**  The Amendment Agreement may be executed in counterparts, each of which will be deemed an original and all of which together will constitute one and the same.

[Signature Page Follows]
[Collateral Maintenance and Liquidation Services Agreement and Signature Page]

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

```
-------------------------------x
                               :
In re:                         :      Chapter 11
                               :
ETOYS, INC., et al.[1]         :      Case Nos. 01-0706 (MFW)
                               :        through 01-0709 (MFW)
          Debtors.            :
                               :      Jointly Administered
-------------------------------x
```

### ORDER AUTHORIZING AND APPROVING EMPLOYMENT OF COLLATERAL LOGISTICS, INC. AS LIQUIDATION CONSULTANT TO THE DEBTORS

Upon consideration of the Debtor's application (the "Application") for an order

authorizing and approving its employment of Collateral Logistics, Inc. ("CLI") as liquidation

consultant to the Debtors, and good and sufficient cause appearing,

### IT IS HEREBY FOUND AND DETERMINED THAT:[2]

A.    The Court has jurisdiction over this Application under 28 U.S.C. § 1334. This

matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of the

Debtors' chapter 11 cases and this Application is proper under 28 U.S.C. §§ 1408 and 1409.

B.    Due and proper notice of the Application was given under the particular

circumstances, and no other or further notice need be given.

---

[1]    The Debtors are the following entities: eToys, Inc., a Delaware corporation; PMJ Corporation, a Delaware corporation; eKids, Inc., a Delaware corporation; and eToys Distribution, LLC, a Delaware LLC.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact as and when appropriate.

NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND
DECREED AS FOLLOWS:

1.     The Application is granted.

2.     The Debtors are authorized to employ CLI on the basis set forth in the CLI
engagement agreement, nunc pro tunc to March 13, 2001, and are further authorized and
empowered to take such actions as may be necessary to implement the terms and conditions of
that employment.

3.     Each month, or as soon thereafter as is practicable, CLI shall submit to the
Debtors for their review and approval, and thereafter file with the Court and serve on the
Office of the United States Trustee and counsel for the Official Committee of Unsecured
Creditors (the "Committee"), an invoice for expenses incurred in connection with these cases.
CLI shall submit with this invoice documentation supporting the charges for the expenses in
the form required by the Office of the United States Trustee for professional fee applications.

4.     If no written objection is filed with the Court and served on CLI with respect to
the amount of the monthly invoice within ten (10) days after the service of the invoice, the
Debtors are authorized to pay the invoice.  If an objection is timely filed and served, the
Debtors are authorized to pay only the undisputed amount of the invoice until such time as the
objection has been resolved by this Court.

5.     CLI shall file an application with the Court seeking allowance of its fees and
costs incurred to that date and paid pursuant to the monthly payment procedure provided for
herein.  In addition, at the earlier of the conclusion of CLI's services or the conclusion of the
cases, CLI shall file an appropriate application seeking final allowance of all fees and costs,
regardless of whether interim compensation has been paid to CLI.   In connection with is final

application for allowance of all fees and costs, CLI is excused from the requirements of Rule 2016-2(d) of the Local Rules of Practice and Procedures for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), except as to that portion of Local Rule 2016-2(d) that requires CLI to identify the general project categories in which it provided services. CLI shall serve notice of its final application on the Debtors, the Committee, the Office of the United States Trustee, all parties-in-interest and all parties required to be notified pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. Upon final allowance of such fees and costs, the Debtors shall pay to CLI the amounts allowed by this Court that were not previously paid to CLI as interim reimbursements.

Dated: Wilmington, Delaware
    April 25, 2001

                              United States Bankruptcy Judge

CC: weinbeiner & UST  4/27/01

405897.01 07                                               3

IN THE UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| ETOYS, INC., et al., | ) | Case Nos. 01-0706 (MFW) |
| | ) | through 01-0709 (MFW) |
| Debtors. | ) | |

### ORDER AUTHORIZING AND APPROVING
### EMPLOYMENT OF COLLATERAL LOGISTICS, INC.
### AS LIQUIDATION AGENT FOR THE DEBTORS

Upon consideration of the Debtors' supplemental application (the "Supplemental Application") for an order authorizing and approving their further employment of Collateral Logistics, Inc. ("CLI") as liquidation agent for the Debtors, and good and sufficient cause appearing,

**IT IS HEREBY FOUND AND DETERMINED THAT:**[1]

A.      The Court has jurisdiction over this Supplemental Application under 28 U.S.C. § 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of the Debtors' chapter 11 cases and this Supplemental Application is proper under 28 U.S.C. §§ 1408 and 1409.

B.      Due and proper notice of the Supplemental Application was given under the particular circumstances, and no other or further notice need be given.

**NOW, THEREFORE, IT IS HEREBY ORDERED, ADJUDGED AND DECREED AS FOLLOWS:**

---

[1]      Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact as and when appropriate.



1.     The Supplemental Application is granted.

2.     The Debtors are authorized to employ CLI on the basis set forth in the Amendment To Collateral Maintenance And Liquidation Service Agreement nunc pro tunc to May 16, 2001 and are further authorized and empowered to take such actions as may be necessary to implement the terms and conditions of that employment.

3.     No later than the twentieth (20th) day of each month during the Extended Retention Period[2], CLI shall submit to the Debtors and the Committee an invoice and supporting documentation supporting the reimbursable CLI Out-Of-Pocket Expenses in the format required by the Office of the United States Trustee.  Following the Debtors' and the Committee's approval thereof, the Debtors shall reimburse CLI for the CLI Out-Of-Pocket Expenses within fifteen (15) days of receipt of the invoice and supporting documentation therefore.  Promptly following the Debtors' and the Committee's approval of the requested reimbursement of CLI Out-Of-Pocket Expenses, CLI shall also file, with the assistance of Debtors' counsel, the invoice with this Court and serve it on the Office of the United States Trustee.

4.     Within forty-five (45) days after the Termination Date, CLI shall provide the Debtors and the Committee, and the Office of the United States Trustee, as and where applicable, with a final account of all Expenses incurred in connection with the Additional Services provided pursuant to the Amendment.  Upon the Debtors' and the Committee's approval and payment of outstanding Expenses reimbursement amounts set forth on the Final Expense Accounting, no further Expense reimbursement request shall be made by CLI.

---

[2]     Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Supplemental Application or the Amendment.

2

5.    With regard to each payment to be made by the Debtors pursuant to the Amendment and this Order, the Debtors shall determine the pro rata amounts due with respect to the properties and assets of each Debtor and each Debtor shall only be responsible for its pro rata portion of such payment.

6.    Not less frequently than every four (4) months during the Extended Retention Period, or such time period as may be fixed by this Court for all retained professionals, CLI will file, with the assistance of Debtors' counsel, an application with this Court seeking an allowance of the Additional Fees, including but not limited to, the Success Fee provided for in the Amendment and paid pursuant to the monthly payment procedure provided for in the Amendment. In addition, within sixty (60) days after the Termination Date, CLI shall file, with the assistance of Debtors' counsel, an appropriate application seeking final allowance of all fees and costs, regardless of whether interim compensation has been paid to the CLI. CLI, with the assistance of Debtors' counsel, will serve notice of its final application on: (i) the Debtors; (ii) the Committee; (iii) the Office of the United States Trustee, (iv) all parties-in-interest; and (v) all parties required to be notified pursuant to Bankruptcy Rule 2002. Upon final allowance of such fees and costs, the Debtors shall pay to CLI the amounts allowed by the Bankruptcy Court that were not previously paid to CLI as interim cost reimbursements. CLI understands and agrees that the proposed compensation arrangement will be subject to the provisions of section 328 of the Bankruptcy Code. CLI further understands and agrees that, to the extent that the aggregate interim payments made to CLI by the Debtors exceeds the amount that is ultimately allowed by the Bankruptcy Court, then CLI will be required to, and shall, promptly repay such overpayment amounts to the Debtors.

3

7.    CLI shall file an application with the Court seeking allowance of its fees and costs incurred to that date and paid pursuant to the monthly payment procedure provided for herein. In addition, at the earlier of the conclusion of CLI's services or the conclusion of the cases, CLI shall file an appropriate application seeking final allowance of all fees and costs, regardless of whether interim compensation has been paid to CLI.   In connection with is final application for allowance of all fees and costs, CLI is excused from the requirements of Rule 2016-2(d) of the Local Rules of Practice and Procedures for the United States Bankruptcy Court for the District of Delaware (the "Local Rules"), except as to that portion of Local Rule 2016-2(d) that requires CLI to identify the general project categories in which it provided services. CLI shall serve notice of its final application on the Debtors, the Committee, the Office of the United States Trustee, all parties-in-interest and all parties required to be notified pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure. Upon final allowance of such fees and costs, the Debtors shall pay to CLI the amounts allowed by this Court that were not previously paid to CLI as interim reimbursements.

Dated: Wilmington, Delaware
                    , 2001



_____
United States Bankruptcy Judge


231447v2



CC. Werkheiser & UST  7/10/01                    4

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF DELAWARE

```
IN RE:                      ) Chapter 11
ETOYS, INC., et al.,        )
                            )
              Debtors.      ) Case No. 01-706 (MFW)
                            ) through Case No. 01-709 (MFW)
                            ) Jointly Administered
                            )
```

### OPINION[1]

Before the Court are Motions filed by a shareholder, Robert
Alber ("Alber"), and an administrative claimant, Collateral
Logistics, Inc. ("CLI"), against Barry Gold ("Gold"), Morris
Nichols, Arsht & Tunnell ("MNAT") and Traub, Bonaquist, Fox LLP
("TBF") and certain of their partners (collectively "the
Respondents") seeking removal, disgorgement of fees, and
sanctions for contravening the disclosure requirements of
Bankruptcy Rule 2014 and the conflict of interest prohibitions of
section 327(a) of the Bankruptcy Code.  The Movants also ask the
Court to refer the matter for criminal and disciplinary
investigations.  The Respondents oppose the Motions.  The United
States Trustee (the "UST") initially filed a Motion seeking
disgorgement of fees from TBF but now seeks approval of a
settlement of that Motion.  A Motion seeking approval of a

---

[1]  This Opinion constitutes the findings of fact and conclusions
of law of the Court pursuant to Federal Rule of Bankruptcy
Procedure 7052, which is made applicable to contested matters by
Federal Rule of Bankruptcy Procedure 9014.

settlement with Goldman Sachs & Co. ("Goldman") is also pending.
For the reasons set forth below, the Court will strike the CLI
Motion, grant the Alber Motion as to MNAT in part, and approve
the TBF and Goldman settlements.  The Court will deny Alber's
Motion as to Gold, but articulates herein a new requirement that
officers of a debtor must in the future disclose any connections
they have with other parties in the case which create a potential
or actual conflict of interest.

I.    BACKGROUND

On March 7, 2001 ("the Petition Date"), eToys, Inc., and
certain of its affiliates (collectively "the Debtors") filed
voluntary petitions for relief under chapter 11 of the Bankruptcy
Code.  The Debtors were electronic retailers of toys and other
children's products.

On April 5, 2001, the Debtors filed applications to retain
two firms as their bankruptcy attorneys: Irell & Manella
("Irell") and MNAT.  The UST objected to Irell's retention
arguing that Irell was not disinterested under section 327(a)
because Peter Juzwiak, the Debtors' Vice President and General
Counsel, was to join the firm as a partner effective April 30,
2001.  As a result, Irell was retained as special counsel only.