2014(a), court-appointed counsel proceed <u>at</u> <u>their</u> <u>own</u> <u>risk</u>.") (emphasis in original).

        a.   <u>Goldman and its Affiliates</u>

MNAT argues that it was not aware of Goldman's involvement in this case at the time it filed its retention application because Goldman was not a creditor. In addition, because MNAT had not represented the Debtors before the case was filed (and was originally only to serve as local counsel), it was not aware of the Debtors' pre-petition transactions with Goldman which led to the conflict.

Prior to the bankruptcy filings, the Debtors had engaged Goldman to obtain a sale, merger or capital infusion for their ailing businesses. Pursuant to an engagement letter, the Debtors advanced Goldman $150,000 for out-of-pocket expenses and a $3 million success fee. That letter provided, however, that $2.5 million of the success fee was refundable if Goldman did not facilitate the sale of the Debtors' assets for at least $20 million or fifty percent of their outstanding stock. As of the Petition Date, the only transaction which had been consummated under the Goldman retention letter was the sale of BabyCenter LLC for approximately $12 million.

After the bankruptcy cases were filed, MNAT became aware of the dispute between the Debtors and Goldman. On May 25, 2001,

MNAT wrote to Goldman on behalf of the Debtors requesting at least $2.5 million of the success fee be returned. The matter was resolved by a Termination Agreement in August, 2001, pursuant to which Goldman returned approximately $2.55 million to the Debtors. MNAT admits, however, that by early June, 2001, it was aware that the Debtors had substantial other claims against Goldman. Rather than file a supplemental disclosure of its conflict, MNAT states that it "solved" the problem by involving the Committee in discussions with Goldman and ultimately arranging for the Committee to take over the representation of the estate in matters involving Goldman.

On September 26, 2001, the Debtors filed a motion to authorize the Committee to investigate and prosecute any further actions the estate may have against Goldman ("the Committee Authorization Motion"). In that Motion, MNAT disclosed that it represented Goldman in an unrelated matter. When no objections were filed, the Court granted the Committee Authorization Motion by order dated October 12, 2001.

Thereafter, the Committee asserted preference and fraudulent conveyance claims against Goldman with respect to the remaining $500,000 of the success fee. The parties have reached a settlement of that motion which would require Goldman to pay an additional $200,000 to the estate. Alber objected to that

settlement asserting that it is tainted by conflicts of interest. The Court took the Goldman settlement motion under advisement with these matters.[4]

Alber argues that MNAT's representation of the Goldman Affiliates during the pendency of the Debtors' case, while at the same time it represented Goldman in the Finova case, created a conflict of interest which is impermissible under section 327(a) of the Bankruptcy Code. He argues that MNAT intentionally failed to disclose its representation of the Goldman Affiliates at the outset of the case and that the subsequent disclosure was inadequate.

i. Disclosure

MNAT argues that the disclosure requirements do not go so far as to require the disclosure of all connections it has with all parties in interest in the case. Such a rule would be so onerous as to create an impossible task, particularly in large corporate cases. See, e.g., In re Enron Corp., No. 01-16034, 2002 WL 32034346, at *5 (Bankr. S.D.N.Y. May 23, 2002), aff'd, 2003 WL 223455 (S.D.N.Y. Feb. 3, 2003) (holding that argument that counsel should be disqualified for "a failure to disclose –

---

[4] As noted hereafter, the Committee (and now the PEDC) is also pursuing a suit in District Court in New York against Goldman related to the Debtors' initial public offering. That action is not affected by the settlement before this Court.

23

not connections as required under 2014 – but a failure to disclose every conceivable interpretation of its connections and possible consequence resulting from the connections. . . . would make disclosure under Rule 2014 an impossible task subject to endless litigation over what would be enough.").

While the disclosure requirements "may not be so onerous as to require the party to raise with the court every imaginable conflict which may occur in a bankruptcy, it certainly compels disclosure where, as here, the party had contemplated and discussed a specific situation involving a potentiality for conflict." In re BH & P, Inc., 119 B.R. 35, 44 (D.N.J. 1990), aff'd 949 F.2d 1300 (3d Cir. 1991).  In this case, there was an actual conflict beginning in May 2001, when MNAT learned that the Debtors had a claim against Goldman.  Disclosure at that time was mandated.

### ii. Conflict of interest

MNAT argues nonetheless that its representation of the Debtors was at all times consistent with the requirements of section 327(a) of the Bankruptcy Code because it did not hold any "adverse interest" with respect to the Debtors and remained "disinterested" during the engagement.  This is incorrect.  While MNAT did not hold an interest adverse to the estate, it represented one.

24

MNAT suggests, however, that Goldman did not really have an interest adverse to the Debtors because it was clear that the success fee had to be returned by Goldman. That is belied by the fact that Goldman did not immediately return the funds and it took several months to obtain even the $2.5 million. The final settlement of this dispute was filed in December 2004, more than three years later. The suggestion that there was no real adverse interest between the Debtors and Goldman is quite simply wrong. Therefore, instead of representing the Debtors in any matter involving Goldman, MNAT should have promptly filed a supplemental affidavit with the Court disclosing its connection with Goldman and let another, disinterested professional handle the matter.

MNAT contends that its representation of Goldman in the *Finova* case was not a conflict because it was unrelated to this case, was limited to acting as Delaware counsel, and only accounted for 0.24% of the firm's total billings from 2000 to 2004. In support of its argument, MNAT cites *In re Muma Servs., Inc.*, 286 B.R. 583, 591 (Bankr. D. Del. 2002). In the *Muma* case, the Court held that the limited representation of a client in another bankruptcy case did not disqualify the firm from representing the committee in a suit against the former client.

The *Muma* case is distinguishable from the instant case. First, the *Muma* case dealt with committee counsel, not debtor's

25

counsel.[5]  Second, in Muma, committee counsel did not continue to represent the other client (in fact the responsible attorney left the firm saying he was taking the client).  Third, the Court found that the client had waived any conflict by not objecting to the firm's retention by the committee for more than a year.

In this case, MNAT continued to represent Goldman in the Finova case.  Further, Goldman did not waive any conflict as is evidenced by the fact that MNAT admitted in the Committee Authorization Motion that there was a conflict and that it was not able to represent the Debtors in any action against Goldman.

Because MNAT had an actual conflict of interest it was not qualified to represent the Debtors in asserting their claims against Goldman.  See, e.g., In re Fleming Cos., 305 B.R. 389, 393 (Bankr. D. Del. 2004) ("[S]ection 327(a) imposes a per se disqualification on any professional who has an actual conflict of interest.") citing In re Pillowtex, Inc., 304 F.3d 246, 251 (3d Cir. 2002).

---

[5] Committee counsel, retained under section 1103, need only show it does not represent an interest adverse to the estate; in fact, committee counsel is specifically authorized to represent a creditor in the case so long as its interests are not adverse to the committee's.  11 U.S.C. § 1103(b).  In contrast, debtor's counsel, retained under section 327, must establish that it is disinterested, which is a higher standard.  11 U.S.C. § 101(14)(E).

26

### iii. Timing of Disclosure

MNAT asserts that it could not have disclosed its representation of the Goldman affiliates in the Finova case when the retention application was filed because it did not know at that time of Goldman's involvement in this case.

Assuming arguendo that MNAT did not know at the outset of this case that Goldman was involved, it nonetheless became aware of Goldman's involvement in May 2001, when MNAT learned that the Debtors had the right to recover the success fee from Goldman. At that time, MNAT was obligated to file a supplemental affidavit of disinterestedness, disclosing its connection with Goldman. See, e.g., Rome, 19 F.3d at 59 ("as soon as counsel acquires even constructive knowledge reasonably suggesting an actual or potential conflict . . . a bankruptcy court ruling should be obtained."). It failed to do so.

MNAT asserts, however, that it did disclose the connection with Goldman by filing the Committee Authorization Motion when the firm learned of circumstances that necessitated the additional disclosure. The Court finds that is not sufficient. The Committee Authorization Motion was filed four months after MNAT knew there was a conflict, during which time MNAT continued to represent the Debtors on the matter. Further, the disclosures should have been made in a supplemental declaration filed under

27

Bankruptcy Rule 2014(a). "It is not sufficient that the information might be mined from petitions, schedules, section 341 meeting testimony, or other sources." B.E.S. Concrete, 93 B.R. at 236.

### iv. Harm to the estate

MNAT contends nonetheless that no sanctions are warranted because there was no harm to the estate. MNAT was successful in collecting part of the success fee from Goldman and no release of any other claims was given to Goldman. MNAT also asserts that the Committee was kept informed of the issue and that, therefore, when the Committee had to take over the representation, there was no delay.

The Court rejects MNAT's arguments. Harm to the estate is not necessary to a decision to order disgorgement of fees where there is a conflict of interest. See, e.g., Leslie Fay, 175 B.R. at 531 (holding that failure to disclose representation of parties who were materially adverse to the debtors mandated disallowance of fees awarded to counsel for debtors even though counsel "caused the debtors no actual injury, and represented them in an exemplary fashion.").

The Court notes, further, that MNAT's actions did result in harm to the estate because of the duplication of effort during the summer of 2001 caused by MNAT's continued work on the Goldman

matter while keeping the Committee advised at every turn. If MNAT had simply withdrawn, the Committee counsel alone would have been billing the estate for this work.

v. Remedy

Because the case is now over, disqualification of MNAT as counsel to the Debtors is not practical. Although the Court could order disgorgement of all fees earned by MNAT after it ceased being disinterested, the Court finds that is unwarranted because MNAT did ultimately recuse itself from Goldman matters in September, 2001. Therefore, after that time it was not laboring under a conflict of interest. Because it had an actual conflict for several months (which it failed to timely disclose), the Court concludes that MNAT should disgorge all fees received in this case for work done by it on matters involving Goldman. 11 U.S.C. §328(c) ("the court may deny allowance of compensation . . . . if, at any time during such professional person's employment under section 327 . . . such professional person is not a disinterested person, or represents or holds an interest adverse to the interest of the estate with respect to the matter on which such professional person is employed."). See also, In re Granite Partners, L.P., 219 B.R. 22, 40-41 (Bankr. S.D.N.Y. 1998) (holding that court has discretion under section 328(c) to deny fees to counsel where a conflict of interest is found); B.E.S.

29

Concrete, 93 B.R. at 237 (holding that court has discretion to deny fees for failure to disclose).

        b.   GECC

With respect to GECC, MNAT admits that it did not disclose the connection. It asserts, however, that it failed to disclose the relationship because it was not aware that GECC was a creditor. GECC was not listed as a creditor on the Debtors' schedules or matrix because it apparently had received an assignment of another creditor's position. Therefore, MNAT asserts that it had no reason to disclose any connection at the time it filed its retention application.

MNAT did, however, become aware of GECC's involvement when GECC filed a notice of appearance in the case on June 4, 2001, and a motion to compel the assumption or rejection of its lease with the Debtors on June 20, 2001. Notwithstanding that notice, MNAT admits that it did not file any additional disclosure.

Instead, MNAT continued to represent the Debtors in connection with matters involving GECC. Those matters apparently included discussions with GECC which resulted in its withdrawal of the motion to compel and the Debtors' agreement to surrender the equipment to GECC. MNAT also represented the Debtors in connection with GECC's administrative claim of $72,909.87. The Debtors, represented by MNAT, objected to that claim, which was

ultimately settled for $57,767.89.  At no time did MNAT disclose (to the Court, creditors and perhaps even the Debtors) its concurrent representation of GECC in the Finova case.

Because MNAT was representing GECC in another case at the same time, its representation of the Debtors against GECC in this case constituted an actual conflict of interest, in the absence of a conflict waiver executed by the parties after full disclosure.  See, e.g., B.E.S. Concrete, 93 B.R. at 235 ("Although the parties can waive the conflict upon appropriate disclosures, the waiver is more difficult to obtain in a chapter 11 case because the debtor in possession stands in a fiduciary capacity that constrains its ability to make such a waiver.")

MNAT asserts that its failure to conduct an additional conflicts search and to make a supplemental disclosure of the GECC relationship was "an inadvertent oversight."  That does not excuse the failure.  See, e.g., BH & P, 949 F.2d at 1318 (finding that failure to disclose may result in disallowance of fees or disqualification, even if the failure was negligent and not willful); In re Jore Corp., 298 B.R. 703, 729 (Bankr. D. Mont. 2003) (same).

Because there was an actual conflict and no disclosure was made, the Court will require MNAT to disgorge the fees the firm has received for work done on behalf of the Debtors in the

31

matters involving GECC. <u>See, e.g.</u>, <u>In re Kaiser Group Int'l</u>, <u>Inc.</u>, 272 B.R. 846, 850 (Bankr. D. Del. 2002) (concluding that court has inherent power to supervise attorneys who appear before it).

    C.    <u>Traub, Bonaquist, Fox LLP</u>

        1.    <u>Alber Motion</u>

Although his pleadings are replete with hyperbole[6] and assertions that were revealed to be false when tested at trial,[7] the crux of Alber's Motion against TBF has some merit: it asserts

---

[6] An example is Alber's joinder to the UST Motion for disgorgement of fees by TBF:
> 44.  While I, ALBER, sympathize with the far reaching implications to the system (and cases as a whole throughout) of the blatant scheming that I, ALBER, feel is overwhelming proved positive by the blatant audacious disregard for the system as a whole such as the language of the hiring letter, by the vastly experienced attorney professionals of the TB&F, MNAT members in bankruptcy as legal extensive experienced professionals having filed many disclosure, fee applications, oaths etc. where even TB&F, ADA disclosed their relationship by the ADA letter in the Homelife case which ran basically almost concurrent with the eToys ESTATE and TB&F complied in part with 11 U.S.C. § 327 and Rule 2014 in Homelife and certainly was preconfirmation to the eToys PLAN of 2002, along with the admittance on March 1, 2005 of the payments by TB&F to GOLD in 2001, along with the subsequent admittance that reimbursement of the $120,000 was paid by ADA back to TB&F, creating a triangle of affiliations, along with TB&F admittance that it made a conscious decision not to disclose even after the issue came to public light in the Bonus Sales [sic] case. . . .

[7] <u>See</u> Discussion at Part E, <u>infra</u>.

32

that there is reason to disqualify TBF as counsel to the PEDC and to require disgorgement of all fees earned while TBF was counsel to the Committee because of TBF's failure at any time to disclose its relationship with Gold.

The relationship between Gold and TBF extends over many years and involves several bankruptcy cases where they were retained by the same or adverse parties. Alber refers to that relationship as "incestuous." The Court, however, differs. It is not unusual for professionals and turnaround specialists to work on the same cases. In fact, given the specialized nature of the bankruptcy practice, it is inevitable.

There is, however, one aspect of the parties' relationship that is unusual. In late 2000 or early 2001, Paul Traub, a partner in TBF, discussed with Gold the possibility of a joint venture for marketing inventory control and asset disposition services to distressed companies. Traub and Gold formed a limited liability corporation called ADA; Gold and Traub are the sole, and equal, members in ADA. Although ADA was not incorporated until April 26, 2001, Gold was compensated by ADA at the rate of $30,000 per month beginning in February 2001. Because ADA had not been formed and had no assets at that time, the compensation was actually paid by TBF. Gold and Traub testified that the funds were lent by TBF to ADA and were

33

ultimately repaid by ADA from revenues ADA earned.

Despite being members of ADA, Gold and Traub are not required to work full time for ADA and may (and do) obtain work individually. Any work done by Gold and Traub individually is not required to be shared with the other or with ADA. ADA has no offices of its own, but conducts its business from the offices of TBF. Traub testified that ADA maintains its own books and records, separate from TBF. TBF does provide administrative services for ADA which ADA reimburses, from time to time. ADA has also used TBF personnel as non-legal consultants on its cases and has paid TBF, from time to time, for those services.

In addition to the ADA relationship, in early 2001 TBF retained Gold as a consultant in connection with the OfficeMax, Inc., and Drug Emporium, Inc., cases. It is unclear when that relationship ended.

At the same time that ADA was being formed, TBF was retained (in January, 2001) by an informal committee of creditors of the Debtors. When the Debtors ultimately filed their chapter 11 petitions, TBF was retained by the Committee. Shortly thereafter, it became clear that the Debtors' senior management would not remain with the companies beyond May, 2001. The Debtors considered candidates for a restructuring executive from the Committee's and the Debtors' financial advisors. TBF, at the

34

suggestion of Traub, recommended Gold for the position. After conducting interviews, the Debtors hired Gold on June 11, 2001, as wind-down coordinator and, after obtaining insurance, as their president and chief executive officer.

In addition, Alber asserts that TBF has failed to disclose its relationship with Fleet Retail Finance, an affiliate of FleetBoston. That failure to disclose is significant, Alber asserts, because the PEDC is pursuing litigation against Goldman and FleetBoston Financial arising from the Debtors' initial public offering. TBF was one of the firms representing the PEDC in that case.[8]

At no time did Gold or TBF reveal any of these relationships. Alber asserts that TBF's failure to disclose these relationships violates the disclosure requirements of Rule 2014 and constitutes a conflict of interest warranting disgorgement of all fees earned in the case. He also asserts that the failure to disclose constitutes perjury and obstruction of justice mandating a referral of this case to the U.S. Attorney.

    a.  <u>Failure to Disclose</u>

TBF admits that it did not disclose the relationship with

---

[8] As a result of the Alber Motion, TBF has withdrawn as counsel in the IPO litigation and the PEDC is represented by others in that suit.

ADA.  At the time of their retention, TBF notes that there was no connection with ADA to be disclosed.  Further, even after the Debtor hired Gold, TBF asserts that no disclosure was mandated, because TBF has no relationship with ADA and ADA is not involved in this case.  ADA is an entity in which Traub, not TBF, has an interest.  TBF asserts it is not a member of and never obtained any income from ADA.  Further, the Debtors retained Gold, not ADA.  Therefore, TBF asserts the "connection" between this case and ADA is remote.

TBF did have a direct relationship with Gold, however, having hired him as a consultant on several of its cases.  TBF does admit, in hindsight, that it should have disclosed its relationship with Gold when the potential employment of Gold by the Debtors arose.  It contends that its failure to do so was a mistake and not intentional wrongdoing.  It argues that if it had intended to keep its relationship secret, it would not have disclosed it in the many cases in which ADA and TBF were involved.  See, e.g., Bonus Stores, No. 03-12284; In re Homelife Corp., No. 01-2412.

The duty of professionals to disclose is an ongoing one. Fed. R. Bankr. P. 2014(a); L. R. 2014-1(a).  The Court and parties in interest rely on the duty to disclose to help them monitor potential and actual conflicts.  Thus, the duty to

36

disclose is broader than the disclosure of actual conflicts, it mandates the disclosure of all connections a professional may have with the other parties in the case.

> All facts that may have any bearing on the disinterestedness of a professional must be disclosed. Consistent with the duty placed on the professional, it is the responsibility of the professional, not of the court, to make sure that all relevant connections have been brought to light. . . . So important is the duty of disclosure that the failure to disclose relevant connections is an independent basis for the disallowance of fees or even disqualification.

Leslie Fay, 175 B.R. at 533. See also, BH & P, 949 F.2d at 1317-18 (noting that professional may not leave court to search the record for undisclosed relationships); Jore, 298 B.R. at 725-26 (holding that professional must disclose all connections; he may not pick and choose which to disclose and which to ignore as unimportant).

Failure to disclose may result in disallowance of fees or disqualification, even if the failure was negligent and not willful. See, e.g., BH & P, 949 F.2d at 1318; Jore, 298 B.R. at 729. Where the failure to disclose is willful, disallowance of fees is almost assured. In re Crivello, 134 F.3d 831, 836-37 (7th Cir. 1998) (stating that "a bankruptcy court should punish a willful failure to disclose the connections required by Fed. R. Bankr. P. 2014 as severely as an attempt to put forth a fraud on the court."). Accord In re ACandS, Inc., 297 B.R. 395, 405

(Bankr. D. Del. 2003) (disallowing nunc pro tunc retention and ordering disgorgement of all fees of professional which willfully concealed relationships and potential and actual conflicts).

      b.   <u>Disqualification</u>

TBF asserts that there is no basis under the Code for its disqualification as counsel to the Committee on the facts of this case. It notes preliminarily that section 327(a) is not applicable because it was counsel to the Committee not counsel to the Debtors. 11 U.S.C. § 327(a). Instead, it asserts that the proper standard for retention of counsel for a committee is section 1103 which provides:

> An attorney . . . employed to represent a committee under section 1102 of this title may not, while employed by such committee, represent any other entity having an adverse interest in connection with the case. Representation of one or more creditors of the same class as represented by the committee shall not per se constitute the representation of an adverse interest.

11 U.S.C. § 1103(b). This provision is different from section 327(a) because (unlike counsel for the debtor) it does not require that counsel to a committee be disinterested.

Section 1103(b) does, however, require that counsel for the committee not hold or represent an adverse interest in connection with the case. An adverse interest is "any economic interest that would tend to lessen the value of the bankruptcy estate or that would create either an actual or potential dispute in which

38

the estate is a rival claimant." TWI Int'l, 162 B.R. at 675; National Liquidators, 182 B.R. at 192.

TBF asserts that there is no evidence of any actual or potential conflict between its representation of the Committee and the Debtors' hiring of Gold. It argues that Gold's employment by the Debtors was completely unrelated to his work for ADA (or TBF). ADA had no involvement with this case, and, even if it did, TBF had no interest in ADA. No one at TBF, other than Traub, had an interest in ADA. While the relationships may raise an appearance of a conflict, they are not actual conflicts and disqualification is not warranted. See, e.g., In re Marvel Entm't Group Inc., 140 F.3d 463, 476 (3d Cir. 1998) (holding that disqualification cannot be premised on the mere appearance of conflict alone though court has discretion to disqualify counsel with a potential conflict and must disqualify counsel with an actual conflict).

2.   UST Motion and Settlement

The UST Disgorgement Motion was based, like Alber's, on TBF's failure to disclose the relationship TBF and Traub had with Gold. Even if, as TBF asserts, the relationship did not constitute a conflict or adverse interest, the UST asserted that it had to be disclosed. Cf., In re CF Holding Corp., 164 B.R. 799, 806-07 (Bankr. D. Conn. 1994) (holding that debtor's counsel

39

should be sanctioned, by a reduction in fees awarded, for failure to disclose another professional's conflict of interest).

Shortly after filing the Disgorgement Motion, the UST settled that dispute. Under the settlement, TBF agreed to disgorge $750,000 of the fees received by it in this case. That amount represents approximately 50% of the total post-petition, pre-confirmation fees earned by TBF.

Settlements are favored as a means of minimizing litigation, expediting administration of estates, and providing for the efficient resolution of bankruptcy cases. In re Martin, 91 F.3d 389, 393 (3d Cir. 1996). To approve a settlement, the Court must consider four criteria: "(1) the probability of success in litigation; (2) the likely difficulties in collection; (3) the complexity of the litigation involved, and the expense, inconvenience and delay necessarily attending it; and (4) the paramount interest of the creditors." Id. Because the Disgorgement Motion is a sanctions motion, the Court should also consider the deterrent value that approval of the Settlement would have. Pearson, 200 F.3d at 42 & n.7, quoting John's Insulation, Inc. v. L. Addison & Assoc., Inc., 156 F.3d 101, 110 (1st Cir. 1998) ("The purpose of sanctions, moreover, is not merely to penalize violations of court procedures, but also to deter future violations by other parties, and thus sanctions do

40